# Case No. 21-35815
# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

BRIAN TINGLEY,
*Plaintiff - Appellant*,

v.

ROBERT W. FERGUSON, in his official capacity as Attorney General for the State of Washington; UMAIR A. SHAH, in his official capacity as Secretary of Health for the State of Washington; KRISTIN PETERSON, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance division of the Washington State Department of Health,

*Defendants - Appellees*,

EQUAL RIGHTS WASHINGTON,
*Intervenor-Defendant - Appellee*.

---

On Appeal from the United States District Court for the
Western District of Washington
Case No. 3:21-cv-05359-RJB
Honorable Robert J. Bryan, United States District Court Judge

---

### Brief of *Amicus Curiae* Institute for Faith and Family
### in Support of Plaintiff-Appellants and Reversal

---

Deborah J. Dewart, Attorney at Law
111 Magnolia Lane
Hubert, NC  28539
lawyerdeborah@outlook.com
(910) 326-4554 (phone)

*Attorney for Amicus Curiae*
Institute for Faith and Family

**CORPORATE DISCLOSURE STATEMENT**
**FRAP 26.1**

Institute for Faith and Family is a nonprofit, tax-exempt organization that does not issue stock and has no parent corporation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS............................................................................. ii

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF *AMICUS CURIAE*............................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 1

ARGUMENT ............................................................................................ 2

I.    WASHINGTON REGULATES PURE *SPEECH* ON THE BASIS OF
      CONTENT AND VIEWPOINT—CONTRARY TO SUPREME COURT
      PRECEDENT. ................................................................................. 2

      A.    The law regulates pure *speech*, not *conduct*......................... 3

      B.    The law is not neutral with respect to either content or viewpoint. ..... 6

      C.    The Supreme Court's decision in *NIFLA* rules out diminished.
            protection for "professional" speech ................................... 10

II.   COUNSELING IS NEITHER VALUE-FREE NOR RELIGIOUSLY
      NEUTRAL.................................................................................. 15

      A.    The government may not condition practice of the counseling
            profession on a requirement that the counselor forego the exercise of.
            his or her constitutional rights to free speech and religion ............... 18

      B.    The State's thinly veiled hostility to religion clashes with the.
            "benevolent neutrality" required of government ............................. 20

CONCLUSION....................................................................................... 22

STATEMENT OF RELATED CASES ................................................................ 24

CERTIFICATE OF COMPLIANCE................................................................. 25

CERTIFICATE OF SERVICE ................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Baird v. State Bar of Arizona*,
  401 U.S. 1 (1971) ............................................................................................. 19

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ........................................................................................... 9

*Brown v. Entm't Merchs. Ass'n*,
  564 U. S. 786 (2011) .................................................................................. 7, 13

*Capitol Square Review & Advisory Bd. v. Pinette*,
  515 U.S. 753 (1995) ......................................................................................... 15

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*,
  447 U.S. 557 (1980) ......................................................................................... 14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ......................................................................................... 20

*Cincinnati* v. *Discovery Network, Inc.*,
  507 U. S. 410 (1993) ......................................................................................... 10

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ................................................... 2, 4, 7, 12, 14, 18

*County of Allegheny v. ACLU*,
  492 U.S. 573 (1989) ................................................................................... 21, 22

*Emp't Div. v. Smith*,
  494 U.S. 872 (1990) ................................................................................... 18, 19

*Epperson v. Arkansas*,
  393 U.S. 97 (1968) ........................................................................................... 21

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ........................................................................................... 7

*Everson v. Bd. of Educ. of Ewing*,
   330 U.S. 1 (1947) .............................................................................. 21

*FCC v. League of Women Voters of Cal.*,
   468 U.S. 364 (1984) .............................................................................. 3

*Florida Bar v. Went-For-It, Inc.*,
   515 U.S. 618 (1995) ........................................................................... 13

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ................................................................................. 6

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995) ............................................................................. 9

*In re Primus*,
   436 U. S. 412 (1978) .......................................................................... 13

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967) ........................................................................... 19

*King v. Gov. of the State of New Jersey*,
   767 F.3d 216 (3rd Cir. 2014) ................................... 4, 10, 11, 12, 13, 14

*Lee v. Weisman*,
   505 U.S. 577 (1992) ...................................................................... 20, 22

*Lowe v. SEC*,
   472 U.S. 181 (1985) ........................................................................... 11

*Lynch v. Donnelly*,
   465 U.S. 688 (1984) .................................................................. 2, 21, 22

*McCreary County, KY v. ACLU*,
   545 U.S. 844 (2005) ........................................................................... 21

*McCullen v. Coakley*,
   573 U. S. 464 (2014) ............................................................................. 3

v

*McDaniel v. Paty*,
   435 U.S. 618 (1978) ........................................................................ 19

