Nos. 21-35815, 21-35856

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

BRIAN TINGLEY,

*Plaintiff-Appellant/Cross-Appellee*,

v.

ROBERT W. FERGUSON, in his official capacity as Attorney General for the State of Washington; UMAIR A. SHAH, in his official capacity as Secretary of Health for the State of Washington; and KRISTIN PETERSON, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance Division of the Washington State Department of Health,

*Defendants-Appellees/Cross-Appellants*,

EQUAL RIGHTS WASHINGTON,

*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court for the
Western District of Washington, Case No. 3:21-cv-05359-RJB
The Honorable Robert J. Bryan

## BRIEF FOR STATE APPELLEES/CROSS-APPELLANTS

ROBERT W. FERGUSON
Attorney General

KRISTIN BENESKI, WSBA #45478          800 Fifth Avenue, Suite 2000
First Assistant Attorney General           Seattle, WA 98104
CRISTINA SEPE, WSBA #53609            Kristin.Beneski@atg.wa.gov
JEFFREY C. GRANT, WSBA #11046        Cristina.Sepe@atg.wa.gov
SIERRA MCWILLIAMS, WBSA #48544      Jeffrey.Grant@atg.wa.gov
Assistant Attorneys General                Sierra.McWilliams@atg.wa.gov

# TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................1

II.   JURISDICTIONAL STATEMENT ...................................................2

III.  STATUTORY AUTHORITIES .........................................................3

IV.   ISSUES PRESENTED .......................................................................3

V.    STATEMENT OF THE CASE ..........................................................4

    A.  Conversion Therapy Is Widely Discredited ................................4

    B.  SB 5722 Prohibits Licensed Professionals From Practicing
       Conversion Therapy on Minors.....................................................7

    C.  Procedural History.....................................................................13

VI.   SUMMARY OF THE ARGUMENT ...............................................14

VII.  STANDARD OF REVIEW ..............................................................16

VIII. ARGUMENT ...................................................................................17

    A.  This Case Is Nonjusticiable.......................................................17

        1.  Tingley lacks standing and his claims are unripe ...............17

        2.  The district court correctly determined that Tingley lacks
           third-party standing .............................................................22

        3.  Tingley's claims are also prudentially unripe.....................25

    B.  The District Court Correctly Dismissed Tingley's Claims
       Because They All Fail as a Matter of Law.................................28

        1.  Tingley's free speech claims fail because SB 5722 regulates
           conduct, not speech .............................................................28

a.  *Pickup* is controlling.....................................................28

b.  *NIFLA* has not altered *Pickup*'s controlling status........31

c.  SB 5722 regulates conduct, not speech .........................42

d.  SB 5722 neither discriminates based on content or
    viewpoint nor chills protected speech ...........................45

e.  SB 5722 is constitutional under any level of scrutiny...46

    (1)  SB 5722 is rationally related to Washington's
         interest in protecting minors.................................46

    (2)  SB 5722 also satisfies heightened scrutiny ..........47

2.  Tingley's due process claim fails because SB 5722 is clear
    and does not allow for arbitrary enforcement......................51

3.  Tingley's free exercise claim fails because SB 5722 is
    neutral and generally applicable ..........................................58

    a.  SB 5722 is neutral and generally applicable ................59

    b.  Tingley cannot state a "hybrid rights" claim.................66

4.  Tingley's third-party claims necessarily fail ......................67

C.  The District Court Properly Denied Tingley's Motion for
    Preliminary Injunction Because He Failed to Show a Likelihood
    of Success on the Merits of His Claims ....................................68

IX.  CONCLUSION..................................................................................70

ADDENDUM

## TABLE OF AUTHORITIES

## <u>Cases</u>

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967) ........................................................................ 27

*Aleman Gonzalez v. Barr*,
    955 F.3d 762 (9th Cir. 2020) .......................................................... 36

*American Beverage Association v. City and County of San Francisco*,
    916 F.3d 749 (9th Cir. 2019) .......................................................... 38

*Anderson v. Holder*,
    673 F.3d 1089 (9th Cir. 2012) ........................................................ 11

*Barsky v. Bd. of Regents of Univ. of State of N.Y.*,
    347 U.S. 442 (1954) .......................................................................... 7

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) .................................................................... 69

*Bostock v. Clayton Cnty., Ga.*,
    140 S. Ct. 1731 (2020) .................................................................... 56

*Branom v. State*,
    974 P.2d 335 (Wash. Ct. App. 1999) ............................................. 40

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
    750 F.3d 184 (2d Cir. 2014) ........................................................... 63

*Cal. Hotels & Lodging Ass'n v. City of Oakland*,
    393 F. Supp. 3d 817 (N.D. Cal. 2019) ........................................... 39

*Cal. Pro-Life Council, Inc. v. Getman*,
    328 F.3d 1088 (9th Cir. 2003) ........................................................ 21

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
    271 F.3d 1141 (9th Cir. 2001) ........................................................ 56

*CDK Glob. LLC v. Brnovich*,
  16 F.4th 1266 (9th Cir. 2021)................................................................ 16, 68

*Central Rabbinical Congress of the United States & Canada v. New York City Department of Health & Mental Hygiene*,
  763 F.3d 183 (2d Cir. 2014)................................................................... 64, 65

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ..................................................................................... 62

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) .............................................................................. passim

*Colwell v. Dep't of Health & Hum. Servs.*,
  558 F.3d 1112 (9th Cir. 2009)......................................................... 25, 26, 27

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002).................................................................. 43, 44

*Conservation Force v. Salazar*,
  646 F.3d 1240 (9th Cir. 2011)..................................................................... 16

*Doe v. Christie*,
  33 F. Supp. 3d 518 (D.N.J. 2014), *aff'd*, 783 F.3d 150
  (3d Cir. 2015) .................................................................................. 23, 24, 67

*Does I thru XXIII v. Advanced Textile Corp.*,
  214 F.3d 1058 (9th Cir. 2000)..................................................................... 24

*Doyle v. Hogan*,
  411 F. Supp. 3d 337 (D. Md. 2019), *vacated on other grounds*,
  1 F.4th 249 (4th Cir. 2021)....................................................... 34, 39, 47, 48

*Doyle v. Hogan*,
  No. DKC 19-0190, 2019 WL 3500924 (D. Md. Aug. 1, 2019),
  *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021).......................... 23, 24

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972) ..................................................................................... 24

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
  494 U.S. 872 (1990) .......................................................... 59, 61, 65

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
  880 F.3d 450 (9th Cir. 2018), *amended*, 881 F.3d 792 (9th Cir. 2018) ........ 46

*F.C.C. v. Pacifica Found.*,
  438 U.S. 726 (1978) ...................................................... 49

*Fang Lin Ai v. United States*,
  809 F.3d 503 (9th Cir. 2015) ......................................... 54

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) ...................................................... 49

*Fulton v. City of Philadelphia, Pa.*,
  141 S. Ct. 1868 (2021) .............................................. 49, 65

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) ...................................................... 42

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975) ................................................... 14, 49

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ...................................................... 40

*Heller v. Doe by Doe*,
  509 U.S. 312 (1993) ...................................................... 47

*Hertzberg v. Dignity Partners, Inc.*,
  191 F.3d 1076 (9th Cir. 1999) ...................................... 62

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................ 54

*Hum. Life of Wash. Inc. v. Brumsickle*,
  624 F.3d 990 (9th Cir. 2010) ....................................... 22

v

*Interpipe Contracting, Inc. v. Becerra*,
  898 F.3d 879 (9th Cir. 2018) ............................................................. 39

*Jacobs v. Clark County Sch. Dist.*,
  526 F.3d 419 (9th Cir. 2008) ............................................................. 67

*Kashem v. Barr*,
  941 F.3d 358 (9th Cir. 2019) ......................................................... 52, 53

*King v. Governor of the State of New Jersey*,
  767 F.3d 216 (3rd Cir. 2014) ............................................. 23, 24, 49, 60

*King v. Murphy*,
  139 S. Ct. 1567 (2019) ..................................................................... 37

*Kissinger v. Bd. of Trs. of Ohio State Univ., Coll. of Veterinary Med.*,
  5 F.3d 177 (6th Cir. 1993) ................................................................. 67

*Knight v. Conn. Dep't of Pub. Health*,
  275 F.3d 156 (2d Cir. 2001) .............................................................. 67

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ........................................................................ 24

*Kwan v. SanMedica Int'l*,
  854 F.3d 1088 (9th Cir. 2017) ........................................................... 16

*Lair v. Bullock*,
  697 F.3d 1200 (9th Cir. 2012) ...................................................... 36, 38

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................ 17

*Mack v. S. Bay Beer Distribs., Inc.*,
  798 F.2d 1279 (9th Cir. 1986), *abrogated on other grounds by Astoria
  Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ............................ 4

*Maryland v. King*,
  567 U.S. 1301 (2012) ....................................................................... 69

*McTernan v. City of York, PA*,
  564 F.3d 636 (3d Cir. 2009) ........................................................................ 67

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ............................................................ 35, 36, 38

*Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*,
  971 F.3d 1021 (9th Cir. 2020) ..................................................................... 53

*Monteiro v. Tempe Union High Sch. Dist.*,
  158 F.3d 1022 (9th Cir. 1998) ...................................................................... 67

*Murray v. Mayo Clinic*,
  934 F.3d 1101 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 2720 (2020) ........... 36

*N.L.R.B. v. SW Gen., Inc.*,
  137 S. Ct. 929 (2017) .................................................................................. 62

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*
  (*NAAP*),
  228 F.3d 1043 (9th Cir. 2000) ........................................................... 42, 47, 49

*Nat'l Inst. of Fam. & Life Advocs. v. Harris*,
  839 F.3d 823 (9th Cir. 2016) ...................................................................... 32

*National Institute of Family and Life Advocates v. Becerra* (*NIFLA*),
  138 S. Ct. 2361 (2018) ......................................................................... passim

*New York v. Ferber*,
  458 U.S. 747 (1982) .................................................................................. 49

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) .................................................................................. 56

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*,
  676 F.3d 829 (9th Cir. 2012) ...................................................................... 22

*Olsen v. Mukasey*,
  541 F.3d 827 (8th Cir. 2008) ...................................................................... 62

*Otto v. City of Boca Raton, Florida*,
    981 F.3d 854 (11th Cir. 2020) ................................................................ 39, 40

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ..................................................................... 38

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ....................................................... 63, 66, 67

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014), *cert. denied*, 573 U.S. 945 (2014) ........ passim

*Pickup v. Brown*,
    No. 12-17681, 2018 WL 11226270 (9th Cir. Nov. 6, 2018) ........................ 37

*Pickup v. Newsom*,
    139 S. Ct. 2622 (2019) ................................................................................ 37

*Pimentel v. Dreyfus*,
    670 F.3d 1096 (9th Cir. 2012) ..................................................................... 68

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ............................................................................... 34, 35

*Powers v. Ohio*,
    499 U.S. 400 (1991) .................................................................................... 23

*Prater v. City of Burnside, Ky.*,
    289 F.3d 417 (6th Cir. 2002) ....................................................................... 63

*Protectmarriage.com-Yes on 8 v. Bowen*,
    752 F.3d 827 (9th Cir. 2014) ....................................................................... 22

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006) ...................................................................................... 40

*S. Bay United Pentecostal Church v. Newsom*,
    985 F.3d 1128 (9th Cir. 2021) ..................................................................... 65

*Sable Commc'ns of Cal., Inc. v. F.C.C.*,
492 U.S. 115 (1989) ........................................................... 48, 49, 66

*San Diego Cnty. Gun Rts. Comm. v. Reno*,
98 F.3d 1121 (9th Cir. 1996) .......................................................... 17

*Shalala v. Ill. Council on Long Term Care, Inc.*,
529 U.S. 1 (2000) ......................................................................... 38

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ............................................. 22, 26, 64

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ....................................................... 66

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ................................................................. 65

*Thomas v. Anchorage Equal Rts. Comm'n*,
220 F.3d 1134 (9th Cir. 2000)................................................. 18, 22

*United States v. Kuzma*,
967 F.3d 959 (9th Cir. 2020)......................................................... 58

*United States v. W.R. Grace*,
504 F.3d 745 (9th Cir. 2007)........................................................... 4

*United States v. Weitzenhoff*,
35 F.3d 1275 (9th Cir. 1994)................................................... 56, 57

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ........................................................... 52, 53, 57

*Walz v. Tax Comm'n of City of New York*,
397 U.S. 664 (1970) ..................................................................... 62

*Ward v. Polite*,
667 F.3d 727 (6th Cir. 2012)......................................................... 66

ix

*Welch v. Brown*,
  834 F.3d 1041 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 2093 (2017).... passim

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................. 68, 69

*Wollschlaeger v. Governor, Fla.*,
  848 F.3d 1293 (11th Cir. 2017)...................................................... 54

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
  471 U.S. 626 (1985) .................................................................... 33

*Zipfel v. Halliburton Co.*,
  861 F.2d 565 (9th Cir. 1988)......................................................... 37