*Milavetz, Gallop & Milavetz, P. A.* v. *United States*,
   559 U. S. 229 (2010) ....................................................................... 14

*Moore-King v. County of Chesterfield*,
   708 F. 3d 560 (4th Cir. 2014) ......................................................... 13

*NAACP v. Button*,
   371 U.S. 415 (1963) ........................................................................ 10

*National Association for the Advancement of Psychoanalysis v.*
   *Cal. Bd. of Psychology ("NAAP")*,
   228 F.3d 1043 (9th Cir. 2000) ............................................... 3, 7, 10

*Nat'l Inst. of Family  & Life Advocates v. Becerra* ("*NIFLA*"),
   138 S. Ct. 2361 (2018) ................................ 3, 6, 8, 10, 11, 12, 13, 14

*Nat'l Socialist Party of Am. v. Village of Skokie*,
   432 U.S. 43 (1977) ............................................................................ 5

*Ohralik* v. *Ohio State Bar Assn.*,
   436 U. S. 447 (1978) ....................................................................... 14

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ................................................ *passim*

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
   961 F.3d 1062 (9th Cir. 2020) ........................................................... 6

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ........................................................................ 20

*Pickup v. Brown*,
   740 F.3d 1208 (9th Cir. 2014) .......................... 3, 4, 5, 6, 7, 11, 12, 13

*Planned Parenthood of Southeastern Pa. v. Casey*,
   505 U. S. 833 (1992) ....................................................................... 14

*Police Dep't of Chicago v. Mosley*,
408 U.S. 92 (1972) ........................................................................ 6

*Prater v. City of Burnside*,
289 F.3d 417 (6th Cir. 2002) ...................................................... 18

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ...................................................................... 7

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) ...................................................................... 8

*Snyder v. Phelps*,
562 U.S. 443 (2011) .................................................................... 11

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .................................................................... 12

*Texas v. Johnson*,
491 U.S. 397 (1989) ................................................................. 2, 9

*Thomas v. Collins*,
323 U.S. 516 (1945) ................................................................. 6, 18

*Thompson v. Western States Medical Ctr.*,
535 U.S. 357 (2002) ...................................................................... 2

*Tingley v. Ferguson*,
2021 U.S. Dist. LEXIS 164063 (W.D. Wash. 2021) .................. 3, 4, 5, 8, 15, 16

*Torcaso v. Watkins*,
367 U.S. 488 (1961) .................................................................... 19

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ................................................................. 7, 10

*United States v. Alvarez*,
567 U. S. 709 (2012) ............................................................. 12, 13

*United States v. Ballard*,
  322 U.S. 78 (1944) ........................................................................... 18

*United States* v. *Schwimmer*,
  279 U.S. 644 (1929) ........................................................................... 2

*United States v. Stevens*,
  559 U.S. 460 (2010) ......................................................................... 12

*Walz v. Tax Comm'n*,
  397 U.S. 664 (1970) ........................................................................... 9

*Watson v. State of Maryland*,
  218 U.S. 173 (1910) ......................................................................... 10

*Welch v. Brown*,
  834 F.3d 1041 (9th Cir. 2016) ......................................................... 15

*West Va. State Bd. of Educ. v. Barnette*,
  319 U. S. 624 (1943) ........................................................................... 1

*Wollschlaeger* v. *Governor of Florida*,
  848 F. 3d 1293 (11th Cir. 2017) ................................................... 4, 12

*Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*,
  471 U. S. 626 (1985) ....................................................................... 14

*Zorach v. Clauson*,
  343 U.S. 306 (1952) ......................................................................... 21

**Statutes**

Cal. Bus. & Prof. Code § 865(b) ........................................................ 5

Wash. Rev. Code § 18.130.020(4) ...................................................... 5

Wash. Rev. Code § 18.130.180(27) (the "Censorship Law") ................. 1

Wash. Rev. Code §§ 18.225.030(4) ...................................................... 16

## Other Authorities

Jay E. Adams, *Competent to Counsel* (1970) ......................................... 17

Berg, *Toward a First Amendment Theory of Doctor-Patient*
   *Discourse and the Right To Receive Unbiased Medical Advice*,
   74 B. U. L. Rev. 201 (1994) ............................................................. 12

Allen E. Bergin and Sol L. Garfield,
   *Handbook of Psychotherapy and Behavior Change*
   (5th Edition) (2004) ................................................................... 17, 18

Gary R. Collins, *Can You Trust Psychology?* (1988)............................ 17

Michael W. McConnell, *"God is Dead and We have Killed Him!"*
   *Freedom of Religion in the Post-Modern Age*,
   1993 BYU L. Rev. 163 (1993) ........................................................... 19