## **Statutes**

28 U.S.C. § 1291 ................................................................................ 2

28 U.S.C. § 1331 ................................................................................ 2

28 U.S.C. § 1343 ................................................................................ 2

2008 Wash. Sess. Laws, ch. 134, § 1 .............................................. 7

2018 Wash. Sess. Laws, ch. 300 .......................................... passim

2018 Wash. Sess. Laws, ch. 300, § 1 .......................................... 9, 10

2018 Wash. Sess. Laws, ch. 300, § 1(1) ........................................ 59

2018 Wash. Sess. Laws, ch. 300, § 1(2) ................................... 49, 66

2018 Wash. Sess. Laws, ch. 300, § 2 ................................. 12, 50, 60

2018 Wash. Sess. Laws, ch. 300, § 2(1) ........................................ 60

2018 Wash. Sess. Laws, ch. 300, § 2(2) ................................... 60, 62

Cal. Bus. & Prof. Code § 865 ........................................... passim

Cal. Bus. & Prof. Code § 865(b)(1) ...................................................... 29

Cal. Bus. & Prof. Code § 865(b)(2) ...................................................... 29

Cal. Bus. & Prof. Code § 865.1 ................................................... passim

Cal. Bus. & Prof. Code § 865.2 ................................................... passim

Md. Code Ann., Health Occ. § 1–212.1 ........................................... 48

SB 6449, 63rd Leg., Reg. Sess. (Wash. 2014) ............................... 11

Wash. Rev. Code § 18.130 ............................................................... 7

Wash. Rev. Code § 18.130.010 ....................................................... 7

Wash. Rev. Code § 18.130.020(4)(a) ......................................... 9, 54

Wash. Rev. Code § 18.130.020(4)(b) ............................................. 9

Wash. Rev. Code § 18.130.040 ....................................................... 8

Wash. Rev. Code § 18.130.040(2)(x) ............................................ 58

Wash. Rev. Code § 18.130.160 ....................................................... 8

Wash. Rev. Code § 18.130.180 ............................................ 8, 12, 13

Wash. Rev. Code § 18.130.180(4) .................................................. 9

Wash. Rev. Code § 18.130.180(27) ................................................ 9

Wash. Rev. Code § 18.130.185 ................................................. 8, 58

Wash. Rev. Code § 18.225 ............................................................. 60

Wash. Rev. Code § 18.225.010(8) ............................................ 43, 45

Wash. Rev. Code § 18.225.030(4) ............................................ 12, 60

Wash. Rev. Code § 18.225.080 ........................................................ 58

Wash. Rev. Code § 49.60.030(1)...................................................... 9

Wash. Rev. Code § 49.60.040(2)...................................................... 9

Wash. Rev. Code § 49.60.040(27)................................................. 9, 57

## Rules

Fed. R. Civ. P. 12(b)(6)............................................................ 14, 16

Fed. R. Civ. P. 65(b)(1).................................................................. 68

## Other Authorities

5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (2021) ................................................................ 4

House Health Care & Wellness Comm., *Public Hearing: SB 5722, SSB 6219*, TVW (Feb. 7, 2018 8:00 AM), https://www.tvw.org/watch/?eventID=2018021058 (video at 0:18:25–00:30:20)......................................................................... 10

*Merriam-Webster's Online Dictionary* [*Webster's*], "gender identity," https://www.merriam-webster.com/dictionary/gender%20identity (last accessed Jan. 13, 2022) .............................................................. 55

*Senate Floor Debate*, TVW (Jan. 19, 2018 10:00 AM), https://tvw.org/video/senate-floor-debate-2018011151/?eventID=2018011151 at 1:23:00.......................... 61

Senate Health & Long Term Care Comm., *Public Hearing: SB 5722, SB 6026, SB 5700*, TVW (Jan. 11, 2018 10:00 AM), https://www.tvw.org/watch/?eventID=2018011104 (video at 1:31:12–1:42:04)...................................................................... 10

Senate Health & Long Term Care Comm., *Public Hearing: SB 5722, SB 6026, SB 5700*, TVW, (Jan. 11, 2018 10:00 AM), https://www.tvw.org/watch/?eventID=2018011104 (video at 1:57:57) ....... 11

## I.  INTRODUCTION

Exercising the well-established authority to regulate state-licensed health professionals, Washington State enacted Senate Bill 5722, which makes the practice of conversion therapy on minors "unprofessional conduct." Conversion therapy—practices or treatments that seek to change a person's sexual orientation or gender identity—has been thoroughly discredited by leading medical and mental health organizations, providers, and academic researchers. It is both ineffective and harmful to children and teenagers.

SB 5722 is a lawful regulation designed to protect youth from a harmful treatment, and the district court correctly dismissed Plaintiff-Appellant Brian Tingley's challenge to the law. This Court can affirm on multiple different grounds. First, because he is not currently being investigated or disciplined under the law, Tingley lacks standing for himself and his third-party minor patients, and his claims are not ripe, meaning there is no "case or controversy" over which the Court has jurisdiction. On the merits, his free speech, due process, and free exercise claims fail as a matter of law under controlling, indistinguishable Circuit authority. In *Pickup v. Brown* and *Welch v. Brown*, this Court decided that California's parallel conversion therapy law does not violate the

First Amendment's speech or free exercise clauses and is neither unconstitutionally vague nor overbroad.

Not only does Tingley ask the Court to disregard its own precedent, but the consequences of his position, should it prevail, are dangerous. It would mean Washington could not protect minors from a thoroughly discredited, ineffective, and harmful treatment provided under the auspices of a state-issued license. In addition, if prohibitions on certain conduct—including dangerous treatments provided primarily through verbal means—are deemed unconstitutional abridgements of free speech or free exercise, it would sharply curtail a state's authority to regulate professions to protect the public. Under Tingley's reasoning, a state would be unable to regulate a physician who fails to provide information necessary for informed consent before a non-emergency treatment or regulate a certified nutritionist who counsels dangerous diets to pre-teen clients concerned about their weight. The First Amendment does not compel these outcomes, and the Court should reject them—as it did in *Pickup* and *Welch*.

## II.    JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

### III.   STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

### IV.   ISSUES PRESENTED

1.     Does Tingley lack standing to bring this pre-enforcement challenge where he is vague about his intent to violate the law, there is no specific threat of enforcement against him, and there is a lack of enforcement history?

2.     Is this case prudentially unripe where Tingley's claims are speculative and require further factual development?

3.     Did the district court correctly decide Tingley lacked third-party standing, where this case is indistinguishable from other conversion therapy cases in which patients were able to bring claims on their own behalf?

4.     Did the district court correctly decide Tingley's free speech claims failed as a matter of law because SB 5722 regulates professional conduct and not speech?

5.     Did the district court correctly decide Tingley's vagueness-based due process claim failed as a matter of law because it is clear to reasonable people, particularly to licensed health professionals, what SB 5722 regulates?

6.     Did the district court correctly decide Tingley's free exercise claims failed as a matter of law because SB 5722 is neutral and generally applicable?

7.     Did the district court properly deny Tingley's motion for preliminary injunction because he did not establish a likelihood of success on the merits of his claims?

## V.     STATEMENT OF THE CASE

### A.     Conversion Therapy Is Widely Discredited[1]

Conversion "therapy," also commonly known as sexual orientation and gender identity change efforts (SOGICE), encompasses a range of interventions directed at changing a person's sexual orientation or gender identity. These interventions include aversive physical therapies, such as electric shock treatment or the use of nausea-inducing drugs, as well as non-aversive therapies, which may incorporate approaches such as psychoanalysis and counseling. *See, e.g.*, American Psychological Association, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses*

---

[1] The Court may properly consider the non-legislative materials cited herein, either because they were considered by the Legislature in connection with SB 5722 or because the Court may take judicial notice of the existence of materials, such as peer-reviewed studies and official positions of well-known professional organizations, that support the basis for SB 5722. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991); *United States v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007); 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (2021).

*to Sexual Orientation* (2009) (APA Report) (at 2-SER-242, 251). It originated as a treatment for what health professionals once considered a disorder or illness—a position these professions have long since abandoned. *See Pickup v. Brown*, 740 F.3d 1208, 1222 (9th Cir. 2014), *cert. denied*, 573 U.S. 945 (2014). The "overwhelming consensus" is that such interventions are ineffective and harmful. *Id.* at 1232. That includes non-aversive, non-physical SOGICE, which can cause serious harms including emotional trauma, depression, anxiety, suicidality, and self-hatred. *See* 2-SER-270–71, 188, 190–94.

A significant body of peer-reviewed research confirms the pernicious effects of conversion therapy on children and teens. *See, e.g.*, 2-ER-178–211. For example, a 2020 study found that exposure to conversion therapy doubled the odds of lifetime suicidal ideation, increased the odds of planning to attempt suicide by 75 percent, and increased the odds of a suicide attempt with no or minor injury by 88 percent in comparison to a control group. *See* 2-SER-431–37. Another study involving minors found that exposure to SOGICE was the strongest predictor of multiple suicide attempts. 2-SER-440–46. And a 2018 study of young adults found that over half who had undergone external conversion efforts were depressed—a rate over three times higher than those who had not; and almost two thirds had attempted suicide—a rate nearly three

times higher than those who had not. 2-ER-191. SOGICE may compound psychological pain and trauma. 2-SER-262; 2-SER-435. SOGICE also tends to prevent or delay access to more efficacious mental health care a person may need. 2-SER-199.

Conversion therapy is also ineffective. Medical interventions should be proven effective through scientific and medical research. But methodologically sound scientific and medical studies offer no support for conversion therapy's reliability or effectiveness in reducing same-sex attraction, increasing heterosexual attraction, or changing gender identity, even in patients who desire those outcomes. *See* Substance Abuse and Mental Health Services Administration, *Ending Conversion Therapy* (2015) (SAMHSA Report) (at 2-SER-372); *see also* 2-SER-246-254; 2-SER-190. There is no peer-reviewed literature supporting the efficacy of SOGICE with any population, including children. *See* 2-SER-255–263; 2-SER-374, 387.

Thus, the professional consensus is that "conversion therapy efforts are inappropriate," 2-SER-364, and that "[i]nterventions aimed at a fixed outcome, such as gender conformity or heterosexual orientation, including those aimed at changing gender identity, gender expression, and sexual orientation are coercive, can be harmful, and should not be part of behavioral health treatments."

2-SER-372. Major medical, psychiatric, psychological, and professional mental health organizations, including the American Psychological Association, the American Psychiatric Association, the National Association for Social Workers, the Pan American Health Organization, and the American Academy of Child and Adolescent Psychiatry, have repudiated conversion therapy. 2-SER-386; *see* 1-SER-41–46 (collecting position statements).

At present, 20 states and the District of Columbia have prohibited or restricted the practice of conversion therapy on minors. *See* 1-SER-47–48 (collecting laws and regulations).

## B. SB 5722 Prohibits Licensed Professionals From Practicing Conversion Therapy on Minors

Washington State has recognized that the regulation of health professions is a traditional state function, *cf., e.g.*, *Barsky v. Bd. of Regents of Univ. of State of N.Y.*, 347 U.S. 442, 451 (1954), and proclaimed its intent "to promote quality" in health care services for residents. 2008 Wash. Sess. Laws, ch. 134, § 1. Thus, specific categories of health care providers are required to be licensed before they can practice in Washington. This requirement helps ensure they are able to safely practice and do not present a risk of patient harm. Wash. Rev. Code § 18.130.010. Chapter 18.130 of the Revised Code of Washington—the Uniform Disciplinary Act (UDA)—provides uniform regulations for licensed health

professionals, including a list of grounds on which disciplinary action may be taken against their licenses. *Id.* § 18.130.180.

The Washington Department of Health (DOH) Secretary is the disciplining authority for mental health counselors and marriage and family counselor licensees. *Id.* § 18.130.040. The range of disciplinary actions for unprofessional conduct is broad and may include corrective action, payment of a fine, censure/reprimand, practice monitoring, remedial education, and suspension or revocation of the license, among other sanctions. *See id.* § 18.130.160. The statute does not authorize either criminal penalties or civil liability, other than disciplinary action and injunctive relief, for unprofessional conduct. *See id.*; *id.* § 18.130.185.

In 2018, the Legislature passed, and the Governor signed, Senate Bill (SB) 5722 (codified at Wash. Rev. Code § 18.130.020(4) and .080(27)).[2] 1-SER-53–59. SB 5722 amended the UDA by adding a definition of "conversion therapy" as follows:

> (a) "Conversion therapy" means a regime that seeks to change an individual's sexual orientation or gender identity. The term includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings

---

[2] Although SB 5722 is now codified, this brief refers to these sections collectively as "SB 5722."

toward individuals of the same sex. The term includes, but is not limited to, practices commonly referred to as "reparative therapy."

(b) "Conversion therapy" does not include counseling or psychotherapies that provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development that do not seek to change sexual orientation or gender identity.