Nora O'Collaghan, *Lessons From Pharaoh and the Hebrew Midwives:*
   *Conscientious Objection to State Mandates as a Free Exercise Right*,
   39 Creighton L. Rev. 561 (2006)...................................................... 19

Thomas Szasz, *The Myth of Psychotherapy* (1978)............................... 17

Siang-Yan Tan, *Counseling and Psychotherapy:*
   *A Christian Perspective* (2011) ...................................................... 17

Paul C. Vitz, *Psychology as Religion* (1994)......................................... 17

https://biblicalcounseling.com/about/beliefs/positions/standards-of-doctrine/.......16

## INTEREST OF *AMICUS CURIAE*[1]

Institute for Faith and Family, as *amicus curiae*, respectfully submits that the District Court decision should be reversed.

*Amicus curiae* Institute for Faith and Family is a North Carolina nonprofit corporation established to preserve and promote faith, family, and freedom through public policies that protect constitutional liberties, including the right to live and work according to conscience and faith. See https://iffnc.com.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Washington's Censorship Law (Wash. Rev. Code § 18.130.180(27)) is a direct attack on pure speech that codifies the State's viewpoint on one of the most contentious social issues of our time. The "fixed star in our constitutional constellation"—barring any public official from prescribing orthodoxy in religion (*West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943))—shines across decades of precedent and prohibits this draconian law that conditions Tingley's counseling practice on the demise of his speech and religious liberties. The statute flouts the Constitution, which "affirmatively mandates accommodation, not merely

---

[1] The parties have consented to the filing of this brief. *Amicus curiae* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission.

tolerance, of all religions, and forbids hostility towards any." *Lynch v. Donnelly*, 465 U.S. 668, 672 (1974).

Counseling is not religiously neutral. On the contrary, counseling is a profession that uniquely touches religion. Religion and counseling both involve thoughts, emotions, speech, conduct, conscience, morality, and personal *values*. Counselors are not robots, and values cannot be extracted from counseling.

## ARGUMENT

## I. WASHINGTON REGULATES PURE *SPEECH* ON THE BASIS OF CONTENT AND VIEWPOINT—CONTRARY TO SUPREME COURT PRECEDENT.

American free speech jurisprudence has long guarded free expression, even "the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting). It is a "bedrock principle underlying the First Amendment" that the government may not suppress an idea merely because some (or even a majority) might find it "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *Otto v. City of Boca Raton*, 981 F.3d 854, 872 (11th Cir. 2020).

In enacting its Censorship Law, Washington bypassed the Supreme Court's warning that "[i]f the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try." *Thompson v. Western States Medical Ctr.*, 535 U.S. 357, 383 (2002); *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). No

matter how politically popular it is to promote homosexuality, transgenderism, or other novel sexualities, the government must not fail "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U. S. 464, 476 (2014), quoting *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 377 (1984). Policing the content of "professional" speech risks suppressing that free "marketplace of ideas." *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2374 (2018).

### A.     The law regulates pure *speech*, not *conduct*.

"If speaking to clients is not speech, the world is truly upside down." *Otto*, 981 F.3d at 866. Professional *conduct* may be regulated even if it incidentally involves speech. *NIFLA*, 138 S. Ct. at 2372. But like the ordinances in *Otto* and other comparable laws, Washington's statute "sanction[s] speech directly, not incidentally." *Otto*, 981 F.3d at 866.

The district court evades the obvious First Amendment concerns by diverting its attention to "treatment." Citing an early Ninth Circuit decision, "psychoanalysis is the treatment of emotional suffering and depression, *not* speech." *Tingley v. Ferguson*, 2021 U.S. Dist. LEXIS 164063, *14 (W.D. Wash. 2021), quoting *National Association for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology ("NAAP")*, 228 F.3d 1043, 1054 (9th Cir. 2000); *Pickup v. Brown*, 740 F.3d 1208, 1226 (9th Cir. 2014). In *Pickup*, California had "ban[ned] a form of

treatment for minors" (*id.* at 1229) while allowing counselors to discuss sexual orientation change efforts with their minor clients. *Tingley*, *15. The district court found Washington's prohibition "analogous to [a] doctor giving a prescription for marijuana," as in *Conant*, because it "involves engaging in a specific act designed to provide treatment." *Id.*, *17.