Wash. Rev. Code § 18.130.020(4)(a)–(b). The bill also added a new ground for a finding of unprofessional conduct by a licensee: "Performing conversion therapy on a patient under age eighteen[.]" *Id.* § 18.130.180(27).[3]

The Legislature's stated intent was to regulate "the professional conduct of licensed health care providers . . . ." 2018 Wash. Sess. Laws, ch. 300, § 1.[4]

---

[3] The DOH Secretary also has the authority to discipline health care providers applying potentially harmful treatment modalities under Wash. Rev. Code § 18.130.180(4), which defines as "[u]nprofessional conduct":

Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed. The use of a nontraditional treatment by itself shall not constitute unprofessional conduct, provided that it does not result in injury to a patient or create an unreasonable risk that a patient may be harmed[.]

[4] SB 5722 is consistent with and complements the Washington Law Against Discrimination, which declares freedom from discrimination based on sexual orientation in places of public accommodation to be a civil right. Wash. Rev. Code § 49.60.030(1). Since 2006, the definition of "[s]exual orientation" includes heterosexuality, homosexuality, bisexuality, and gender expression or identity. *Id.* § 49.60.040(27). The definition of "public accommodation" includes "any place" where health, medical, or other "personal" services are provided. *Id.* § 49.60.040(2).

It found that "Washington has a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by conversion therapy." *Id*. Both the House and Senate heard public testimony on the harms caused by SOGICE, including testimony from the Director of Professional Affairs for the Washington State Psychological Association, who described the consensus of leading professional organizations that "[a]vailable literature shows that conversion therapy is tied to negative self-image, depression, and other issues, in youth who receive it." 1-SER-63; *see also* Senate Health & Long Term Care Comm., *Public Hearing: SB 5722, SB 6026, SB 5700*, TVW (Jan. 11, 2018 10:00 AM), https://www.tvw.org/watch/?eventID=2018011104 (video at 1:31:12–1:42:04) (hearing testimony on harms); House Health Care & Wellness Comm., *Public Hearing: SB 5722, SSB 6219*, TVW (Feb. 7, 2018 8:00 AM), https://www.tvw.org/watch/?eventID=2018021058 (video at 0:18:25–00:30:20) (similar). The Legislature was presented with both the 2009 APA Report and the 2015 SAMHSA Report. *See* 1-SER-78 (summarizing the APA Report); *id.*, 1 SER-67 (discussing the SAMHSA Report).

*Health Impact Review of SB 5722*, a report from the Washington State Board of Health, accompanied SB 5722.[5] 1-SER-70–83. The report found evidence that prohibiting conversion therapy on minors would decrease health risks and improve outcomes for this group. 1-SER-70. It cited "very strong evidence" that LGBTQ adults and youths are already at heightened risk for many negative health outcomes, and "therefore mitigating any emotional, mental, and physical harm among this population has potential to decrease health disparities." *Id.* It also summarized numerous studies and reports, including the 2009 APA Report, the 2012 Report of the American Psychiatric Association Task Force on Treatment of Gender Identity Disorder, and numerous academic articles. 1-SER-76–83. In addition, the legislative findings in SB 6449, a 2014 bill that proposed very similar language to SB 5722, cited other articles, statements, and reports of medical and health organizations, including the 2009 APA report, on the harms posed by conversion therapy. SB 6449, 63rd Leg., Reg. Sess. § 1 (Wash. 2014). 1-SER-85–86.

---

[5] The *Health Impact Review of 5722* was also presented to the Legislature as part of its consideration of SB 5722. *See* Senate Health & Long Term Care Comm., *Public Hearing: SB 5722, SB 6026, SB 5700*, TVW, (Jan. 11, 2018 10:00 AM), https://www.tvw.org/watch/?eventID=2018011104 (video at 1:57:57). The Court may consider the *Review* as part of the legislative history in this case. *See, e.g.*, *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012).

SB 5722 "may not be construed to apply to"

(1) Speech that does not constitute performing conversion therapy by licensed health care providers on patients under age eighteen;

(2) Religious practices or counseling under the auspices of a religious denomination, church, or organization that do not constitute performing conversion therapy by licensed health care providers on patients under age eighteen; and

(3) Nonlicensed counselors acting under the auspices of a religious denomination, church, or organization.

2018 Wash. Sess. Laws, ch. 300, § 2. The first two exceptions permit speech, religious practices, or counseling by *licensed* counselors, if they are not acting or representing themselves as acting in their licensed capacity, and not collecting a fee. *Cf.* Wash. Rev. Code § 18.225.030(4) (providing exemption from licensing requirement for "[t]he practice of marriage and family therapy, mental health counseling, or social work under the auspices of a religious denomination, church, or religious organization."). The third exception makes clear that SB 5722 does not regulate non-licensed religious counseling.

DOH intends to enforce SB 5722 as it enforces other restrictions on unprofessional conduct. DOH typically does not conduct investigations unless a complaint has been filed against a licensee's practice. The complaint must allege conduct in violation of Wash. Rev. Code § 18.130.180. *See also* 1-SER-134. No

complaint has been filed alleging a violation of subsection (27), including none filed against Tingley. 1-SER-133–34. Therefore, no investigation or enforcement action has yet been taken under SB 5722. *Id.* If a health care provider is unsure whether conduct might violate § 18.130.180, they may contact DOH for generalized guidance, or consult an attorney or professional association. 1-SER-137.

## C.   Procedural History

Tingley sued defendant state officials[6] to invalidate SB 5722 and moved for preliminary injunctive relief in May 2021. His complaint asserted five claims: Counts I and II alleged violations, facially and as applied, of his personal free speech right under the First Amendment, and the free speech rights of unnamed clients, respectively. 3-ER-402–07. Count III alleged a facial due process violation based on vagueness. 3-ER-407–13. Counts IV and V alleged violations of his personal free exercise right under the First Amendment, and the free exercise rights of unnamed clients, respectively. 3-ER-413–16.

---

[6] Defendants-Appellees/Cross-Appellants in the case are Robert W. Ferguson, in his official capacity as Attorney General for the State of Washington; Umair A. Shah, in his official capacity as Secretary of Health for the State of Washington; and Kristin Peterson, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance Division of the Washington State Department of Health (collectively, "State Defendants").

The State Defendants and Intervenor-Defendant Equal Rights Washington opposed Tingley's motion for a preliminary injunction and moved to dismiss under Rule 12(b)(6). The district court granted the State Defendants' motion to dismiss, holding that Tingley had individual standing to pursue his claims but that the claims were foreclosed by this Court's decisions in *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), and *Welch v. Brown*, 834 F.3d 1041 (9th Cir. 2016). 1-ER-15–19. The parties timely appealed. 2-ER-23; 1-SER-2.

## VI.    SUMMARY OF THE ARGUMENT

Presented with overwhelming evidence that conversion therapy is ineffective and particularly harmful to children and teenagers, Washington State added "performing conversion therapy on a patient under age eighteen" to the list of acts regarded as unprofessional conduct for licensed health professionals. SB 5722 falls well within the State's broad authority to regulate the practice and licensing of professions as part of its "power to protect the public, health, safety, and other valid interests . . . ." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975).

Applying controlling precedent, the district court correctly determined that Washington's prohibition on the practice of conversion therapy does not infringe on Tingley's rights to free speech, free exercise, and due process. But

on review, the Court need not reach the merits of Tingley's constitutional claims, because he does not have standing to bring this lawsuit—either for himself or his minor clients—and his claims are not prudentially ripe. Tingley's declaration testimony does not clearly indicate that he practices SOGICE, but reflects only "some day intentions." Furthermore, he has not demonstrated any threat to his practice as a licensed family and marriage therapist in Washington State. He also has not established that his clients are unable to pursue their own claims and thus that he should be allowed to pursue claims on their behalf, as the district court correctly found.

Tingley's claims also fail as a matter of law. Tingley asks this Court to hold that SB 5722 regulates speech, not conduct, and is entitled to heightened First Amendment protection that must satisfy strict scrutiny. This Court, however, has squarely considered and rejected this argument in upholding a nearly indistinguishable law. Under *Pickup* and other authorities, SB 5722 is a regulation of professional practice that has, at best, only an incidental effect on speech, and readily satisfies deferential rational basis review.

Tingley's due process claim is similarly foreclosed. As in *Pickup*, SB 5722's prohibition on SOGICE is straightforward and articulated through terms of common understanding that are readily comprehensible to a person of

ordinary intelligence and, in particular, to a licensed health practitioner.

Finally, Tingley's free exercise claims are meritless. Like the conversion therapy law reviewed in *Welch*, SB 5722 is a neutral and generally applicable law that does not target religious practices; in fact, it expressly excludes them from the law's reach.

This Court should affirm the judgment of the district court.

## VII.   STANDARD OF REVIEW

The Court reviews de novo the district court's judgment granting a 12(b)(6) motion for failure to state a claim upon which relief can be granted and "may affirm the dismissal based on any ground supported by the record." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1093 (9th Cir. 2017) (cleaned up). Dismissal under Rule 12(b)(6) "is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (cleaned up).

The Court reviews the denial of a preliminary injunction for abuse of discretion and reviews the district court's underlying legal conclusions de novo. *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021).

# VIII. ARGUMENT

## A.    This Case Is Nonjusticiable

This Court can and should affirm the district court's dismissal of Tingley's complaint because this case is nonjusticiable. Tingley lacks standing to pursue this lawsuit and this case is unripe. The district court correctly concluded Tingley could not assert claims on behalf of absent third parties.

### 1.    Tingley lacks standing and his claims are unripe

The "irreducible constitutional minimum of standing" requires an injury in fact, not a hypothetical or theoretical dispute. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In this facial challenge to the constitutionality of a state law that has yet to be enforced against him, Tingley was required to show a "*genuine* threat of *imminent*" enforcement to establish Article III standing. *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1126–27 (9th Cir. 1996) (cleaned up). He failed to do so, and the district court erred by applying a relaxed standard based on Tingley's meritless assertion that SB 5722 implicates his First Amendment rights.

This Circuit examines three factors to determine whether a plaintiff has pre-enforcement standing: (1) whether the plaintiff has a "concrete plan" to violate the challenged law; (2) "whether the prosecuting authorities have

communicated a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). Tingley conceded below that there was no specific "threat" or "history" of enforcement, leaving only the "concrete plan" factor at issue. A "concrete plan" is one that involves more than "some day intentions," and the plaintiff must describe with specificity "when, to whom, where, [and] under what circumstances" he would violate the challenged law. *Id.* at 1139–40.

The district court noted that Tingley claimed to have previously counseled minors on "changing th[eir] sense of identity to a gender identity consistent with their biological sex" and on "changing their sexual attractions by reducing same-sex attraction and increasing attraction to the opposite sex." 1-ER-9. To be sure, such conduct would violate SB 5722 if performed on a minor. However, the district court did not identify any "concrete plan" to perform conversion therapy on a particular individual, at a particular time and place, under particular circumstances—because Tingley did not even attempt to make this required showing. Instead, Tingley focused on his *past* conduct, but described it in such vague and ambiguous terms that it is impossible to determine whether SB 5722 would apply.

Tingley never articulated a concrete plan to violate SB 5722 in the future. Rather, he invoked his past conduct only—and even then, his declaration studiously *avoided* saying that counseling he provided in the past sought to change a minor client's sexual orientation or gender identity. First, Tingley discussed an "older teen" client's use of pornography and desire to change that behavior, and stated that he counseled that client at an unspecified point in the past ("recent years")—without ever stating that he attempted to change the client's sexual orientation, or even specifying what the client's orientation was. *See* 3-ER-351. Tingley's vague description makes it impossible to understand whether the counseling constituted conversion therapy, whether the "teen" was a minor or an adult, or whether the counseling occurred before or after SB 5722 went into effect. SB 5722 does not prohibit counseling related to pornography use or other sexual behavior unless it attempts to change a client's sexual orientation or gender identity; nor does it prohibit performing conversion therapy (or any type of therapy) on an adult; nor is it possible to violate a law before it has gone into effect.

Second, Tingley discussed another client whom he counseled about gender identity—but he described that client's gender identity in ambiguous terms, and never stated that he attempted to change the client's identity.

3-ER-346. In his declaration, Tingley described the client as a "girl;" stated that the client was "asserting a male gender identity" at some point; but in the very same sentence, referred to "*her female* gender identity." *Id.* (emphasis added). Again, this ambiguity about the client's identity makes it impossible to understand whether Tingley's counseling was intended to *change* the client's identity, and he declined to specify whether this was in fact his goal. SB 5722 does not prohibit counseling that involves exploration of a minor client's gender identity unless the counseling attempts to change their identity.

In sum, far from articulating a specific, "concrete plan" to violate SB 5722, Tingley did not even succeed in showing that he had performed conversion therapy on minor clients in the past. Because he did not specify "when, to whom, where, [and] under what circumstances" he planned to violate the law, Tingley failed to meet the *only* prong of the three-factor test that might weigh in favor of pre-enforcement standing. With all three factors against him, Tingley lacks Article III standing and his claims are unripe. His complaint should have been dismissed for that reason alone.