The government plays word games, attempting to regulate speech by improperly "relabeling it as conduct." *Otto*, 981 F.3d at 865. Such "relabeling" is "unprincipled and susceptible to manipulation." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc). As this circuit observed in *Pickup*, "past aversive treatments" included "inducing nausea, vomiting, or paralysis; providing electric shocks; or having an individual snap an elastic band around the wrist when aroused by same-sex erotic images or thoughts." *Pickup*, 740 F.3d at 1222. These practices, if prohibited on a content-neutral basis, might rightly be considered "conduct." But this case, like others, restricts "purely speech-based therapy" (*Otto*, 981 F.3d at 859), "talk therapy . . . administered solely through verbal communication." *King v. Gov. of the State of New Jersey*, 767 F.3d 216, 221 (3rd Cir. 2014). The Third Circuit had no trouble concluding that SOCE[2] implicated *speech*, rather than *conduct*, for First Amendment purposes. *Id.* at 225, 229.

---

[2] Sexual Orientation Change Efforts ("SOCE").

In a strange twist, much like falling down Alice-in-Wonderland's rabbit-hole, the SOCE bans in California and Washington expressly allow "discussing various treatment options, including conversion therapy." *Tingley*, *18, citing Wash. Rev. Code 18.130.020(4) and Cal. Bus. & Prof. Code § 865(b). The therapist may even *recommend* SOCE treatment, so long as someone else provides it. *Tingley*, *18. California law also did not prohibit counselors from "communicating with the public about SOCE," "expressing their views to patients, whether children or adults," or "referring minors to unlicensed counselors, such as religious leaders." *Pickup*, 740 F.3d at 1223. Close scrutiny would admittedly be required for "content- or viewpoint-based regulation of communication *about* treatment" but "*treatment itself*" could be regulated. *Id.* at 1231.

This hair-splitting exercise collides with the Constitution. "The First Amendment does not [merely] protect the right to speak about banned speech; *it protects speech itself*, no matter how disagreeable that speech might be to the government." *Otto*, 981 F.3d at 863 (emphasis added). In *Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43 (1977), it would have been bizarre to suggest that "people were welcome to *advocate* for a pro-Nazi demonstration" but "could not actually hold the demonstration." *Otto*, 981 F.3d at 863. And it would be a strange counseling session if a therapist recommended the benefits of SOCE but

5

could not provide it. *Id*. Indeed, since the therapy itself is speech, it could be impossible to distinguish between talking *about* SOCE and actually providing it.

Finally, courts must consider the practical effect of a law to determine whether it implicates speech. *Thomas v. Collins*, 323 U.S. 516, 536 (1945). Even a law that "may be described as directed at conduct" implicates speech where "the conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (regulation of what educational programs may be offered "squarely implicates the First Amendment"). There is no question that SOCE itself, or even discussing it, communicates a message.

## B. The law is not neutral with respect to either content or viewpoint.

The speech involved in this case is "highly controversial" but "the First Amendment has no carveout for controversial speech." *Otto*, 981 F.3d at 859. Like the abortion issue in *NIFLA*, sexuality is "anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at 2372. At the heart of the First Amendment is the principle that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). But if the district court decision stands, it will hand the government "a new and powerful tool to silence expression based on a political or moral judgment."

6

*Pickup*, 740 F.3d at 1216 (O'Scannlain, J., dissenting from denial of rehearing en banc). Using "the guise of a professional regulation," the district court "insulates from First Amendment scrutiny" Washington's prohibition of "politically unpopular expression." *Id*. at 1215.

Washington's Censorship Law is unquestionably content-based because it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In *Conant*, similarly, the government penalized physicians precisely because of the content—discussions with their patients about the medical use of marijuana. *Conant*, 309 F.3d at 637. These statutes contrast with the content-neutral law considered in *NAAP*, where California did not "dictate the content of what is said in therapy" or prohibit particular "psychoanalytical methods." *NAAP*, 228 F.3d at 1055-1056.

Importantly, the "mere assertion of a content-neutral purpose" cannot salvage Washington's statute, "which, on its face, discriminates based on content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642-643 (1994). Regardless of the law's purpose, the first question is "whether it restricts or penalizes speech on the basis of that speech's content." *Otto*, 981 F.3d at 862. Here, as in past SOCE cases, the law purports to protect children. But important as that interest is, it "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entm't Merchs. Ass'n*, 564 U. S. 786, 794-95 (2011); *see also Erznoznik v. City of*

*Jacksonville*, 422 U.S. 205, 213-14 (1975) (speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them"); *Otto*, 981 F.3d at 868 (citing both cases).

Washington's Censorship Law also discriminates based on viewpoint, as revealed by the "significant carveout" (*Otto*, 981 F.3d at 860) for counseling that provides "acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development that do not seek to change sexual orientation or gender identity." Wash. Rev. Code § 18.130.020(4)(b); *Tingley*, at *4. Viewpoint-based regulations like these are "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Such regulations are "a matter of serious constitutional concern." *NIFLA*, 138 S. Ct. at 2378 (Kennedy, J., concurring). Like the law examined in *NIFLA*, Washington's statute "is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *Id*. Washington attempts to "codify a particular viewpoint—sexual orientation is immutable, but gender is not." *Otto*, 781 F.3d at 864. Even more, the law codifies the viewpoint that homosexuality and transgenderism are normal, morally right, and should be affirmed.