Despite these evident shortcomings, the district court determined that Tingley had pre-enforcement standing, "especially in this context because he brings a First Amendment challenge." 1-ER-10; *see also* 1-ER-9 (citing *LSO,*

*Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000), which held that "the inquiry tilts dramatically toward a finding of standing" in First Amendment cases to avoid chilling protected speech). However, the district court erred to the extent it relied on a relaxed standing inquiry applicable to First Amendment claims, given its correct conclusion that the First Amendment *does not apply* to Tingley's claims. Under the controlling law of this Circuit, SB 5722 exclusively regulates conduct, and does not regulate protected speech in any way. *See infra* pp. 28–31.

Contrary to the district court's conclusion, simply invoking the First Amendment does not automatically lower the bar for standing. In this Circuit, a plaintiff may not "challenge the constitutionality of a statute on First Amendment grounds by nakedly asserting that his or her speech was chilled by the statute." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). "In the free speech context, such a fear of prosecution will only inure *if the plaintiff's intended speech arguably falls within the statute's reach*." *Id.* (emphasis added). In *Getman*, the Court held that the plaintiff lacked pre-enforcement standing for a claim based on activity that was "not subject to" the challenged statute. *Id.* at 1096. Likewise, here, any "speech" that Tingley may engage in is not subject to SB 5722, because that statute only regulates

conduct: i.e., attempting to change a minor's sexual orientation or gender identity by providing counseling as a state-licensed therapist. And to the extent Tingley alleges that he wishes to perform conversion therapy on minors, under the controlling case of *Pickup*, there is no viable argument that such conduct is protected by the First Amendment. *Infra* pp. 28–31; *see* 1-ER-11–17. Thus, there is no danger of chilling protected speech, so a relaxed standing analysis does not apply.[7] This case is nonjusticiable, as Tingley lacks Article III standing for his unripe claims.

### 2. The district court correctly determined that Tingley lacks third-party standing

Although it erred in finding that Tingley had standing on his own behalf, the district court was correct in finding that Tingley lacked standing to assert claims on behalf of his nonparty patients—a conclusion consistent with that of multiple other courts that have considered the exact same issue. *See* 1-ER-10. A plaintiff seeking to assert third-party standing must demonstrate: (1) "injury in

---

[7] In any event, the three-factor test identified in *Thomas* still applies in First Amendment cases. *See, e.g.*, *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012); *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009). As discussed above, Tingley's failure to meet the *Thomas* test is fatal.

fact," (2) "a close relation to the third party," and (3) a "hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991).

The district court correctly determined that, at a minimum, Tingley failed to meet the third requirement because he "d[id] not demonstrate that his minor patients are hindered in their ability to protect their own interests." 1-ER-10. In this appeal, Tingley merely reiterates his unsubstantiated argument that it is "difficult" for his clients to assert their own interests, but fails to distinguish this case from the multiple other conversion therapy cases in which therapists were found to lack third-party standing. *See* 1-ER-10 (citing *Doyle v. Hogan*, No. DKC 19-0190, 2019 WL 3500924 (D. Md. Aug. 1, 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021); *King v. Governor of the State of New Jersey*, 767 F.3d 216, 244 (3rd Cir. 2014)). Like the plaintiffs in *Doyle* and *King*, Tingley offers only generalized statements about clients' purported difficulties, without providing any specifics to establish that they are in fact unable to protect their own interests. *See* Opening Br. at 35–36.

Moreover, as noted in the *Doyle* and *King* decisions, minor clients challenging similar laws were able to file suit pseudonymously in both *Pickup*, 740 F.3d at 1224, and *Doe v. Christie*, 33 F. Supp. 3d 518 (D.N.J. 2014), *aff'd*,

783 F.3d 150 (3d Cir. 2015). *See King*, 767 F.3d at 244; *Doyle*, 2019 WL 3500924, at *9 (and decisions cited therein). As relevant here, pseudonymous filing is appropriate "when identification creates a risk of retaliatory or physical harm" or "when anonymity is necessary to preserve privacy in a matter of sensitive and highly personal nature." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). As in *Pickup*, if such concerns did apply here, Tingley's minor clients would be able to challenge SB 5722 under a pseudonym. Tingley offers no reason why they could not do so. *See* Opening Br. at 35–36.

Tingley's other cited authority is inapposite. In *Kowalski v. Tesmer*, the Supreme Court found that lawyers lacked third-party standing on behalf of hypothetical future clients, 543 U.S. 125, 126 (2004)—just as Tingley lacks third-party standing on behalf of hypothetical future clients. And Tingley cannot credibly assert that his clients—if indeed he is performing conversion therapy on any non-hypothetical clients—are "denied a forum in which to assert their own rights," *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972), because actual conversion-therapy clients *did* pursue their own legal challenges in *Pickup*, and could do so here as well.

Finally, Tingley's assertion that his clients' right to receive "ideas" or "information" protected by the First Amendment, Opening Br. at 34–35, is unavailing because conversion therapy—as defined by SB 5722—is conduct, not speech. *Infra* pp. 42–44. By its plain terms, SB 5722 does not in any way prohibit Tingley from expressing his views about conversion therapy, gender identity, or sexual orientation to patients or others, nor does it prohibit him from providing religious counseling. It only prohibits him from attempting to change a minor patient's sexual orientation or gender identity by providing treatment as a state-licensed therapist. For the same reason, Tingley's plea for a "relaxed" standing analysis because he has asserted First Amendment claims must be rejected, *see* Opening Br. at 36–37, as First Amendment scrutiny does not apply to SB 5722. The district court correctly determined that Tingley lacked third-party standing.

### 3. Tingley's claims are also prudentially unripe

The district court did not reach the State Defendants' argument that Tingley's claims are prudentially unripe, but this is another independent ground on which the complaint should have been dismissed as nonjusticiable. A plaintiff's claims are prudentially unripe when they are unfit for judicial decision and withholding consideration will not cause undue hardship. *Colwell v. Dep't*

*of Health & Hum. Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009). Both elements are met here.

As to the first element of prudential ripeness, "[a] claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stormans*, 586 F.3d 1109, 1126 (9th Cir. 2009) (cleaned up). Here, this prong is not met because Tingley's unripe claims require further factual development. They depend almost entirely on how the law *might* be applied to Tingley based on his future conduct, and this is impossible to predict because he has not described his plans with the required specificity. *See supra* pp. 19–20; 1-ER-416–17; *see also, e.g.*, 1-ER-408–09 (speculating based on language pulled out of context from non-binding report issued by another agency in 2014). This alone defeats prudential ripeness.

As to the second element, "[t]o meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Stormans*, 586 F.3d at 1126 (cleaned up); *see also Colwell*, 558 F.3d at 1128 (hardship must be "immediate, direct, and significant"). "Hardship in this context does not mean just anything that makes life harder; it means hardship of a legal kind" that poses an "immediate dilemma." *Colwell*, 558 F.3d at 1128 (cleaned up). There is no

such hardship here for at least three reasons. First, Tingley failed to allege or show that he has actually performed conversion therapy on minors or that he has concrete plans to do so, as discussed above. Therefore, he cannot show that the law requires him to change his conduct in any way, much less that it creates an "immediate dilemma." *See id.* Second, Tingley did not allege that his practice depends, even in part, on his ability to perform conversion therapy on minors; in fact, his declaration states that he counsels clients on a "very wide range of problems" and does not indicate that conversion therapy is a significant part of his practice. 1-ER-342. Third, Tingley cannot establish immediate "hardship of a legal kind" from any threat of enforcement, given that professional sanctions (not criminal or civil liability) are SB 5722's only prescribed penalty, and Tingley could, if he wished, seek guidance from DOH about his intended conduct. *See Colwell*, 558 F.3d at 1128 (claims were prudentially unripe where plaintiffs were "several steps removed" from consequences of violating agency guidance); *see also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967) (requiring ripeness protects agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties").

Tingley's claims are not prudentially ripe, and jurisdiction should have been declined for this additional reason.

**B.  The District Court Correctly Dismissed Tingley's Claims Because They All Fail as a Matter of Law**

**1.  Tingley's free speech claims fail because SB 5722 regulates conduct, not speech**

The district court soundly applied this Court's precedent and found meritless Tingley's arguments that SB 5722 regulates constitutionally protected speech that must therefore satisfy strict scrutiny. The district court's conclusion is correct: *Pickup* controls, and SB 5722 is a neutral regulation of professional conduct that is rationally related to the State's interest in protecting the physical and psychological well-being of minors. 1-ER-13.

**a.  *Pickup* is controlling**

In *Pickup v. Brown*, this Court squarely addressed the same free speech issues raised in this case. *See* 740 F.3d at 1225–32. *Pickup* concerned California's professional prohibition on sexual orientation change efforts (SOCE)—SB 1172 (codified at Cal. Bus. & Prof. Code §§ 865, 865.1, and 865.2). 740 F.3d at 1222–23, 1234. California's law was—and is—functionally identical to Washington's law. *See id.* The only substantive difference is that

28

Washington's law is more explicit in its prohibition of gender identity change efforts.

California's law states that the practice of SOCE on a patient under 18 is not permitted under California's Business and Professions Code and may subject a provider to professional discipline. Cal. Bus. & Prof. Code §§ 865.1–.2. Under that law's definitions:

> "Sexual orientation change efforts" means any practices by mental health providers that seek to change an individual's sexual orientation. This includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex.

*Id.* § 865(b)(1).

> "Sexual orientation change efforts" does not include psychotherapies that: (A) provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and (B) do not seek to change sexual orientation.

*Id.* § 865(b)(2).

The Ninth Circuit recognized that the California's SB 1172 does not do any of the following:

- Prevent mental health providers from communicating with the public about SOCE

- Prevent mental health providers from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic

- Prevent mental health providers from recommending SOCE to patients, whether children or adults

- Prevent mental health providers from administering SOCE to any person who is 18 years of age or older

- Prevent mental health providers from referring minors to unlicensed counselors, such as religious leaders

- Prevent unlicensed providers, such as religious leaders, from administering SOCE to children or adults

- Prevent minors from seeking SOCE from mental health providers in other states[.]

*Pickup*, 740 F.3d at 1223. Washington's SB 5722 does not do any of these things, either.

*Pickup* held that no heightened First Amendment scrutiny applied to California's law because it exclusively regulates conduct, not speech. *Id.* at 1225, 1229. The court found that the law only "bans a form of treatment for minors; it does nothing to prevent licensed therapists from discussing the pros and cons of SOCE with their patients." *Id.* at 1229. Regulation of professional conduct is a valid exercise of police power, *id.*, and "the First Amendment does not prevent a state from regulating treatment even when that treatment is performed through speech alone." *Id.* at 1230. Thus, California's law was "subject to only rational

basis review and must be upheld if it bears a rational relationship to a legitimate state interest." *Id.* at 1231. The Ninth Circuit recognized California's interest in protecting the health of minors. *Id.* And, citing evidence similar to what is in the public record here, the Court "ha[d] no trouble concluding" that the California legislature rationally relied on the professional consensus regarding SOCE. *See id.* at 1231–32.

*Pickup* is indistinguishable, so it controls.

### b. *NIFLA* has not altered *Pickup*'s controlling status

Tingley argues that the Supreme Court's 5-4 decision in *National Institute of Family and Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361 (2018), "cannot be reconciled with *Pickup*, so *Pickup* is no longer good law and does not bind this panel." Opening Br. at 16. He is wrong. *NIFLA* did not discuss, much less abrogate, *Pickup*'s central holding that California's SB 1172 regulates conduct rather than protected speech.

*NIFLA* addressed a First Amendment challenge to a different California law (the "Notice Law") requiring that licensed facilities offering pregnancy or family planning services post affirmative notices informing patients that subsidized reproductive health care services were available from the state. 138 S. Ct. at 2368–69. The Ninth Circuit upheld the law, but the Supreme Court

reversed. *Id.* at 2370. In contrast to the law examined by *Pickup*, the Ninth Circuit's opinion in *NIFLA* did *not* determine that the Notice Law only regulated conduct as opposed to speech. *See Nat'l Inst. of Fam. & Life Advocs. v. Harris*, 839 F.3d 823, 834 (9th Cir. 2016). Instead, the Ninth Circuit held that the Notice Law regulated—indeed, compelled—the content of speech. *Id.* at 835–36. The Ninth Circuit held that, as a viewpoint-neutral regulation of professional speech, intermediate scrutiny applied. *Id.* at 834–35.