It is not the business of government to silence one side of the ongoing political and moral debates about sexuality. The government "is not free to interfere with

speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 661 (2000), quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995). Washington unlawfully demands that licensed counselors conform to the State's view on one side of a contentious topic. Tingley's speech would be protected even if it were an unpopular minority viewpoint. *Dale,* 530 U.S. at 660; *Texas v. Johnson*, 491 U.S. 397 (burning American flag). Instead, his views follow centuries of moral and *religious* teaching. Washington's viewpoint discrimination is especially disturbing in a changing social environment—"the fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Dale,* 530 U.S. at 660. People of faith are entitled to a voice and "frequently take strong positions on public issues." *Walz v. Tax Comm'n*, 397 U.S. 664, 670 (1970). "We could not expect otherwise, for religious values pervade the fabric of our national life." *Id*. at 670.

The religious beliefs at issue here touch a matter of intense public controversy. Courts and legislatures across America continue to address a wide spectrum of LGBT issues. The controversy has only escalated following the Supreme Court's redefinition of marriage in a manner that conflicts with many religious traditions. It

is not the business of *any* government official in *any* position to coerce *any* citizen's chosen perspective on this hot-button topic.

### C. The Supreme Court's decision in *NIFLA* rules out diminished protection for "professional" speech.

Attempts to regulate "professional" speech raise the specter of viewpoint discrimination—"the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *NIFLA*, 138 S. Ct. at 2374, quoting *Turner*, 512 U.S. at 641; *Otto*, 781 F.3d at 861.

**Licensing**. States have long held authority to impose licensing requirements for professions that require special education and training. *See NAAP*, 228 F.3d 1043 (upholding licensing scheme for psychotherapy). This power "extends . . . particularly to those [trades] which closely concern the public health." *King*, 767 F.3d at 229, quoting *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910). But as the Supreme Court has cautioned in considering how to define "professional speech," the states do not have "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA*, 138 S. Ct. at 2375. Otherwise, they would have a "powerful tool" to impose "invidious discrimination of disfavored subjects." *Id.*, quoting *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 423-424, n. 19 (1993).

**Constitutional collision.** "[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *NAACP* v. *Button*, 371 U. S.

415, 439 (1963); *NIFLA*, 138 S. Ct. at 2373. The SOCE cases—*Pickup*, *King*, *Otto*, and now this case—demonstrate the danger of subjecting "professional speech" to a diminished standard for First Amendment purposes. The state does not have carte blanche to engage in blatant viewpoint discrimination, especially concerning a contentious matter of public concern that also involves deeply held religious convictions. *See, e.g., Snyder v. Phelps*, 562 U.S. 443 (2011). On the contrary, the state may cross the line and create a "collision between the power of government to license and regulate" and the free speech rights "guaranteed by the First Amendment." *King*, 767 F.3d at 229, quoting *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring in the result). As some courts have acknowledged, "[a]t some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press." *King*, 767 F.3d at 230, quoting *Lowe*, 472 U.S. at 228, 230 (White, J., concurring in the result).

**Medical/Health Context**. Where medical treatment is concerned, "a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream, or even dangerous, is entitled to robust protection under the First Amendment—just as any person is—even though the state has the power to regulate medicine." *Pickup*, 740 F.3d at 1227; *see Lowe*, 472 U.S. at 232 (White, J., concurring). One important concern is the confidential nature of the doctor-patient relationship. "Doctors help patients make deeply personal decisions, and their

11

candor is crucial." *Wollschlaeger*, 848 F. 3d at 1328 (W. Pryor, J. concurring). In the past, governments have "manipulat[ed] the content of doctor-patient discourse" to increase state power and suppress minorities." *NIFLA*, 138 S. Ct. at 2374, citing Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right To Receive Unbiased Medical Advice*, 74 B. U. L. Rev. 201, 201-202 (1994). Frank and open communication is essential. *Conant*, 309 F.3d at 636. Finally, the Supreme Court has "stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" *NIFLA*, 138 S. Ct. at 2374, quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).