The Supreme Court reversed the Ninth Circuit's holding and questioned its application of lesser scrutiny to "professional speech." *NIFLA*, 138 S. Ct. at 2371–76. Notably, it agreed with the Ninth Circuit that the Notice Law was not a regulation of professional *conduct*, reasoning that the required notice was "not tied to a [medical] procedure at all." *Id.* at 2373. But, under the particular facts of the case, the Supreme Court held that the Notice Law's content-based regulation could not survive even intermediate scrutiny because it was not sufficiently tailored to achieve California's asserted interest. *Id.* at 2375.[8]

---

[8] *NIFLA* also considered a separate requirement that *unlicensed* facilities providing pregnancy-related services post a notice regarding their lack of a license. 138 S. Ct. at 2370. The Ninth Circuit decision below had not decided whether this requirement regulated professional speech, because the court concluded that the requirement would satisfy strict scrutiny. *Harris*, 839 F.3d at 843. But the Supreme Court reversed, holding that the unlicensed notice requirement did not satisfy even the deferential standard applicable to

*Pickup* approached the distinct issue of whether California's SOCE law regulated speech or conduct by identifying two ends of a "continuum" at one end, "where a professional is engaged in a public dialogue, First Amendment protection is at its greatest"; at the other end is "the regulation of professional *conduct*, where the state's power is great, even though such regulation may have an incidental effect on speech." 740 F.3d at 1227–29. *Pickup* held that California's SOCE law falls into the latter category and therefore does not offend the First Amendment—and *NIFLA* did not disturb this holding. Rather, the *NIFLA* Court criticized *dicta* in *Pickup* identifying a "midpoint" of the continuum: "within the confines of a professional relationship, First Amendment protection of a professional's speech is somewhat diminished." *Id.* at 1228; *see NIFLA*, 138 S. Ct. at 2371. Pointing to this language in *Pickup* and other cases, *NIFLA* clarified that the Court's precedents has not recognized "professional speech" as a separate category of speech at that time. 138 S. Ct. at 2371–72, 2375; *but see id.* at 2375 ("We do not foreclose the possibility that some such reason exists.").

---

commercial disclosures required under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). *NIFLA*, 138 S. Ct. at 2370. The instant case does not implicate compelled commercial speech, and so the part of *NIFLA* concerning the unlicensed notice requirement is not relevant here.

*NIFLA* did not alter—rather, it recognized and upheld—the central legal principle relied upon by *Pickup*: that "States may regulate professional *conduct*, even though that conduct incidentally involves speech." *NIFLA*, 138 S. Ct. at 2372 (emphasis added); *see Pickup*, 740 F.3d at 1229; 1-ER-14 (holding *NIFLA* "does not undermine the distinction between speech and conduct central to the holding in *Pickup*"); *Doyle v. Hogan*, 411 F. Supp. 3d 337, 345 n.1 (D. Md. 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021) (recognizing that *NIFLA* did not affect *Pickup* on this point).[9] As examples of such conduct, the *NIFLA* Court cited cases about malpractice, anticompetitive agreements, client solicitation, and informed consent. *See* 138 S. Ct. at 2372–73. For example, while obtaining informed consent for abortion procedures involves verbal communication, the state may require such communication "as part of the practice of medicine, subject to reasonable licensing and regulation . . . ." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (joint opinion of O'Connor, Kennedy, & Souter, JJ.). *NIFLA* distinguished *Casey* on the ground that California's Notice Law was not tied to

---

[9] *Doyle* held that Maryland's analogous minor conversion therapy law was a regulation of conduct. 411 F. Supp. 3d at 345. It applied intermediate scrutiny based on circuit precedent. *See id.* at 346.

any particular treatment and instead "applie[d] to all interactions between a covered facility and its clients[.]" 138 S. Ct. at 2373.

*NIFLA* did not overrule the central holding of *Pickup*: that California's SOCE law is constitutionally sound because it regulates professional conduct, not speech. To the contrary, *NIFLA* reinforced the doctrinal basis for *Pickup*'s result. *See id.* at 2372 ("States may regulate professional conduct, even though that conduct incidentally involves speech."). As in *Casey*, both California's SB 1172 and Washington's SB 5722 apply to particular *treatments* performed by licensed professionals. Neither "applies to all interactions between a covered facility and its clients[.]" *See id.* at 2373; *Pickup*, 740 F.3d at 1223 (listing all the areas the SOCE law does not regulate). Because there is no relevant distinction between California's SOCE law and Washington's SOGICE law, *Pickup* controls.

This Circuit has established a test for determining "when, if ever, a district court or a three-judge panel is free to reexamine the holding of a prior panel in light of an inconsistent decision by a court of last resort on a closely related, but not identical issue." *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003). *Pickup* may only be reexamined by this Court if *NIFLA* "undercut the theory or reasoning underlying [it] in such a way that the cases are clearly irreconcilable."

*Miller*, 335 F.3d at 900. This is a "high standard." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (cleaned up). "It is not enough for there to be 'some tension' between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast doubt' on the prior circuit precedent[.]" *Id*. at 1207 (cleaned up). The Court is bound by "prior precedent if it can be reasonably harmonized with the intervening authority." *Id.* at 1206 (cleaned up); *cf. Murray v. Mayo Clinic*, 934 F.3d 1101, 1106 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 2720 (2020) (*Miller*'s *"*clearly irreconcilable" standard satisfied where Supreme Court "directly contradict[ed] the textual reasoning" underlying prior holding).

Tingley has not shown that *Pickup* and *NIFLA* "are so fundamentally inconsistent" that this Court can no longer apply *Pickup*. *Aleman Gonzalez v. Barr*, 955 F.3d 762, 766 (9th Cir. 2020). Far from it. There is a major analytic difference between the cases: *NIFLA* examined a regulation of professional speech; *Pickup*, professional conduct. With respect to the latter, the Supreme Court did not shift its jurisprudence in *NIFLA*; instead, it reinforced the very same line of cases relied upon by *Pickup*. *See NIFLA*, 138 S. Ct. at 2373 ("While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it[.]"). *Pickup* easily harmonizes with *NIFLA*. The

Supreme Court merely questioned *Pickup*'s irrelevant dicta that professional *speech* receives less First Amendment protection; it did not alter the law concerning the regulation of professional *conduct*. Finally, the cases present entirely different and distinguishable factual scenarios. Therefore, not only is *Pickup*'s central holding with respect to SB 1172 not irreconcilable with *NIFLA*, it is not even in tension.

This point is underscored by the result of the *Pickup* plaintiffs' motion to recall the Ninth Circuit's mandate in light of *NIFLA*. The *Pickup* panel denied the motion and implied that the standard for recall was not met. *Pickup v. Brown*, No. 12-17681, 2018 WL 11226270 (9th Cir. Nov. 6, 2018).[10] The Supreme Court denied certiorari both in *Pickup* and in a similar case involving the regulation of SOCE from the Third Circuit. *See Pickup v. Newsom*, 139 S. Ct. 2622 (2019); *King v. Murphy*, 139 S. Ct. 1567 (2019). In short, if this Court believed *Pickup* required reconsideration, it could have recalled the mandate in that case. That it did not do so strengthens the conclusion that its holding remains controlling precedent.

---

[10] A Supreme Court decision that "departs in some pivotal aspects" from an appellate court's decision may justify recall of the appellate court's mandate. *Zipfel v. Halliburton Co.*, 861 F.2d 565, 567 (9th Cir. 1988) (recalling mandate).

Tingley incorrectly contends that this Court has twice "recognize[d] that *NIFLA* abrogated *Pickup*." Opening Br. at 27. But neither citation reflects or even considers the distinction between conduct and speech addressed in *Pickup*. Judge Ikuta's concurrence in the result in *American Beverage Association v. City and County of San Francisco*, 916 F.3d 749 (9th Cir. 2019), explained that *NIFLA* "rejected a line of circuit court cases holding that professional speech is exempt 'from the rule that content-based regulations of speech are subject to strict scrutiny.' " *Id.* at 759. Judge Ikuta made no observations about *Pickup*'s central holding: that the SOCE law regulates conduct, not speech. Tingley next contends *Pickup* is abrogated based on a parenthetical appended to a case citation, but this argument is absurd. *See* Opening Br. at 27 (citing *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068–69 (9th Cir. 2020)). This Circuit devotes extensive and nuanced analysis to decide whether the Supreme Court has abrogated its precedent. *See, e.g.*, *Miller*, 335 F.3d at 893, 899–900; *Lair*, 697 F.3d at 1206–07; *cf. Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*[.]"). *Pacific Coast Horseshoeing School* does not engage in any such analysis; the parenthetical alone is far too thin a reed. Moreover, this Court and others have continued to cite *Pickup*

favorably post-*NIFLA*. *See, e.g.*, *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 895 (9th Cir. 2018); *Cal. Hotels & Lodging Ass'n v. City of Oakland*, 393 F. Supp. 3d 817, 832 (N.D. Cal. 2019); *Doyle*, 411 F. Supp. 3d at 345 n.1.

Finally, Tingley relies on the Eleventh Circuit's split decision in *Otto v. City of Boca Raton, Florida*, 981 F.3d 854 (11th Cir. 2020). But unlike *Pickup*, *Otto* is not binding. In *Otto*, the Eleventh Circuit held that local prohibitions on minor conversion therapy directly regulated speech and not merely conduct. *Id.* at 865. *But cf. id.* ("The local governments are not entirely wrong when they characterize speech-based SOCE as a course of conduct."). The Eleventh Circuit conducted an independent analysis of that issue, demonstrating that it did not believe it was bound by *NIFLA*, which further underscores that *Pickup* controls in this case. *See Otto*, at 862–65; *cf. id.* at 867–68.

*Otto* was also wrongly decided and a petition for en banc review is pending. *See id.*, *petition for panel reh'g and reh'g en banc filed* (Dec. 11, 2020). SOGICE laws regulate practices or interventions defined by specific intended outcomes. Those outcomes are not in the realm of abstract ideas: they are fundamentally health-related treatments—some involving invasive physical tactics, such as revulsion therapy and electro-shock therapy—designed to induce concrete changes in mental health, identity, and behaviors, including, but not

limited to, gender expression or sexual attraction. It is well within a state's authority to regulate conduct—including conduct that could occur through verbal means—that aims to produce a medical-behavioral outcome, as opposed to an exchange of ideas. *See, e.g.*, *Branom v. State*, 974 P.2d 335, 339 (Wash. Ct. App. 1999) (term "health care" in Washington statute includes "medical advice regarding the diagnosis and recommended course of treatment . . . ."). And regulation of conduct that affects public health, in particular, is a core area of traditional state concern. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 270–71 (2006).

The *Otto* majority attempted a slippery slope argument, suggesting that events like protests, debates, or book clubs cannot be distinguished from conversion therapy. *Otto*, 981 F.3d at 865. But they can, easily. Those activities are "inherently expressive." *See, e.g.*, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). That is, they are intrinsically directed toward the expression of ideas, in contrast to the treatment of a condition or disease by a state-licensed practitioner. Of course, inherently expressive activities may be oriented toward concrete changes (an anti-war protest seeking to end a war, for example), but this occurs in the context of a free exchange of ideas in which no speaker's viewpoint is given the imprimatur of a state license. By contrast, the

regulation of health professions takes place in an entirely different context, one in which there is a desired health *outcome*—behavioral or physical—in treating the patient and in which a state-licensed expert occupies a position of trust and verified proficiency. *Cf. Pickup*, 740 F.3d at 1228 ("When professionals, by means of their state-issued licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate.").

Ultimately, if a licensed professional such as Tingley represents himself as a health care provider and benefits from Washington State's licensing regime, it is well established that the State may seek to ensure that he is offering therapies aimed at actually promoting "health," rather than ones that are ineffective and can harm minors.

*Pickup*'s holding—that no heightened First Amendment scrutiny applied to California's conversion therapy law because it regulates conduct, not speech—is controlling. 740 F.3d at 1225, 1229. Regulation of professional conduct is a valid exercise of police power, *id.* at 1226, and "the First Amendment does not prevent a state from regulating treatment even when that treatment is performed through speech alone." *Id.* at 1230. As a consequence, California's SOCE law was "subject to only rational basis review and must be

upheld if it bears a rational relationship to a legitimate state interest." *Id.* at 1231. This Court upheld California's law, and that holding compels the same result here as to Washington's law.

### c. SB 5722 regulates conduct, not speech

SB 5722, like the law at issue in *Pickup*, only regulates conduct that is well within the State's authority—namely, the ineffective and harmful practice of conversion therapy on minors. That some providers practice conversion therapy through verbal means does not change the fact that the law regulates therapeutic treatment practiced by licensed healthcare professionals. *See Pickup*, 740 F.3d at 1227, 1230–31; *see also Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.* (*NAAP*), 228 F.3d 1043, 1054 (9th Cir. 2000) (holding that psychoanalysis does not receive heightened First Amendment protection; "the key component of psychoanalysis is the treatment of emotional suffering and depression, *not* speech . . . ."). SB 5722 "regulates conduct" because it "bans a form of treatment." *Pickup*, 740 F.3d at 1229; *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated,

evidenced, or carried out by means of language, either spoken, written, or printed.").

Washington marriage and family therapists, like Tingley, are state-licensed counselors who diagnose and treat mental and emotional disorders and apply "psychotherapeutic and family systems theories and techniques . . . *for the purpose of treating such diagnosed nervous and mental disorders*." Wash. Rev. Code § 18.225.010(8) (emphasis added). Tingley's assertion that his treatment of minors during counseling sessions is "pure speech" rather than professional conduct demonstrates a grave lack of understanding of his own licensed profession. "[P]sychotherapists are not entitled to special First Amendment protection merely because the mechanism used to deliver mental health treatment is the spoken word[.]" *Pickup*, 740 F.3d at 1227. To hold otherwise would "make talk therapy virtually immune from regulation." *Id.* at 1231 (cleaned up).