**New speech categories**. The Supreme Court has strongly cautioned lower courts against exercising "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Alvarez*, 132 S. Ct. 2537 (2012) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). *See King*, 767 F.3d at 229; *Otto*, 981 F.3d at 866 (acknowledging this limitation). "The Supreme Court has chastened us lower courts for creating, out of whole cloth, new categories of speech to which the First Amendment does not apply." *Pickup*, 740 F.3d at 1221 (O'Scannlain, J., dissenting from denial of rehearing en banc). Nevertheless, some courts have carved out "professional speech" as "a separate category of speech that is subject to different rules." *NIFLA*, 138 S. Ct. at 2371, citing *King*, 767 F.3d at 232 ("a licensed professional does not enjoy the full

12

protection of the First Amendment when speaking as part of the practice of her profession"); *Pickup*, 740 F.3d at 1227-1229; *Moore-King* v. *County of Chesterfield*, 708 F. 3d 560, 568-570 (4th Cir. 2014).

The Supreme Court has never recognized "professional speech" as a separate category subject to diminished First Amendment protection. "Speech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 138 S. Ct. at 2371-2372. The Court explained its reluctance to "exempt a category of speech from the normal prohibition on content-based restrictions." *Id.* at 2372, quoting *United States* v. *Alvarez*, 567 U. S. at 722 (plurality opinion). Such an exemption would require "persuasive evidence" of a "long tradition." *NIFLA*, 138 S. Ct. at 2372, quoting *Brown v. Entm't Merchs. Ass'n*, 564 U. S. at 792. No such evidence or tradition has been recognized by the Supreme Court, as the Eleventh Circuit recognized: "In fact, the *NIFLA* decision not only addressed similar doctrinal issues to those we face here—it directly criticized other circuit decisions [*Pickup, King*] approving of SOCE bans." *Otto*, 981 F.3d at 867.

**Standard for "Professional" Speech**. Supreme Court "precedents have long protected the First Amendment rights of professionals." *NIFLA*, 138 S. Ct. at 2374; *In re Primus*, 436 U. S. 412, 432 (1978) (noncommercial speech of lawyers). Professional speech may be entitled to "the strongest protection our Constitution has to offer." *Florida Bar v. Went-For-It, Inc.*, 515 U.S. 618, 634 (1995). As this circuit

acknowledged, "[b]eing a member of a regulated profession does not . . . result in a surrender of First Amendment rights." *Conant*, 309 F.3d at 637. The Third Circuit departed from the standard articulated in *NIFLA*, concluding that a regulation could survive a free speech challenge if it "directly advance[d] the State's substantial interest in protecting its citizens from harmful or ineffective professional practices" and was "not more extensive than necessary to serve that interest." *King*, 767 F.3d at 225, 233. This tracks the standard for commercial speech announced in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*, 447 U.S. 557, 566 (1980), but it does not conform to current Supreme Court precedent as articulated in *NIFLA*.

There are two narrow circumstances where professional speech may be limited. First, professionals may be required to "disclose factual, noncontroversial information." *NIFLA*, 138 S. Ct. at 2372; *see Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 651 (1985); *Milavetz, Gallop & Milavetz, P. A.* v. *United States*, 559 U. S. 229, 250 (2010); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455-456 (1978). Second, states may regulate professional *conduct* (assuming it is truly conduct rather than pure speech), even if it incidentally implicates speech. *NIFLA*, 138 S. Ct. at 2372; *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U. S. 833, 884 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.).

14

## II. COUNSELING IS NEITHER VALUE-FREE NOR RELIGIOUSLY NEUTRAL.

Counseling and religion both involve values, morality, thoughts, beliefs, emotions, and conduct—including sexual conduct and morality. Counseling is not a hard science, but a highly subjective undertaking. What Washington regulates is *religious* speech, which is not only "as fully protected . . . as secular private expression," but historically, "government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (internal citations omitted). Tingley's clients typically share his own "sincerely held *religious* beliefs conflicting with homosexuality, and voluntarily seek SOCE counseling in order to live in congruence with their faith and to conform their identity, concept of self, attractions, and behaviors to their sincerely held *religious* beliefs." *Otto*, 981 F.3d at 860 (emphasis added). The State claims it does not explicitly target religion—"the object of the Conversion Law is not to infringe upon or restrict practices *because of* their religious motivation" (*Tingley*, \*14) and that it "regulates conduct only *within the confines of the counselor-client relationship*" (*id*., quoting *Welch v. Brown*, 834 F.3d 1041, 1044 (9th Cir. 2016)). But the very wording of the statute tacitly admits that Washington has wandered into theological territory. The law is inapplicable to therapy provided "under the auspices of a religious denomination, church, or religious organization."

15

Wash. Rev. Code § 18.225.030(4); *Tingley*, *5. That disclaimer does not salvage the statute; it simply highlights the inherently religious nature of counseling and the statute's blatant violation of religious liberty.