Tingley incorrectly characterizes *Conant v. Walters* as supporting his claim that the conduct at issue is protected speech. Opening Br. at 24. There, the Ninth Circuit held that a health care provider's right to communicate with patients regarding the benefits and drawbacks of using cannabis to treat the patients' illnesses was protected speech—even though the health care provider

did not have the legal right to provide or prescribe cannabis, a federally illegal substance. *Conant*, 309 F.3d 629, 632 (9th Cir. 2002). A more accurate application of *Conant* to this case is that, while Tingley may not practice SOGICE on minors, he can talk about the practice or share with the minor client options to speak with a non-licensed counselor, including a religious counselor, about the minor's desire to decrease attraction to a particular sex. SB 5722 clearly addresses this distinction and restricts only the professional conduct that seeks to change a client's sexual orientation or gender as a fixed outcome.

Tingley claims that SB 5722 regulates only speech, and that there is no "conduct" the speech could be incidental to, Opening Br. at 20, but that is demonstrably false. The law affects him only when he is engaged in the conduct of providing treatment as a state-licensed therapist. In every other setting, SB 5722 has no effect on Tingley. He can write articles, appear on television, provide religious counseling, or speak in any number of other ways about conversion therapy without violating the law. Because SB 5722 only affects his speech incidental to regulating his conduct, if at all, rational basis review applies. *See Pickup*, 740 F.3d at 1231.

>    d.    **SB 5722 neither discriminates based on content or viewpoint nor chills protected speech**

Tingley's arguments that SB 5722 discriminates based on content or viewpoint fails under this Circuit's authority. As *Pickup* recognized, "a regulation of only *treatment itself*—whether physical medicine or mental health treatment—implicates free speech interests only incidentally, if at all." *Id.* So while the Court should closely scrutinize "content- or viewpoint-based regulation of communication *about* treatment," the same scrutiny does not apply to a regulation of treatment. *Id.*

Tingley's contention that SB 5722 chills his protected speech similarly fails because, again, the law only regulates *treatment*. *See* Wash. Rev. Code § 18.225.010(8) (defining "[m]arriage and family therapy" as the diagnosis and treatment of mental and emotional disorders within the context of relationships). A state-licensed professional only violates SB 5722 by conducting interventions with the defined goal of changing a minor client's sexual orientation or gender identity. As this Court in *Pickup* and the district court below observed, licensed counselors and therapists can freely discuss SOGICE, express opinions on sexual orientation or gender identity, or inform patients about other counseling and treatment options. *See Pickup*, 740 F.3d at 1229; 1-ER-14–15.

45

### e. SB 5722 is constitutional under any level of scrutiny

#### (1) SB 5722 is rationally related to Washington's interest in protecting minors

Because SB 5722 regulates only conduct, rational basis review applies. *Pickup*, 740 F.3d at 1231. "On rational basis review, the State carries a light burden, as '[l]egislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.' " *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018), *amended*, 881 F.3d 792 (9th Cir. 2018) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). SB 5722 readily meets rational basis review for essentially the same reason as in *Pickup*: "the legislature acted rationally when it decided to protect the well-being of minors by prohibiting mental health providers from using SOCE on persons under 18." 740 F.3d at 1231–32. It is undisputed that the Washington Legislature considered evidence of "scientifically credible proof of harm" to minors from SOGICE, *cf. id.* at 1232, including extensive evidence of serious harms associated with conversion therapy and that minors are particularly vulnerable. *See supra* pp. 10–11; 1-SER-61–90. These legislative materials overwhelmingly support the law.

Tingley does not argue that SB 5722 fails rational basis review. Nor could he. State regulation survives rational basis review as long as the legislature is acting in pursuit of a permissible government interest that bears a rational relationship to the means chosen to achieve that interest. *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). This review is deferential; courts do not sit in review of the wisdom of legislative policy judgments. *Id.* Duly enacted laws are presumed to be constitutional. *NAAP*, 228 F.3d at 1050. "[W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did." *Id.* (quoting *Dittman v. California*, 191 F.3d 1020, 1031 (9th Cir. 1999)). Tingley does not, and cannot, meet his burden of establishing that SB 5722 lacks any conceivable rational basis.

### (2) SB 5722 also satisfies heightened scrutiny

Should the Court conclude that it is not bound by *Pickup* and that some form of heightened scrutiny is appropriate, the Court should apply intermediate scrutiny to Tingley's free speech claim. Under this standard, the State must show "a substantial state interest" that the law is "sufficiently drawn" to protect. *See NIFLA*, 138 S. Ct. at 2375. This standard would be consistent with the district court's post-*NIFLA* decision in *Doyle v. Hogan*, 411 F. Supp. 3d 337 (D.

47

Md. 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021),[11] which addressed Maryland's law prohibiting the performance of professional conversion therapy on minors. *See* Md. Code Ann., Health Occ. § 1–212.1. *Doyle* held that Maryland's SOGICE law "land[ed] on the conduct end of the sliding scale." *Doyle*, 411 F. Supp. 3d at 345. And under Fourth Circuit precedent, intermediate scrutiny was the appropriate standard of review for "conduct regulations that incidentally impact speech." *Id.* at 346 (cleaned up). Applying this standard, *Doyle* upheld Maryland's law on a record similar to the one presented in this case. *Id.* at 346–48. (As noted, the court's decision was recently vacated on jurisdictional grounds.)

But even under a strict scrutiny analysis, SB 5722 passes constitutional muster because it addresses a compelling interest, is narrowly tailored, and is the least-restrictive alternative. *See Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).

First, SB 5722 identifies the State's compelling interest in "protecting the physical and psychological well-being of minors" and "protecting its minors against exposure to serious harms caused by conversion therapy." 2018 Wash.

---

[11] The Fourth Circuit held that the plaintiff in *Doyle* sued the wrong defendants and therefore did not reach the First Amendment issues. 1 F.4th at 251–52.

Sess. Laws, ch. 300, § 1(2). The Supreme Court has repeatedly recognized that "[t]here is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns*, 492 U.S. at 126; *see also New York v. Ferber*, 458 U.S. 747, 756–57 (1982); *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 749–50 (1978). The State also has a "compelling interest in the practice of professions within their boundaries," *Goldfarb*, 421 U.S. at 792, and in "regulating mental health," *NAAP*, 228 F.3d at 1054. The State has a separate "weighty" interest in affirming the dignity and equal worth and treatment of LGBT people. *Fulton v. City of Philadelphia, Pa.*, 141 S. Ct. 1868, 1877 (2021) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018)). The law reflects research findings showing that SOGICE is ineffective and harmful to children. *See supra* pp. 5–6, 10–11. In addition to its consideration of public health authorities and professional consensus, the Legislature was aware that many other states and cities have restricted SOGICE, and that courts recognize that such prohibitions protect public health. *See* 1-SER-67. The State may justify its laws "by reference to studies and anecdotes pertaining to different locales altogether" or even "based solely on history, consensus, and simple common sense." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (cleaned up); *see also King*, 767 F.3d at 238

(legislatures may "rely on the empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review, particularly when this community has spoken with such urgency and solidarity on the subject."). Washington's Legislature reasonably restricted professional SOGICE to protect youth from serious harms, including a significantly increased risk of depression and suicide.

Second, SB 5722 is narrowly tailored because (1) it is limited to regulating the practice of conversion therapy on minors and (2) it only applies to licensed practitioners acting or representing themselves as acting in their licensed capacity. As demonstrated by its careful exceptions and limitations for speech and religious practices, the law is targeted squarely at a professional health therapy known to be ineffective and dangerous. *See Pickup*, 740 F.3d at 1223–24; 2018 Wash. Sess. Laws, ch. 300, § 2. The law does not preclude licensed health professionals from discussing SOGICE with the public or with their clients, and it does not prevent them from expressing their views about SOGICE, sexual orientation, or gender identity with their clients. Nor does the law prevent practitioners from administering SOGICE to people 18 and over, or from referring minors to unlicensed counselors, including religious leaders. *See Pickup*, 740 F.3d at 1223.

Third, the law is the least restrictive alternative. Tingley argues the law is overbroad and should have been limited to physical abuse of children. Opening Br. at 56–57. But limiting the law to aversion therapy only would not adequately protect minors. Research presented to the Legislature emphasized the importance of therapy without a predetermined outcome to avoid the risk of harm from conversion therapy. *See, e.g.*, 2-SER-372 (professional consensus on conversion therapy with minors is that "[i]nterventions aimed at a fixed outcome, such as gender conformity or heterosexual orientation, including those aimed at changing gender identity, gender expression, and sexual orientation are coercive, can be harmful, and should not be part of behavioral health treatments"); 2-SER-219, 300; 1-SER-78. The restriction on all conversion therapy performed on minors by licensees furthers the State's compelling interest in protecting minors.

### 2. Tingley's due process claim fails because SB 5722 is clear and does not allow for arbitrary enforcement

The district court correctly held that SB 5722 does not violate due process. 1-ER-17–18. Tingley's due process claim fails for several reasons, but principally, there is no mystery about what SB 5722 prohibits.

First, Tingley's due process claim is a facial, not as-applied, challenge. *See* 3-ER-417. This challenge fails at the outset because "vagueness challenges

to statutes that do not involve First Amendment violations must be examined as applied to the defendant." *Kashem v. Barr*, 941 F.3d 358, 375 (9th Cir. 2019) (cleaned up). Here, as discussed above, binding authority holds that SB 5722 does not implicate the First Amendment. Yet Tingley has expressly indicated he is not making an as-applied challenge. And his "straightforward vagueness challenge" does not present any "exceptional circumstances" that might preclude an as-applied challenge.[12] *Id.* at 377. Therefore, this claim fails at the first step.[13]

Second, even if Tingley could make a facial challenge to the law, it would be directly precluded by *Pickup*, which held that California's nearly indistinguishable law is not vague as a matter of law. 740 F.3d at 1233–34. While the Court did not analyze whether that statute encourages "arbitrary

---

[12] An exception to the rule described in *Kashem* exists only in rare cases—for example, where the statute might be vague as applied to the challenger or where the statute does not lend itself to an as-applied challenge. *Id.* at 376–77. Tingley has failed to show that either circumstance is present here.

[13] But even if Tingley's complaint could be construed to raise an as-applied challenge, the claim still fails. Though it is possible Tingley may be violating SB 5722, an as-applied challenge is not yet ripe, for the reasons explained above. *See supra* pp. 25–27. Even if it were, the Court should conclude that the law is not vague because it only prohibits, in terms that are at least "reasonably clear," *see Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 505 (1982), those therapies directly aimed at *changing* a minor's sexual orientation or gender identity.

52

enforcement," Opening Br. at 68, it did conclude that the commonly understood terms therein provided sufficient notice of the prohibited conduct.

Third, even if *Pickup* somehow did not control, the due process claim still fails as a matter of law. To succeed on a facial vagueness challenge to a business regulation, "the complainant must demonstrate that the law is impermissibly vague in *all* of its applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982) (emphasis added); *see also Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1030–31 (9th Cir. 2020) (upholding definition of "anticompetitive or deceptive practice" that used standards-based language). SB 5722 is not vague in every application. For example, exposing a minor to heterosexual pornography in an effort to change their sexual orientation, or counseling a minor to wear certain clothes in an effort to change their gender identity, would clearly constitute unprofessional conduct under the law. *Cf.* 3-ER-352.

Fourth, even if a more exacting version of the vagueness doctrine applied, SB 5722 would meet it. The doctrine only requires fair notice and sufficient standards to guard against arbitrary enforcement. *Kashem*, 941 F.3d at 369–70. The degree of vagueness permitted depends on the nature of the enactment. *Id.* at 370. "[P]erfect clarity and precise guidance have never been required even of

regulations that restrict expressive activity." *Pickup*, 740 F.3d at 1233 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The relevant inquiry is whether the law is "so vague and indefinite as really to be no rule or standard at all," and whether "a person of ordinary intelligence" would know whether his or her conduct runs afoul. *Fang Lin Ai v. United States*, 809 F.3d 503, 514 (9th Cir. 2015) (cleaned up).[14] The standard of clarity is lower in a professional context, where specialized knowledge is assumed. *Pickup*, 740 F.3d at 1234.

Here, to determine whether conduct by a health professional constitutes conversion therapy, one need only ask: Is the goal of the regime to "change a[] [minor's] sexual orientation or gender identity"? Wash. Rev. Code § 18.130.020(4)(a). If so, it is unprofessional conduct. *See Pickup*, 740 F.3d at 1234 ("A reasonable person would understand the statute to regulate only . . . treatment, including psychotherapy, that aims to alter a minor patient's sexual orientation" or gender identity).

---

[14] Statutory terms will be invalidated on vagueness grounds if they require application of "wholly subjective judgments" such as a statute that "tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent . . . .'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010); *see, e.g.*, *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (statute prohibiting doctors from "<u>unnecessary</u> harassment is incomprehensibly vague").