Many counseling centers exist to serve Christian clients. So do entire professional associations, e.g., American Association of Christian Counselors (www.aacc.net); National Christian Counselors Association (www.ncca.org); Association of Certified Biblical Counselors (www.biblicalcounseling.com); Christian Counseling and Educational Foundation (www.ccef.org); Institute for Biblical Counseling and Discipleship (https://ibcd.org). In the Preamble to its doctrinal standards, the Association of Certified Biblical Counselors emphasizes the *theological* nature of its mission: "We are an association of Christians who have been called together by God to help the Church of Jesus Christ excel in the ministry of biblical counseling. We do this with the firm resolve that counseling is a fundamentally *theological* task. The work of understanding the problems which require counseling and of helping people with those problems is *theological* work requiring *theological* faithfulness in order to accomplish that effectiveness which honors the triune God." (emphasis added)[3] Washington's rigid stance will exclude many people of faith from entering the counseling profession.

---

[3] https://biblicalcounseling.com/about/beliefs/positions/standards-of-doctrine/.

Among those who share Tingley's Christian worldview, there is vigorous debate concerning whether (or to what extent) theories of modern psychotherapy should be integrated with religious doctrine. *See, e.g.*, Paul C. Vitz, *Psychology as Religion* (1994); Jay E. Adams, *Competent to Counsel* (1970); Gary R. Collins, *Can You Trust Psychology?* (1988); Siang-Yan Tan, *Counseling and Psychotherapy: A Christian Perspective* (2011). The existence of these discussions is strong testimony that counseling is not religiously neutral.

Outside the faith community, psychiatrist Thomas Szasz observed that "psychotherapy is a modern, scientific-sounding name for what used to be called the 'cure of souls.'" Thomas Szasz, *The Myth of Psychotherapy* (1978), 26. One reason he wrote *The Myth of Psychotherapy* was: "to show how, with the decline of religion and the growth of science in the eighteenth century, the cure of (sinful) souls, which had been an integral part of the Christian religions, was recast as the cure of (sick) minds, and became an integral part of medicine." *Id.* at xxiv.

The counseling profession is not uniform. There are a multitude of competing approaches:

> A clear trend in psychotherapeutic interventions since the mid-1960s has been the proliferation not only of the types of practitioners, but also of the types and numbers of psychotherapies used alone and in combination in day-to-day practice. Garfield (1982) identified 60 forms of psychotherapy in use in the 1960s. In 1975, the Research Task Force of the National Institute of Mental Health estimated that there were 125 different forms. Herink (1980) listed over 200 separate approaches, while Kazdin (1986) noted 400 variants of psychotherapy.

17

Allen E. Bergin and Sol L. Garfield, *Handbook of Psychotherapy and Behavior Change* (5th Edition) (2004), 6.

**A.   The government may not condition practice of the counseling profession on a requirement that the counselor forego the exercise of his or her constitutional rights to free speech and religion.**

The First Amendment entitles Americans to enter the counseling profession without sacrificing their religious beliefs about marriage and sexuality. "Being a member of a regulated profession does not . . . result in a surrender of First Amendment rights." *Conant*, 309 F.3d at 637, citing *Thomas v. Collins*, 323 U.S. at 531 ("the rights of free speech and a free press are not confined to any field of human interest"). The Constitution "protects not only the right to hold a particular religious belief, but also the right to engage in conduct motivated by that belief." *Prater v. City of Burnside*, 289 F.3d 417, 427 (6th Cir. 2002); *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990) ("the exercise of religion often involves not only belief and profession but the performance of (or abstention from) physical acts").

The drafters of the Constitution "fashioned a charter of government which envisaged the widest possible toleration of conflicting views." *United States v. Ballard*, 322 U.S. 78, 87 (1944). Washington tolerates no dissenting voices, unilaterally imposing a secular orthodoxy that represents only one side of a contentious issue that intersects law, religion, philosophy, morality, and politics. Washington's Censorship Law is a massive violation of Tingley's rights that implicates both speech *and* religion. People of faith who are forced to abandon their

moral principles in the workplace are squeezed out of full participation in civic life. Nora O'Callaghan, *Lessons From Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates as a Free Exercise Right*, 39 Creighton L. Rev. 561, 561-3 (2006). If religion is thrust to the private fringes of life, constitutional guarantees ring hollow. Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163, 176 (1993).