Tingley contends that the line for when a therapy seeks "change" is unclear. Opening Br. at 60–61. But the law is clear: Efforts to help a minor come to terms with their own understanding of their gender identity or sexual orientation, without an a priori goal of an externally-chosen identity or orientation, would be permitted. Interventions aimed at a fixed outcome that steers a minor into a particular identity or orientation that does not align with their own sense of identity or orientation, would not be.

Tingley further complains that "gender identity" is not defined by SB 5722, but the term has a generally understood meaning, particularly amongst health professionals. "Gender identity" refers to an individual's deeply felt sense of how they experience their own gender. *See, e.g.*, 2-SER-376 ("Gender identity refers to a person's deeply felt, inherent sense of being a girl, woman or female; a boy, a man or male; a blend of male or female; or an alternative gender[.]"); 2-SER-425 (similar); 2-SER-234 (similar); *see also, e.g.*, *Merriam-Webster's Online Dictionary* [*Webster's*], "gender identity," https://www.merriam-webster.com/dictionary/gender%20identity (last accessed Jan. 13, 2022) (defining the term as "a person's internal sense of being male, female, some combination of male and female, or neither male nor female"). To practicing therapists, it is a term of "common understanding . . . to which no [practitioner]

is a stranger." *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (cleaned up).

Tingley's vagueness challenge is particularly untenable given that courts at all levels have used the terms "sexual orientation" and "gender identity" in their opinions with no sign of difficulty in understanding what they mean. For example, eight justices of the Supreme Court signed on to opinions that referred to "sexual orientation" and "gender identity" as now-established terms. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020); *id.* at 1758 (Alito, J., dissenting); *id.* at 1756 n.6 (noting that the APA has defined "gender identity"). And *Pickup* recognized that the phrase "sexual orientation" has a commonly understood meaning. 740 F.3d at 1234; *see also, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 661 (2015).

Tingley's argument is also disingenuous because he states that he has counseled minors on gender identity issues, and the phrase "gender identity" appears no fewer than 17 times in his declaration supporting his motion for preliminary injunctive relief. *See* 3-ER-342. To paraphrase this Court in *Pickup*, "it is hard to understand how therapists who identify themselves as [SOGICE] practitioners can credibly argue that they do not understand what practices qualify as [SOGICE]." 740 F.3d at 1234; *see also United States v. Weitzenhoff*,

35 F.3d 1275, 1289 (9th Cir. 1994) (explaining defendants were knowledgeable in field and should know what the terms meant). The terms in the law are "reasonably clear." *See Hoffman Ests.*, 455 U.S. at 505. To the extent Tingley has any confusion, he is assumed to have the ability "to clarify the meaning of the [law] by [his] own inquiry, or by resort to an administrative process," *id.* at 498.

Tingley next argues the term "gender identity" is vague by selectively quoting another law's definition of the term: "gender *expression or* identity." *See* Opening Br. at 63. Under the Washington Law Against Discrimination (WLAD):

> "Sexual orientation" means heterosexuality, homosexuality, bisexuality, and gender expression or identity. As used in this definition, "gender expression or identity" means having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth.

Wash. Rev. Code § 49.60.040(27). This definition under WLAD is clear and supports the fact that "gender identity" has a commonly understood meaning. Tingley also wrongly identifies the agency tasked with enforcing SB 5722; the DOH Secretary—not the Washington State Human Rights Commission—is the

disciplining authority for marriage and family therapy counselors. *See* Wash. Rev. Code §§ 18.225.080, 18.130.040(2)(x); Opening Br. at 63.

Finally, as he did below, Tingley contends that SB 5722 is impermissibly vague because the statute permits "the attorney general, any prosecuting attorney, . . . or any other person [to] maintain an action . . . to enjoin the person from committing the violations." Wash. Rev. Code § 18.130.185. The district court rightly rejected this argument because the law "gives clear notice of what activity Plaintiff may and may not engage in." 1-ER-18. Thus, "[h]e cannot claim that he would be subject to 'arbitrary enforcement' because he knows what activity puts him at risk of an enforcement action." *Id.*; *see also United States v. Kuzma*, 967 F.3d 959, 970 (9th Cir. 2020) (facial vagueness challenge failed where the statute "provides both sufficient notice as to what is prohibited and sufficient guidance to prevent against arbitrary enforcement").

### 3. Tingley's free exercise claim fails because SB 5722 is neutral and generally applicable

SB 5722 is neutral and generally applicable, and the district court correctly held Tingley's free exercise claims failed as a matter of law for similar reasons as in *Welch v. Brown*, 834 F.3d 1041 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 2093 (2017). 1-ER-18–19. The right to freely exercise one's chosen religion "does not relieve an individual of the obligation to comply with a valid and

neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (cleaned up). Thus, "a law that is neutral and of general applicability need not be justified by a compelling interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

### a. SB 5722 is neutral and generally applicable

Despite arguing that the analysis of neutrality is fact-specific, Tingley does not factually distinguish this case from *Welch*. Opening Br. at 37. Because this case is on all fours with *Welch*, the same analysis—and outcome—applies. In *Welch v. Brown*, the panel that decided *Pickup* also rejected a Free Exercise Clause challenge to California's SOCE law. *Welch* recognized that California's law regulates only conduct "*within the confines of the counselor-client relationship*." 834 F.3d at 1044. It does not regulate the way in which licensed professionals or their clients practice their religions. The same is true for SB 5722. The intent of the Legislature was to regulate "the *professional* conduct of licensed health care providers . . . ." 2018 Wash. Sess. Laws, ch. 300, § 1(1) (emphasis added). And unlike California's law, SB 5722 expressly exempts

religious activity. *Compare id.* § 2(1)–(2) *with Welch*, 834 F.3d at 1045. In *Welch*, California represented that its law would not apply to counselors "acting in their pastoral or religious capacity" who "don't hold themselves out as operating pursuant to their license." *Welch*, 843 F.3d at 1045. SB 5722 expressly provides this exemption, *see* 2018 Wash. Sess. Laws, ch. 300, § 2. This interpretation is consistent with the limitation stated in chapter 18.225 Wash. Rev. Code, the chapter focused specifically on mental health counselors, marriage and family therapists, and social workers. That chapter (including the requirement that the practitioner obtain a license) expressly does not apply to these professions when practiced "under the auspices of a religious denomination, church, or religious organization." Wash. Rev. Code § 18.225.030(4). Section 18.225.030(4) reinforces that the State intended to regulate marriage and family therapists (and others) only to the extent they act in a licensed professional capacity.

*Welch* further recognized that California's law is neutral with respect to religion. *See* 843 F.3d at 1045–47. Specifically, this Court held that the law's object was not "to infringe upon or restrict practices because of their religious motivation[.]" *Id.* at 1047 (quoting *Lukumi*, 508 U.S. at 533); *see also King*, 767 F.3d at 243 (holding that New Jersey statute banning SOCE "is neutral and

generally applicable, and therefore triggers only rational basis review"). So too here.

The precedent of *Welch* aside, the text, operation, and history of SB 5722 all show the law is "neutral [and] generally applicable." *Smith*, 494 U.S. at 880. SB 5722 makes no reference to religion or religious practice—except to clarify that the law does not apply to religion or religious practice—and is therefore neutral on its face. *See Lukumi*, 508 U.S. at 533–34. Nor does SB 5722's context and legislative history evince any intent to suppress religious beliefs or practices. *See Lukumi*, 508 U.S. at 534–40. Instead, its neutral, secular basis is manifestly apparent: the Legislature had before it evidence that conversion therapy is an ineffective practice and particularly harmful to minors. *Supra* pp. 10–11. "The object of [SB 5722] is the prevention of harm to minors, regardless of the motivations for seeking [SOGICE]." *Welch*, 834 F.3d at 1047. Tingley makes no allegations of statements that can be imputed to the Legislature showing that religious practices were the primary target of the law or that SB 5722 is a "religious gerrymander." *Lukumi*, 508 U.S. at 535.[15] The record does not

---

[15] Tingley selectively quotes one legislator describing her friend's experience—not the law's aim. *Compare* Opening Br. at 40, *with Senate Floor Debate*, TVW (Jan. 19, 2018 10:00 AM), https://tvw.org/video/senate-floor-debate-2018011151/?eventID=2018011151 at 1:23:00. In any event, "floor statements by individual legislators rank among the least illuminating forms of

"compel[] the conclusion that suppression of [religion] was the object . . . ." *Id.* at 534. It would be very odd indeed for a law allegedly "inhibiting religion" to expressly exempt "[r]eligious practices and counseling." 2018 Wash. Sess. Laws, ch. 300, § 2(2); *see Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 673 (1970) (exemption for religious activity was "a reasonable and balanced attempt to guard against" hostility to religion).

But even if Tingley could show that some, or even a substantial, amount of conversion therapy were religiously motivated as a practical matter, this would not demonstrate that the Legislature's primary intent was to target religious practices.[16] *See, e.g.*, *Welch*, 834 F.3d at 1047; *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) ("General applicability does not mean absolute universality."). Notably, in both this case and in *Welch*, the plaintiffs selectively pointed to the APA Report and other materials which asserted that some individuals seeking to change their sexual orientation are religiously motivated. *See* Opening Br. at 39; *Welch*, 834 F.3d at 1046. But upon

---

legislative history." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017); *see also Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999). Thus, a single legislator's remarks "are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979).

[16] Tingley himself acknowledges that his clients do not necessarily come in with a "religious motivation." *See* 3-ER-349, 384.

examination, this Court noted that the scientific evidence considered by the California Legislature (and also before the Washington Legislature) "also stressed that persons seek SOCE for many secular reasons[,]" *Welch*, 834 F.3d at 1047, "such as social stigma and the desire to live in accordance with 'personal' values[,]" *id.* at 1046. This Court further explained "even if [the Court] assume[s] that persons with certain religious beliefs are more likely to seek SOCE, the 'Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct.'" *Id.* at 1047 (quoting *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1077 (9th Cir. 2015)).[17] Like California's law, SB 5722 is neutral with respect to religion. *See id.* at 1045–47.

For similar reasons, SB 5722 is also generally applicable. General applicability "addresses whether a law treats religious observers unequally," such as "when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020)

---

[17] And allegations of "disparate impact" are not sufficient to state a free exercise claim. *See, e.g.*, *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 750 F.3d 184, 195–96 (2d Cir. 2014); *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 429 (6th Cir. 2002).

(quoting *Lukumi*, 508 U.S. at 542–53). SB 5722 does not impose burdens only on conduct motivated by religious belief. It bars *all* state-licensed health professionals from engaging in SOGICE with minors, regardless of whether the licensed professional or the minor is motivated by religious belief or motivated by any other purpose. *See Stormans*, 586 F.3d at 1134. For this reason, Tingley's reliance on *Lukumi*, 508 U.S. 520, and *Central Rabbinical Congress of the United States & Canada v. New York City Department of Health & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014), is misplaced. In *Lukumi*, the Supreme Court considered the constitutionality of multiple city ordinances that interfered with the practice of Santeria, a religion that includes animal sacrifice in its rituals. 508 U.S. at 526. The ordinances prohibited the killing of animals in Santeria rituals, but excluded almost all other animal killings, including those that occurred in connection with hunting, fishing, meat production, pest extermination, and euthanasia. *Id.* at 537. In effect, they applied to no entity other than the Santeria Church. The Court thus held that these "gerrymandered" ordinances were not neutral or generally applicable. *Id.* at 542. In *Central Rabbinical Congress*, the Second Circuit held a regulation related to circumcision violated the Free Exercise Clause in part because it applied only to specific religious conduct associated with a small percentage of infection cases

and the government did not address non-religious conduct associated with a much larger percentage of infections. SB 5722 does not bear similarity to the unconstitutional regulations that were intended to—and did—target particular religious practices in *Lukumi* and *Central Rabbinical Congress*.[18]

Finally, Tingley's arguments that SB 5722 is not generally applicable because the law allows for discretion-based individualized exemptions misreads the statute. *See* Opening Br. at 44. As the Supreme Court recently explained in *Fulton v. City of Philadelphia*, a law may not be "generally applicable" under *Smith* for either of two reasons: First, "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions;" or, second, "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." 141 S. Ct. at 1877 (cleaned up). SB 5722 does not allow for either; there is no system of individualized exemptions and the statute does not condone violations "when they occur for secular reasons but not when they occur

---

[18] *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), is also distinguishable, because while a law that "single[s] out houses of worship for especially harsh treatment" must meet strict scrutiny, a "law [that] is neutral and of general applicability . . . need only survive rational basis review[.]" *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1140 (9th Cir. 2021) (quoting *Roman Cath. Diocese of Brooklyn, N.Y. v. Cuomo*, 141 S. Ct. 63, 66 (2020) (per curiam)).

for religious reasons." *Wiesman*, 794 F.3d at 1082; *see also Ward v. Polite*, 667 F.3d 727, 738–39 (6th Cir. 2012) (observing that "[w]hat poses a problem" for a policy that is "[o]n its face . . . generally applicable," is "the implementation of the policy, permitting *secular* exemptions but not religious ones . . . .") (emphasis added).