A citizen may not be excluded from public office based on "state-imposed criteria forbidden by the Constitution." *Torcaso v. Watkins*, 367 U.S. 488, 495-496 (1961) (striking down requirement that notary public declare a belief in God). *Torcaso's* holding encompasses both religious belief and conduct. "The government may not...impose special disabilities on the basis of religious views or religious status." *Smith,* 494 U.S. at 877. The Supreme Court, striking down a Tennessee statute that disqualified religious leaders from public office, reasoned that "ministerial status is defined in terms of conduct and activity rather than in terms of belief." *McDaniel v. Paty*, 435 U.S. 618, 627 (1978). Tingley is not compelled to become a counselor, but he may not be excluded from the profession by unconstitutional criteria. *Baird v. State Bar of Arizona*, 401 U.S. 1, 6-7 (1971); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 607 (1967). Counseling, like the practice of law, "is not a matter of grace, but of right for one who is qualified by his learning

19

and his moral character." *Baird*, 401 U.S. at 8. More generally, the state "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

### B. The State's thinly veiled hostility to religion clashes with the "benevolent neutrality" required of government.

"[T]he Free Exercise Clause pertain[s] if the law at issue discriminates against some or all religious beliefs . . . ." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). The Clause "protects against governmental hostility which is masked as well as overt." *Id*. at 534. Religious teachings commonly include standards of conduct, including sexual morality. The Washington law, even absent a facial attack on religion, reeks of hostility toward religious traditions that teach the religious view of marriage as a relationship between one man and one woman and do not affirm same-sex relationships or the ability to transition to the opposite sex.

This Court has a "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). "A state-created orthodoxy"—Washington's preferred views about sexual morality—"puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." *Id*. at 592. The Constitution demands a benevolent government neutrality so that each religious

20

creed may "flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). The Framers intentionally protected "the integrity of individual conscience in religious matters." *McCreary County, KY v. ACLU*, 545 U.S. 844, 876 (2005).

Washington runs roughshod over Tingley's conscience, exhibiting the very hostility the Constitution forbids. The Religion Clauses forbid government hostility or callous indifference toward religion. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *Lynch v. Donnelly*, 465 U.S. at 673. "No person can be punished for entertaining or professing religious beliefs or disbeliefs. . . ." *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15-16 (1947). Washington punishes Tingley, his clients, and others like them for holding to their religious beliefs. "State power is no more to be used so as to handicap religions than it is to favor them." *Id*. at 18. Washington handicaps both counselors and clients who will not espouse the State's view of sexual morality. The State unlawfully suppresses Tingley's religious beliefs and excludes him from serving others in the community as a counselor.

Washington "conveys a message" strongly disapproving Tingley's religious beliefs. *Lynch v. Donnelly*, 465 U.S. at 690 (O'Connor, J., concurring); *County of Allegheny v. ACLU*, 492 U.S. 573, 597 (1989). The State not only inhibits Tingley's ability to adhere to his religious faith—it renders his religion relevant to his standing in the community, potentially barring him from his chosen profession unless he

abandons his beliefs. *Id.* at 594. Washington's frontal assault on Tingley's religious beliefs is a more personalized disapproval—with more serious, permanent consequences—than many earlier cases where government has limited religious expression. *See, e.g., Lynch v. Donnelly*, 465 U.S. at 678-679 (creche in city Christmas display); *County of Allegheny v. ACLU*, 492 U.S. 573 (creche and menorah display); *Lee v. Weisman*, 505 U.S. at 592 (high school graduation invocation).

If "[t]he Constitution forbids the State to exact religious conformity from a student as the price of attending her own high school graduation" (*Lee v. Weisman*, 505 U.S. at 596)—then it surely precludes exacting such conformity and "employ[ing] the machinery of the State to enforce religious orthodoxy"—as the price of entering or remaining in the counseling profession. *Id*. at 592.

## CONCLUSION

Counseling necessarily implicates personal values, beliefs, and morality. When people of faith become counselors or seek counseling, is also intersects religion. Clients are best served by a system that incorporates respect for the values and conscience of both counselor and client. Washington's statutory scheme fails to comply with the Constitution by preserving the counselor's liberties of free speech and religion.

This Court should reverse the district court ruling.

DATED:     December 13, 2021                    Respectfully submitted,

                                                /s/ Deborah J. Dewart
                                                Deborah J. Dewart
                                                111 Magnolia Lane
                                                Hubert, NC 28539
                                                (910) 326-4554
                                                lawyerdeborah@outlook.com

                                                Attorney for *Amicus Curiae*
                                                Institute for Faith and Family

## STATEMENT OF RELATED CASES
### 9th Cir. Rule 28-2.6

There are no related cases currently pending before the Court.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because:

This brief contains **5,201** words, including footnotes, but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.


DATED:  December 13, 2021  /s/ Deborah J. Dewart

Deborah J. Dewart
Attorney for *Amicus Curiae*
Institute for Faith and Family

25

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2021, I electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


DATED:     December 13, 2021          /s/ Deborah J. Dewart
                                      Deborah J. Dewart
                                      Attorney for *Amicus Curiae*
                                      Institute for Faith and Family