Because SB 5722 is neutral and generally applicable, rational basis review applies. Tingley does not dispute that Washington State has a legitimate interest in protecting minors from harmful conduct. *See Sable Commc'ns*, 492 U.S. at 126; 2018 Wash. Sess. Laws, ch. 300, § 1(2) (explaining the State's compelling interest in protecting the physical and psychological well-being of minors and in protecting its minors against exposure to serious harms caused by conversion therapy). As a matter of law, SB 5722 does not violate the Free Exercise Clause.

**b.     Tingley cannot state a "hybrid rights" claim**

Tingley argues that the Court should apply strict scrutiny because he alleges a "hybrid-rights claim," Opening Br. at 46–47, but the district court correctly rejected this argument for several reasons, *see* 1-ER-19. First, this Court has questioned whether the "hybrid rights" doctrine even exists and declined to follow the very case Tingley relies on. *See Parents for Privacy*, 949 F.3d at 1236–38; *id.* at 1237 (discussing *Miller v. Reed*, 176 F.3d 1202 (9th Cir.

1999), and explaining there is "no binding Ninth Circuit authority deciding the issue of whether the hybrid rights exception exists and requires strict scrutiny").[19] Second, if the doctrine does exist, "alleging multiple failing constitutional claims that do not have a likelihood of success on the merits cannot be enough to invoke a hybrid rights exception and require strict scrutiny." *Id.* at 1237. Tingley has not established a free exercise claim nor any companion claims, as discussed above. And third, even if heightened scrutiny applied, SB 5722 is still narrowly tailored to address a compelling state interest. *Supra* pp. 48–51.

### 4. Tingley's third-party claims necessarily fail

Although Tingley lacks third-party standing, it still bears emphasizing that SB 5722 also does not violate the free speech or free exercise rights of Tingley's minor clients, for the same reasons the law does not violate Tingley's own rights. *See Pickup*, 740 F.3d at 1232 n.9; *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998); *Doe*, 783 F.3d at 155 (rejecting claim

---

[19] *See also Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 440 n.45 (9th Cir. 2008) (describing widespread criticism and declining to adopt the doctrine); *McTernan v. City of York, PA*, 564 F.3d 636, 647 n.5 (3d Cir. 2009); *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001); *Kissinger v. Bd. of Trs. of Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993).

that law prohibiting SOCE to minors violated right to receive information because the law did not violate counselors' right to speak). Tingley's clients are not in any way deprived of their ability to engage in an exchange of ideas concerning conversion therapy and SB 5722 is neutral and generally applicable.

## C. The District Court Properly Denied Tingley's Motion for Preliminary Injunction Because He Failed to Show a Likelihood of Success on the Merits of His Claims

Tingley's final argument is that the Court should reverse the district court's denial of a preliminary injunction and remand with a mandate to enter a preliminary junction. Opening Br. at 66. But Tingley cannot make a "clear showing" that: (1) he is likely to succeed on the merits; (2) he would suffer irreparable harm; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest. Fed. R. Civ. P. 65(b)(1); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The district court's dismissal of Tingley's complaint for failure to state a claim necessarily meant Tingley could not show a likelihood of success on the merits. And because Tingley failed to demonstrate any likelihood of success on the merits of his claims, the district court was not required to consider the remaining preliminary injunction factors. *See CDK Glob.*, 16 F.4th at 1274; *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (per curiam).

Regardless, Tingley also failed to establish the other *Winter* requirements. Regarding irreparable harm, in the absence of any constitutional violation, Tingley cannot demonstrate that he will be injured, let alone irreparably so. This is especially true given that Tingley faces no imminent threat of enforcement, and the record is devoid of any clear indication that Tingley is actually performing or intends to perform conversion therapy on minors. As discussed above, SB 5722 does not implicate the First Amendment; but even in the First Amendment context, where the irreparable harm requirement may be relaxed, the Supreme Court has stated that "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (per curiam). Turning to the balance of equities and public interest, Tingley ignores the irreparable harm to the State if it cannot enforce a statute enacted by the Washington State Legislature. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Most importantly, the State has a significant interest in regulating an ineffective and harmful practice affecting minors, and the public has an interest in protecting this vulnerable population from harms, including severe depression and suicidal thoughts, associated with SOGICE. *See supra* pp. 5–6 (describing harms and inefficacy of

such efforts). Washington State's interest in protecting children and teenagers from serious adverse health outcomes far outweighs Tingley's interest in practicing an ineffective and harmful therapy on his minor clients.

The law, the equities, and the public interest all weigh decisively against entry of a preliminary injunction in this matter.

## IX.    CONCLUSION

The Court should affirm the judgment of the district court.

RESPECTFULLY SUBMITTED this 14th day of January 2022.

ROBERT W. FERGUSON
Attorney General

*/s/ Cristina Sepe*
KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General
CRISTINA SEPE, WSBA #53609
JEFFREY C. GRANT, WSBA #11046
SIERRA MCWILLIAMS, WSBA #48544
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Kristin.Beneski@atg.wa.gov
Cristina.Sepe@atg.wa.gov
Jeffrey.Grant@atg.wa.gov
Sierra.McWilliams@atg.wa.gov
*Attorneys for the State Defendants-*
*Appellees/Cross-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 21-35815, 21-35856

The undersigned attorney or self-represented party states the following:

[x]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Cristina Sepe                    **Date** January 14, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                    *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 21-35815, 21-35856

I am the attorney or self-represented party.

**This brief contains 15,305 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[x] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Cristina Sepe       **Date** January 14, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**       *Rev. 12/01/18*

# ADDENDUM

**Wash. Rev. Code § 18.130.020**

**Definitions.**

The definitions in this section apply throughout this chapter unless the context clearly requires otherwise.

(1) "Board" means any of those boards specified in RCW 18.130.040.

(2) "Clinical expertise" means the proficiency or judgment that a license holder in a particular profession acquires through clinical experience or clinical practice and that is not possessed by a lay person.

(3) "Commission" means any of the commissions specified in RCW 18.130.040.

(4)(a) "Conversion therapy" means a regime that seeks to change an individual's sexual orientation or gender identity. The term includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex. The term includes, but is not limited to, practices commonly referred to as "reparative therapy."

(b) "Conversion therapy" does not include counseling or psychotherapies that provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development that do not seek to change sexual orientation or gender identity.

(5) "Department" means the department of health.

(6) "Disciplinary action" means sanctions identified in RCW 18.130.160.

(7) "Disciplining authority" means the agency, board, or commission having the authority to take disciplinary action against a holder of, or applicant for, a professional or business license upon a finding of a violation of this chapter or a chapter specified under RCW 18.130.040.

(8) "Health agency" means city and county health departments and the department of health.

(9) "License," "licensing," and "licensure" shall be deemed equivalent to the terms "license," "licensing," "licensure," "certificate," "certification," and "registration" as those terms are defined in RCW 18.120.020.

(10) "Practice review" means an investigative audit of records related to the complaint, without prior identification of specific patient or consumer names, or an assessment of the conditions, circumstances, and methods of the professional's practice related to the complaint, to determine whether unprofessional conduct may have been committed.

(11) "Secretary" means the secretary of health or the secretary's designee.

(12) "Standards of practice" means the care, skill, and learning associated with the practice of a profession.

(13) "Unlicensed practice" means:

(a) Practicing a profession or operating a business identified in RCW 18.130.040 without holding a valid, unexpired, unrevoked, and unsuspended license to do so; or

(b) Representing to a consumer, through offerings, advertisements, or use of a professional title or designation, that the individual is qualified to practice a profession or operate a business identified in RCW 18.130.040, without holding a valid, unexpired, unrevoked, and unsuspended license to do so.

**Wash. Rev. Code § 18.130.180**

**Unprofessional conduct.**

The following conduct, acts, or conditions constitute unprofessional conduct for any license holder under the jurisdiction of this chapter:

(1) The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not. If the act constitutes a crime, conviction in a criminal proceeding is not a condition precedent to disciplinary action. Upon such a conviction, however, the judgment and sentence is conclusive evidence at the ensuing disciplinary hearing of the guilt of the license holder of the crime described in the indictment or information, and of the person's violation of the statute on which it is based. For the purposes of this section, conviction includes all instances in which a plea of guilty or nolo contendere is the basis for the

conviction and all proceedings in which the sentence has been deferred or suspended. Nothing in this section abrogates rights guaranteed under chapter 9.96A RCW;

(2) Misrepresentation or concealment of a material fact in obtaining a license or in reinstatement thereof;

(3) All advertising which is false, fraudulent, or misleading;

(4) Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed. The use of a nontraditional treatment by itself shall not constitute unprofessional conduct, provided that it does not result in injury to a patient or create an unreasonable risk that a patient may be harmed;

(5) Suspension, revocation, or restriction of the individual's license to practice any health care profession by competent authority in any state, federal, or foreign jurisdiction, a certified copy of the order, stipulation, or agreement being conclusive evidence of the revocation, suspension, or restriction;

(6) Except when authorized by RCW 18.130.345, the possession, use, prescription for use, or distribution of controlled substances or legend drugs in any way other than for legitimate or therapeutic purposes, diversion of controlled substances or legend drugs, the violation of any drug law, or prescribing controlled substances for oneself;

(7) Violation of any state or federal statute or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice;

(8) Failure to cooperate with the disciplining authority by:

(a) Not furnishing any papers, documents, records, or other items;

(b) Not furnishing in writing a full and complete explanation covering the matter contained in the complaint filed with the disciplining authority;

(c) Not responding to subpoenas issued by the disciplining authority, whether or not the recipient of the subpoena is the accused in the proceeding; or

(d) Not providing reasonable and timely access for authorized representatives of the disciplining authority seeking to perform practice reviews at facilities utilized by the license holder;

(9) Failure to comply with an order issued by the disciplining authority or a stipulation for informal disposition entered into with the disciplining authority;

(10) Aiding or abetting an unlicensed person to practice when a license is required;

(11) Violations of rules established by any health agency;

(12) Practice beyond the scope of practice as defined by law or rule;

(13) Misrepresentation or fraud in any aspect of the conduct of the business or profession;

(14) Failure to adequately supervise auxiliary staff to the extent that the consumer's health or safety is at risk;

(15) Engaging in a profession involving contact with the public while suffering from a contagious or infectious disease involving serious risk to public health;

(16) Promotion for personal gain of any unnecessary or inefficacious drug, device, treatment, procedure, or service;

(17) Conviction of any gross misdemeanor or felony relating to the practice of the person's profession. For the purposes of this subsection, conviction includes all instances in which a plea of guilty or nolo contendere is the basis for conviction and all proceedings in which the sentence has been deferred or suspended. Nothing in this section abrogates rights guaranteed under chapter 9.96A RCW;

(18) The procuring, or aiding or abetting in procuring, a criminal abortion;

(19) The offering, undertaking, or agreeing to cure or treat disease by a secret method, procedure, treatment, or medicine, or the treating, operating, or prescribing for any health condition by a method, means, or procedure which the licensee refuses to divulge upon demand of the disciplining authority;

(20) The willful betrayal of a practitioner-patient privilege as recognized by law;

(21) Violation of chapter 19.68 RCW or a pattern of violations of RCW 41.05.700(8), 48.43.735(8), 48.49.020, 48.49.030, 71.24.335(8), or 74.09.325(8);

A.4

(22) Interference with an investigation or disciplinary proceeding by willful misrepresentation of facts before the disciplining authority or its authorized representative, or by the use of threats or harassment against any patient or witness to prevent them from providing evidence in a disciplinary proceeding or any other legal action, or by the use of financial inducements to any patient or witness to prevent or attempt to prevent him or her from providing evidence in a disciplinary proceeding;

(23) Current misuse of:

(a) Alcohol;

(b) Controlled substances; or

(c) Legend drugs;

(24) Abuse of a client or patient or sexual contact with a client or patient;

(25) Acceptance of more than a nominal gratuity, hospitality, or subsidy offered by a representative or vendor of medical or health-related products or services intended for patients, in contemplation of a sale or for use in research publishable in professional journals, where a conflict of interest is presented, as defined by rules of the disciplining authority, in consultation with the department, based on recognized professional ethical standards;

(26) Violation of RCW 18.130.420;

(27) Performing conversion therapy on a patient under age eighteen;

(28) Violation of RCW 18.130.430.

## 2018 Wash. Sess. Laws, ch. 300, § 1

(1) The legislature intends to regulate the professional conduct of licensed health care providers with respect to performing conversion therapy on patients under age eighteen.

(2) The legislature finds and declares that Washington has a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by conversion therapy.

**2018 Wash. Sess. Laws, ch. 300, § 2**

This act may not be construed to apply to:

(1) Speech that does not constitute performing conversion therapy by licensed health care providers on patients under age eighteen;

(2) Religious practices or counseling under the auspices of a religious denomination, church, or organization that do not constitute performing conversion therapy by licensed health care providers on patients under age eighteen; and

(3) Nonlicensed counselors acting under the auspices of a religious denomination, church, or organization.