No. 21-35815, 21-35856

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

BRIAN TINGLEY,
*Plaintiff-Appellant,*

v.

ROBERT W. FERGUSON, in his official capacity as Attorney General for the State of Washington; Umair A. Shah, in his official capacity as Secretary of Health for the State of Washington; and Kristin Peterson, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance division of the Washington State Department of Health,
*Defendants-Appellees*

and

EQUAL RIGHTS WASHINGTON,
*Intervenor Defendant-Appellee*

———————————

On Appeal from the United States District Court for the
Western District of Washington (Dist. Ct. Case No. 3:21-cv-05359)

———————————

## BRIEF OF AMERICAN PSYCHOLOGICAL ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

———————————

Nathalie F.P. Gilfoyle
Deanne M. Ottaviano
AMERICAN PSYCHOLOGICAL
ASSOCIATION
750 First Street NE
Washington, DC 20002
(202) 336-6100

*Counsel for American
Psychological Association*

Tassity Johnson
*Counsel of Record*
Jessica Ring Amunson
Jessica Sawadogo
JENNER & BLOCK LLP
1099 New York Avenue NW, Ste. 900
Washington, DC 20001
(202) 637-6303
tjohnson@jenner.com

*Counsel for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

/s/ *Tassity Johnson*

Tassity Johnson
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite #900
Washington, DC 20001
(202) 637-6303
tjohnson@jenner.com

*Counsel for Amicus Curiae*

C-1

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .................................................... C-1

TABLE OF AUTHORITIES ..................................................................... ii

IDENTITY AND INTERESTS OF *AMICUS CURIAE* ........................................... 1

SUMMARY OF THE ARGUMENT ..................................................... 4

ARGUMENT AND CITATIONS OF AUTHORITY ........................................... 7

I.   Background on SOCE and GICE ................................................. 9

    A.   History of SOCE.................................................................... 9

    B.   History of GICE ................................................................ 10

    C.   The APA's Position on SOCE and GICE ......................................... 11

II.  There is Insufficient Evidence to Support the Efficacy of SOCE or GICE. ...................................................................................... 15

III. SOCE and GICE Pose Significant Risks, Especially to Minors.................. 18

    A.   Some Individuals Report Harm from SOCE and GICE..................... 18

    B.   Minors Are Particularly Vulnerable to Harm from SOCE and GICE.............................................................................. 24

    C.   Licensed Mental Health Providers Have a Duty to Avoid Harm to Members of the Public Whom They are Licensed to Serve .......... 25

IV.  Appellant Misstates and Misrepresents the Science on SOCE and GICE. ...................................................................................... 27

CONCLUSION ...................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *abrogated by National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ..... 13

*Doyle v. Hogan*, Case No. 19-cv-0190, 2019 WL 3500924 (D. Md. Aug. 1, 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021).......................... 13

**OTHER AUTHORITIES**

Tiffiny A. Ainsworth & Jeffrey H Spiegel, *Quality of Life of Individuals With and Without Facial Feminization Surgery or Gender Reassignment Surgery*, 19 Qual. Life Res. 1019(2010)............................................................ 29

American Academy of Child & Adolescent Psychiatry, *Conversion Therapy* (approved Feb. 2018), https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx ........................................................ 12

American Association for Marriage and Family Therapy, *Statement on Nonpathologizing Sexual Orientation* (2004)..................................................... 12

American Foundation for Suicide Prevention, *State Laws: Banning Conversion Therapy Practices Issue Brief* (updated May 19, 2021), https://www.datocms-assets.com/12810/1621449151-conversion-therapy-issue-brief-5-19-21.pdf..................................................................... 12

American Medical Association, *Advocating for the LGBTQ Community*, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community (last visited Jan. 19, 2022) .................................................... 12

American Psychological Association, *Ethical Principles of Psychologists and Code of Conduct* (Jan. 1, 2017), https://www.apa.org/ethics/code .............. 25-26

*APA Handbook of Sexuality and Psychology* (Deborah L. Tolman & Lisa M. Diamond eds., 2014)......................................................................... 15

John Bancroft, *Aversion Therapy of Homosexuality: A Pilot Study of 10 Cases*, 115 Brit. J. Psychiatry 1417 (1969) ...................................................... 19

ii

A. Lee Beckstead & Susan L. Morrow, *Mormon Clients' Experiences of Conversion Therapy: The Need for a New Treatment Approach*, 32 Counseling Psychologist 651 (2004) ............................................................ 20

Lee Birk et al., *Avoidance Conditioning for Homosexuality*, 25 Archives Gen. Psychiatry 314 (1971) ......................................................................... 15

Blosnich et al., *Sexual Orientation Change Efforts, Adverse Childhood Experiences, and Suicide Ideation and Attempt Among Sexual Minority Adults in the United States, 2016-2018*, 110 Am. J. Public Health 1024 (2020) ........................................................................................................ 21

Kate Bradshaw et al., *Sexual Orientation Change Efforts Through Psychotherapy for LGBQ Individuals Affiliated with the Church of Jesus Christ of Latter-day Saints*, 41 J. Sex & Marital Therapy 391 (2015) ........ 16, 22

Council of the District of Columbia, Comm. on Health, Comm. Rep. on Bill 22-0972, *Conversion Therapy for Consumers Under a Conservatorship or Guardianship Amendment Act of 2018* (Nov. 1, 2018) .................................... 13

Gerald C. Davison, *Homosexuality: The Ethical Challenge*, 44 J. Consulting & Clinical Psych. 157 (1976) ............................................................ 28

John P. Dehlin et al., *Sexual Orientation Change Efforts Among Current or Former LDS Church Members*, J. Counseling Psych. (Online) (Mar. 2014) ........................................................................................................ 16

Annelou L. C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014) ..................................................................................................... 29-30

Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among U.S. LGBTQ Youths and Young Adults*, 110 Am J. Public Health 1221 (2020 ........................................................................................................ 25

Steven H. Herman & Michael Prewett, *An Experimental Analysis of Feedback to Increase Sexual Arousal in a Case of Homo- and Heterosexual Impotence: A Preliminary Report*, 5 J. Behav. Therapy & Experimental Psychiatry 271 (1974) ....................................................................... 19

Gregory M. Herek, *Evaluating Interventions to Alter Sexual Orientation: Methodological and Ethical Consideration*s, 32 Archives Sexual Behav. 438 (2003) .......................................................................................... 28

Madison Higbee et al., *Conversion Therapy in the Southern United States: Prevalence and Experiences of the Survivors*, J. Homosexuality (Online) (2020) .......................................................................................................... 11

Institute of Medicine, *Finding What Works in Health Care: Standards for Systematic Reviews* (2011) .................................................................. 7

Basil James, *Case of Homosexuality Treated by Aversion Therapy*, 1 Brit. Med. J. 768 (1962) ............................................................................... 19

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey, National Center for Transgender Equality* (Dec. 2016), https://trans equality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.......... 24

Stanton L. Jones & Mark A. Yarhouse, *A Longitudinal Study of Attempted Religiously Mediated Sexual Orientation Change*, 37 J. Sex & Marital Therapy 404 (2011) ............................................................. 16-17, 22

Scott O. Lillenfeld, *Psychological Treatments that Cause Harm*, 2 Persp. on Psych. Sci. 53 (2007) ............................................................................ 28

Elaine M. Maccio, *Self-Reported Sexual Orientation and Identity Before and After Sexual Reorientation Therapy*, 15 J. Gay & Lesbian Mental Health 242 (2011) ................................................................................................ 16

Neil McConaghy, *Is A Homosexual Orientation Irreversible?*, 129 Brit. J. Psychiatry 556 (1976) ................................................................................ 15

Neil McConaghy & R.F. Barr, *Classical, Avoidance, and Backward Conditioning Treatment of Homosexuality*, 122 Brit. J. Psychiatry 151 (1973) ..................................................................................................... 28

Movement Advancement Project, *Conversion "Therapy" Laws*, https://www.lgbtmap.org/equality-maps/conversion_therapy (data current as of Jan. 7, 2022) ..................................................................................... 22-23

iv

National Association of Social Workers, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May 2015), https://www.socialworkers.org/LinkClick.aspx?fileticket=IQYALknHU6s%3D&portalid=0 .......................... 12

Joseph Nicolosi et al., *Retrospective Self-Reports of Changes in Homosexual Orientation: A Consumer Survey of Conversion Therapy Clients*, 86 Psych. Rep. 1071 (2000)................................................................... 20

John C. Norcross & Clara E. Hill, *Empirically Supported Therapy Relationships*, 57 Clinical Psychologist 19 (2004)............................................ 23

Tiffany O'Shaughnessy & Zachary Speir, *The State of LGBQ Affirmative Therapy Clinical Research: A Mixed-Methods Systematic Synthesis*, 5 Psych. Sexual Orientation & Gender Diversity 82 (2018) ................................ 14

Dwight Panozzo, *Advocating for an End to Reparative Therapy: Methodological Grounding and Blueprint for Change*, 25 J. Gay & Lesbian Soc. Servs. 362 (2013) ........................................................... 17

A. Przeworski et al., *A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts*, 28 Clinical Psychol.: Sci. & Prac. 81 (2020)........................................................ 18

J.T. Quinn et al., *An Attempt to Shape Human Penile Responses*, 8 Behav. Res. & Therapy 213 (1970) ............................................................. 19

Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. on Homosexuality 159 2018).......................................... 22, 25

Travis Salway et al., *Prevalence of Exposure to Sexual Orientation Change Efforts and Associated Sociodemographic Characteristics and Psychosocial Health Outcomes among Canadian Sexual Minority Men*, 65 Can. J. Psychiatry 502 (2020)...................................................................20-21

Paul L. Santero et al., *Effects of Therapy on Religious Men Who Have Unwanted Same-Sex Attraction*, Linacre Q., July 2018 .................................... 16

Kim W. Schaeffer et al., *Religiously Motivated Sexual Orientation Change*, 19 J. Psych. & Christianity 61 (2000)................................................................. 20

Michael Schroder & Ariel Shidlo, *Ethical Issues in Sexual Orientation Conversion Therapies: An Empirical Study of Consumers*, 131 J. Gay & Lesbian Psychotherapy 131 (2001) ................................................................. 20

Ariel Shidlo & Michael Schroder, *Changing Sexual Orientation: A Consumer's Report*, 33 Prof. Psych.: Res. & Prac. 249 (2002) ....................... 20

Ariel Shidlo & John C. Gonsiorek, *Psychotherapy with Clients Who Have Been Through Sexual Orientation Change Interventions or Request to Change Their Sexual Orientation*, in Handbook of Sexual Orientation and Gender Diversity in Counseling and Psychotherapy (Kurt A. DeBord et al., eds., 2017) .................................................................................................... 26

Glenn Smith et al., *Treatments of Homosexuality in Britain Since 1950—An Oral History: The Experiences of Patients*, 328 Brit. Med. J. 427 (2004) ........ 20

Society for Prevention Research, *Standards of Evidence: Criteria for Efficacy, Effectiveness, and Dissemination* (2005) ............................................................ 16

Barry A. Tanner, *Avoidance Training With and Without Booster Sessions to Modify Homosexual Behavior in Males*, 6 Behav. Therapy 649 (1975) ........... 15

Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68 (2020) ............ 23

United Nations HRC 44/53, *Report on Conversion Therapy*, May 2020, https://undocs.org/A/HRC/44/53 ..................................................................... 22

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*[1]

*Amicus curiae* the American Psychological Association ("APA") submits this brief to provide the Court with context regarding the state of scientific knowledge about the efficacy and safety of sexual orientation change efforts ("SOCE") and gender identity change efforts ("GICE"), which can be forms of SOCE. As the largest professional association of psychologists, the APA is concerned about the effects of SOCE and GICE, especially on minors, and has a particular interest in this case because both parties cite the APA's research to advance their arguments.

The APA is a scientific and educational organization dedicated to increasing and disseminating psychological knowledge. Its over 122,000 members include researchers, educators, clinicians, consultants, and students. The APA's major purposes include increasing and disseminating knowledge regarding human behavior and fostering the application of psychological learning to important human concerns.

From 2007 to 2009, the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation (the "Task Force") conducted a systematic review

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than *amicus*, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

1

of the peer-reviewed studies on SOCE, which culminated in a comprehensive Report (the "2009 Report") on the state of the scientific literature. *See* 2-SER-213-350[2]. As detailed below, the Report "concluded that efforts to change sexual orientation are unlikely to be successful and involve some risk of harm, contrary to the claims of SOCE practitioners and advocates." *Id.* at 219. The APA later voted to adopt a Resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts (the "2009 Resolution," *id.* at 340-342), reflecting the Report's findings. The Resolution states, "[T]here is insufficient evidence to support the use of psychological interventions to change sexual orientation" and "mental health professionals" should "avoid misrepresenting the efficacy of sexual orientation change efforts by promoting or promising change in sexual orientation when providing assistance to individuals distressed by their own or others' sexual orientation." *Id.* at 341-42.

In 2021, the APA updated its findings on SOCE to reflect the most recent research on SOCE efficacy, and to assess studies published on GICE efficacy since the 2009 Report. This effort culminated in the APA's passage of the APA Resolution on Sexual Orientation Change Efforts ("SOCE Resolution,"), 2-ER at 70-78[3] and the APA Resolution on Gender Identity Change Efforts ("GICE Resolution,"), 2-ER

---

[2] "SER" stands for Supplemental Excerpts of Record.
[3] "ER" stands for Excerpts of Record.

at 85-88. The SOCE Resolution reports, "The research on SOCE published since [the 2009 Report and Resolution] has continued to support the conclusions that former participants in SOCE look back on those experiences as harmful to them and that there is no evidence of sexual orientation change." *Id.* at 72. The GICE Resolution similarly reports, "GICE are not supported by empirical evidence as effective practices for changing gender identity and are associated with psychological and social harm." *Id.* at 86.

The APA's 2009 Report and Resolution, and 2021 Resolutions, were discussed in the Appellants' Complaint (22-ER-371, 394); Appellants' motion for a preliminary injunction (Motion at 19, ECF No. 2); Expert Declarations in support of Appellant's motion for preliminary injunction (2-ER-268-69, 271-72, 278, 315, 320, 322-23, 326); Appellees' motion to dismiss (*see, e.g.*, 2-SER-13-14); Expert Declarations in support of Appellees' motion to dismiss (*see, e.g.*, *id.* at 186-88); Appellees' Briefs (Ferguson Brief at 5, 10-11, 62, ECF No. 36), (Equal Rights Washington Brief at 2, 5-6, 30, ECF No. 35); and Appellant's Brief at 39, ECF No. 19.

Given the attention the parties have devoted to the Report and 2021 Resolutions, and Appellants' mischaracterizations of several of the Task Force's key findings, the APA has a distinct interest in this case.

3

## SUMMARY OF ARGUMENT

The APA's findings in the 2009 Report and Resolution, and the 2021 Resolutions—and the state of the scientific evidence regarding the efficacy and safety of SOCE and GICE more broadly—are at the center of this case. At all stages of this dispute—from passage of the relevant law to the preliminary injunction order now on appeal—the parties have expressed divergent views about the effectiveness and risks of SOCE and GICE for minors. *Amicus* respectfully submits this brief to clarify and describe the scientific evidence on these therapeutic approaches.

As detailed below, SOCE and GICE developed in the nineteenth century as modes of ridding patients of homosexual desires and gender-nonconforming behaviors, which were then viewed as mental illnesses. By the 1970s, the APA and other professional organizations concluded homosexuality was not a pathology. Mainstream mental health professionals began to view SOCE as unethical and potentially harmful, and studies on SOCE became less common. By the 1980s, however, some mental health providers within religious communities began to claim SOCE were safe and effective for people whose religious beliefs were perceived to conflict with their sexual orientation or gender identity. This development led

several mainstream mental health organizations to adopt resolutions against SOCE and GICE.

Before adopting its 2009 Resolution, the APA Task Force conducted a comprehensive multi-year survey of the scientific literature on SOCE. The 2009 Report reached two key conclusions. *First*, it found SOCE unlikely to be effective. At the time of the Report—and through the present—there is a scientific consensus that SOCE are unlikely to reduce same-sex attractions. With respect to minors specifically, no scientific evidence shows any form of childhood therapy can alter adult sexual orientation. *Second*, the Report concluded SOCE pose a risk of harm to patients. Multiple scientific studies suggest SOCE may lead to depression, suicidal ideation, anxiety, substance abuse, impotence and sexual dysfunction, nightmares, gastric distress, dehydration, social isolation, deterioration of relationships with friends and family, and an increase in high-risk sexual behaviors, as well as indirect harms like loss of time and money. In the absence of data showing SOCE are safe for children and adolescents, the potential for psychological risks of SOCE for minors is especially concerning.

The APA updated the 2009 Report's findings with the publication of its 2021 SOCE and GICE Resolutions. After reviewing research since 2009 on the harms of SOCE, the SOCE Resolution reaffirmed SOCE lack sufficient bases in scientific principles. The GICE Resolution canvassed the current research, and similarly

concluded GICE pose a significant risk of harm and are not supported by empirical evidence as effective practices for changing gender identity.

In their challenge to the Appellees' bans on SOCE and GICE for minors, Appellants repeatedly misstate or mischaracterize the 2009 Report's key findings and ignore the 2021 Resolutions' updated evidence. For example, Appellants attempt to discredit the 2009 Report by (1) noting the lack of published research on SOCE; (2) suggesting the 2009 Report does not indicate evidence of harm; (3) claiming the 2009 Report improperly dismisses evidence of SOCE's purported benefits and (4) refusing to engage with new research supporting the 2009 Report and Resolution, or the 2021 Resolutions. Each of these claims is inconsistent with the 2009 Report and Resolution, the 2021 Resolutions, and with the available scientific evidence regarding SOCE. Appellants furthermore ignore scientific evidence on the harm of GICE and lack of research on GICE efficacy.

Contrary to Appellants' suggestion (and consistent with the best available evidence), the APA recommends "provid[ing] multiculturally competent and client-centered therapies to children, adolescents, and their families *rather than SOCE*." 2-SER-300 (emphasis added). The APA similarly recommends that "clinicians … use gender-affirming practices when addressing gender identity issues," and "*opposes GICE*." 2-ER-87 (emphasis added). *Amicus* urges this Court to reject

Appellants' mischaracterizations of the scientific evidence and to affirm the decision below.

## ARGUMENT AND CITATIONS OF AUTHORITY

This brief reports the conclusions of a systematic review[4] of peer-reviewed empirical research on the efficacy of SOCE completed and published by the APA in 2009, as well as the conclusions of studies completed on SOCE and GICE efficacy since the 2009 Report.

The APA Task Force conducted the systematic review that became the 2009 Report. The Task Force was established by the APA in 2007 to address several concerns the professional literature and advocacy organizations had raised about the use of SOCE on children and adolescents. Although the APA did not explicitly charge the Task Force to review the efficacy literature on SOCE, the Task Force decided such a review was necessary to provide context for the larger 2009 Report and its conclusions.

The APA's systematic review attempted to answer three questions: (1) whether SOCE can alter sexual orientation; (2) whether SOCE are harmful; and (3)

---

[4] The Institute of Medicine has defined a systematic review as "a scientific investigation that focuses on a specific question and uses explicit, prespecified scientific methods to identify, select, assess, and summarize the findings of similar but separate studies." Institute of Medicine, *Finding What Works in Health Care: Standards for Systematic Reviews* 1 (2011).

whether SOCE may result in any outcomes other than changing sexual orientation. The review considered only peer-reviewed empirical research on treatment outcomes published from 1960 to the time of the Report. *See* 2-SER-313-37.

The 2009 Report presented an accurate summary of the state of scientific knowledge on the efficacy of SOCE up to that time. For this brief, *amicus* has made a good faith effort to review and report the findings of all valid, empirical studies published on SOCE and GICE efficacy since the Report.

The 2009 Report also conducted narrative reviews of the larger body of studies on SOCE that did not meet the scientific standards necessary to be a valid study of efficacy. These studies are useful in understanding the motivations and experiences of those who have participated in SOCE (including whether they look back on those experiences as harmful or helpful), but they are not valid bases for conclusions regarding efficacy. The Task Force's conclusions regarding those studies (and the results of similar studies published since the Report was completed) will be reported in this brief when they are pertinent to important questions other than the question of efficacy.

Importantly, the lack of recent scientifically-valid efficacy studies on the broad range of SOCE and GICE used in recent decades is due in part to the ethical barriers to such research. Conducting a random controlled trial of a treatment that has not been determined to be safe is not ethically permissible, and institutional

review boards would not approve such research on vulnerable minors who cannot themselves provide legal consent.

Before citing a study, *amicus* critically evaluated the study's methodology, including the reliability and validity of the measures and tests the study employed and the quality of the study's data-collection procedures and statistical analyses. Scientific research is a cumulative process, and no empirical study is perfect in its design and execution. Accordingly, *amicus* bases its conclusions as much as possible on findings replicated across studies rather than on the findings of any single study. Even well-executed studies may be limited in their implications and generalizability. Many studies discuss their own limitations and provide suggestions for further research. This is consistent with the scientific method and does not impeach these studies' overall conclusions.

## I.    Background on SOCE and GICE.

### A. History of SOCE.

SOCE developed in the mid-nineteenth century to "cure" homosexual desires, which were then viewed as a mental illness. 2-ER-70. Because homosexuality was believed to be caused by "psychological immaturity" or pathologies like genetic defects and hormonal exposure, early SOCE "treatments attempted to correct or repair the damage done by pathogenic factors or to facilitate maturity." 2-SER-241.

These erroneous perspectives on homosexuality persisted through much of the twentieth century. *Id.* Indeed, "efforts to alter sexual orientation through psycho-analytic and behavior therapy were prevalent" by the mid-twentieth century. *Id.* at 242. These techniques included inducing nausea and paralysis; providing electric shock therapy; providing shame-aversion therapy; and attempting "systematic desensitization." *Id.* Some therapists also used non-aversive treatments like assertiveness and dating trainings, so-called "satiation therapy," or hypnosis. *Id.*

At the same time, "countervailing evidence was accumulating" against the proposition that homosexuality was a pathology. *Id.* In the 1940s and 1950s, Alfred Kinsey showed homosexuality was more prevalent than previously assumed, and Evelyn Hooker cast doubt on the notion that homosexuality was a mental disorder. *Id.* at 224-43. By 1973, the American Psychiatric Association had removed homosexuality from the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"). *Id.* at 231. In 1975, the APA adopted a policy reflecting the same conclusion. *Id.* at 244. Over the next several decades, professional health and mental health organizations increasingly adopted the view that homosexuality is "a normal variant of human sexuality." *Id.* at 231.

**B. History of GICE.**

GICE, which can be forms of SOCE, focus on changing an individual's gender identity, gender expression, or associated components to align with gender role

behaviors stereotypically associated with that individual's sex assigned at birth. 2-ER-85. Like SOCE, GICE arose from a belief that nonconformity of a person's gender identity or expression with that person's sex assigned at birth, or a person's nonbinary gender identity, is pathological. *See id.*

As with views on same-sex attraction, over the last few decades, "gender nonconformity underwent a … transition from 'gender identity disorder' to 'gender dysphoria,' indicating that being transgender or non-binary does not constitute a mental disorder." Madison Higbee et al., *Conversion Therapy in the Southern United States: Prevalence and Experiences of the Survivors*, J. Homosexuality (Online), at 1 (2020). Health organizations today recognize that an "incongruence between sex and gender in and of itself is not a mental disorder." 2-ER-85.

### C. The APA's Position on SOCE and GICE.

After homosexuality was removed from the DSM, experiments and studies on SOCE decreased dramatically. *See* 2-SER-244; *see also id.* at 247 (most studies on SOCE were conducted before 1981). Behavioral therapists "became increasingly concerned that aversive therapies designed as SOCE for homosexuality were inappropriate, unethical, and inhumane." *Id.* at 244. By the 1980s, mainstream mental health professionals had rejected SOCE because they saw same-sex sexual orientation as a normal part of the continuum of sexual orientation. However, in the 1990s, a counter-movement led primarily by mental health providers practicing

within religious communities began to assert SOCE were safe and effective for people whose religious beliefs were in conflict with their sexual orientation.

This led mental health organizations—including the American Counseling Association, the American Psychiatric Association, and the American Psychoanalytic Association—to adopt resolutions opposed to SOCE because "such efforts were ineffective and potentially harmful."[5] *Id.* at 232.

To assess the safety and effectiveness of SOCE, the APA Task Force conducted an extensive review of the literature and published a 124-page Report. The 2009 Report concluded, "[T]he peer-refereed empirical research on the outcomes of efforts to alter sexual orientation provides little evidence of efficacy and some evidence of harm." *Id.* at 255.

---

[5] The National Association of Social Workers, the American Medical Association, the American Association for Marriage and Family Therapy, the American Foundation for Suicide Prevention, and the American Academy of Child & Adolescent Psychiatry also all oppose SOCE and GICE. *See* Nat'l Ass'n of Soc. Workers, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May 2015), https://www.socialworkers.org/LinkClick.aspx?fileticket=IQYALknHU6s%3D&portalid=0; Am. Medical Ass'n, *Advocating for the LGBTQ Community*, https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community (last visited Jan. 19, 2022); Am. Ass'n for Marriage and Family Therapy, *Statement on Nonpathologizing Sexual Orientation* (2004); Am. Found. for Suicide Prevention, *State Laws: Banning Conversion Therapy Practices* (updated May 19, 2021), https://www.datocms-assets.com/12810/1621449151-conversion-therapy-issue-brief-5-19-21.pdf; Am. Acad. of Child & Adolescent Psychiatry, *Conversion Therapy* (approved Feb. 2018), https://www.aacap.org/aacap/Policy_Statements/2018/Conversion_Therapy.aspx.

Several states and localities have relied on the 2009 Report's findings when passing bans on SOCE for minors. *See, e.g.*, *Pickup v. Brown*, 740 F.3d 1208, 1224, 1231-32 (9th Cir. 2014) (California legislature relied on APA report in banning mental health providers from using SOCE on minors), *abrogated on other grounds by Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); Council of the District of Columbia, Comm. on Health, Comm. Rep. on Bill 22-0972, *Conversion Therapy for Consumers Under a Conservatorship or Guardianship Amendment Act of 2018*, at 1 (Nov. 1, 2018) (Council of District of Columbia citing APA report in justifying SOCE ban). Numerous courts, including this Court, have also cited the Report in upholding bans on SOCE for minors. *See Doyle v. Hogan*, Case No. 19-cv-019, 2019 WL 3500924, at *2-3 (D. Md. Aug. 1, 2019) (discussing and citing 2009 Report while upholding Maryland's ban on SOCE for minors), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021); *Pickup*, 740 F.3d at 1224, 1231-32 (discussing and citing 2009 Report while upholding California's ban on SOCE for minors).

In 2021, the APA reviewed the research on SOCE published since the 2009 Report and Resolution, and passed a new resolution reaffirming and strengthening its opposition to SOCE, especially when used on minors. The SOCE Resolution found that SOCE pose a significant risk of harm to minors and may be understood as an adverse childhood experience. 2-ER-70. It reiterates that the APA opposes

SOCE and opposes training psychologists in SOCE in any stage of their education, or otherwise teaching SOCE as part of an education in psychology. *Id.* In 2021, the APA also passed a similar resolution on GICE, based on findings that empirical evidence does not show GICE are effective practices for changing gender identity, but does show GICE are associated with psychological and social harm. 2-ER-85. As with SOCE, the APA opposes professional training in GICE for psychologists. *Id.*

Accordingly, "mainstream mental health professional associations [currently] support affirmative approaches that focus on helping sexual minorities cope with the impact of minority stress and stigma," rather than SOCE.[6] 2-SER-244. The same is true of GICE: The APA and other health organizations "have established empirically-supported practice guidelines that encourage clinicians to use gender-affirming practices when addressing gender identity issues," not GICE. *See* 2-ER-86.

---

[6] Affirmative therapy here refers to "therapy that is culturally relevant and responsive to LGBQ clients and their multiple social identities and communities; addresses the influence of social inequities on the lives of LGBQ clients; fosters autonomy; enhances resilience, coping, and community building; advocates to reduce systemic barriers to mental, physical, relational, and sexual flourishing; and leverages LGBQ client strengths." Tiffany O'Shaughnessy & Zachary Speir, *The State of LGBQ Affirmative Therapy Clinical Research: A Mixed-Methods Systematic Synthesis*, 5 Psych. Sexual Orientation & Gender Diversity 82, 83 (2018).

## II. There Is Insufficient Evidence to Support the Efficacy of SOCE or GICE.

Based on a systematic review of the literature on the efficacy of SOCE, the 2009 Report concluded there is no scientific evidence SOCE are likely to reduce same-sex attractions.[7] As the Report observes, and the 2021 SOCE Resolution affirms, a systematic review of the small number of rigorous peer-reviewed empirical studies found little evidence SOCE decreased same-sex attraction or increased other-sex attraction or behaviors. Moreover, the studies showed little evidence of any enduring changes or changes generalized from the treatment context into the real world.[8] Some studies that claimed to find sexual orientation change were not rigorous enough to permit the Task Force to draw any conclusions from those studies about the efficacy of SOCE.

---

[7] Mental health and medical organizations now see homosexuality as a normal variant of sexual orientation not in need of change, alteration, or cure. Moreover, the current scientific consensus encourages theorizing about the nature of human sexuality and sexual orientation to account for biological and cultural perspectives. *See generally APA Handbook of Sexuality and Psychology* (Deborah L. Tolman & Lisa M. Diamond eds., 2014).

[8] The Task Force Report noted that "enduring change to an individual's sexual orientation is uncommon and that a very small minority of people in the [early SOCE] studies showed any credible evidence of reduced same-sex sexual attraction, though some showed lessened physiological arousal to all sexual stimuli. … Few studies provided strong evidence that any changes produced in laboratory conditions translated to daily life." 2-SER-263; *see id.* at 231; *see also* Lee Birk et al., *Avoidance Conditioning for Homosexuality*, 25 Archives Gen. Psychiatry 314 (1971); Neil McConaghy, *Is A Homosexual Orientation Irreversible?*, 129 Brit. J. Psychiatry 556 (1976); Barry A. Tanner, *Avoidance Training With and Without Booster Sessions to Modify Homosexual Behavior in Males*, 6 Behav. Therapy 649 (1975).

Studies post-dating the Report do not alter its original conclusions. The APA has identified only one post-Report study purporting to show SOCE are effective that meets the minimum standards of an efficacy study in its design,[9] but this study suffers from methodological flaws.[10] *See* Stanton L. Jones & Mark A. Yarhouse, *A*

---

[9] Peer-reviewed empirical research on SOCE that does not meet the minimum standards for efficacy studies has been published since the Report was released. *See, e.g.*, Kate Bradshaw et al., *Sexual Orientation Change Efforts Through Psychotherapy for LGBQ Individuals Affiliated with the Church of Jesus Christ of Latter-day Saints*, 41 J. Sex & Marital Therapy 391, 391 (2015) (SOCE efforts for Mormons suggest a "very low likelihood of a modification of sexual orientation"); John P. Dehlin et al., *Sexual Orientation Change Efforts Among Current or Former LDS Church Members*, J. Counseling Psych. (Online) at 1 (Mar. 2014) ("[O]verall results support the conclusion that sexual orientation is highly resistant to explicit attempts at change and that SOCE are overwhelmingly reported to be either ineffective or damaging by participants."); Elaine M. Maccio, *Self-Reported Sexual Orientation and Identity Before and After Sexual Reorientation Therapy*, 15 J. Gay & Lesbian Mental Health 242, 242 (2011) (reporting "no statistically significant differences in sexual orientation … from before SRT [sexual reorientation therapy] participation to the time of participation in this study").

[10] The Jones and Yarhouse study resulted in a high attrition rate, which the researchers do not explain or address; lacks a baseline measure representing a state of being untreated; did not maintain constancy regarding assessment intervals; had significant variations among participants in terms of the length of exposure to treatment, the nature of treatment, and the amount of time between a person's initial and subsequent assessments; and fails to explain significant gaps in data regarding participants. For these reasons, among others, the Jones and Yarhouse study does not demonstrate SOCE efficacy by any scientifically valid standard. *See generally* Society for Prevention Research, *Standards of Evidence: Criteria for Efficacy, Effectiveness, and Dissemination* (2005) ("*2005 SPR Standards*").

Another paper released after the Report was published purports to show SOCE led to shifts in sexual orientation for most participants in the study with no harmful side effects. *See* Paul L. Santero et al., *Effects of Therapy on Religious Men Who Have Unwanted Same-Sex Attraction*, Linacre Q., July 2018, at 1. But that study was recently retracted by the publishing journal due to statistical flaws.

*Longitudinal Study of Attempted Religiously Mediated Sexual Orientation Change*, 37 J. Sex & Marital Therapy 404 (2011); *see also supra* at 11-12 (noting recent decrease in SOCE-related studies). The Jones and Yarhouse study found little evidence of decreased same-sex sexual orientation; it could not distinguish to what extent reported changes involved attraction, rather than identity; and it provided no evidence of increase in other-sex sexual orientation. Accordingly, the conclusions of this study are substantially the same as the conclusions of the 2009 Report. And because the Jones and Yarhouse study concerned SOCE conducted by religious ministries—not psychotherapy provided by licensed psychotherapists—it is also irrelevant to the law at issue in this dispute.

Since the 2009 Report, social scientists have determined many of the existing studies on SOCE are methodologically and statistically flawed. *See e.g.*, Dwight Panozzo, *Advocating for an End to Reparative Therapy: Methodological Grounding and Blueprint for Change*, 25 J. Gay & Lesbian Soc. Servs. 362 (2013) (reviewing the methodological and ethical problems of SOCE). A 2021 paper by reviewers at Case Western University found that dozens of research studies deeming SOCE effective suffered from "biased recruitment, retrospective study designs, lack of generalizability, reliance on samples of bisexual individuals rather than those who are predominantly homosexual, and the use of sexual or social behavior (e.g., engaging in sex with or marrying an individual of a different gender) as the outcome

instead of sexual orientation." *See* A. Przeworski et al., *A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts*, 28 Clinical Psychol.: Sci. & Prac. 81, 83, 92-93 (2020). The APA and social scientists have similarly found no empirical evidence that GICE are effective or safe practices for changing gender identity. *See* 2-ER-86.

### III. <u>SOCE and GICE Pose Significant Risks, Especially to Minors.</u>

### A. Some Individuals Report Harm from SOCE and GICE.

As the Report explained, there is "evidence to indicate that individuals experienced harm from SOCE." 2-SER-223; *see id.* at 226 (SOCE "has the potential to be harmful"); *id.* at 263. With respect to aversive SOCE therapies, studies show "negative side effects includ[e] loss of sexual feeling, depression, suicidality, and anxiety." *Id.* at 223. Even for so-called "nonaversive" SOCE, research reports published at the time of the Report "indicate[d] that there are individuals who perceive that they have been harmed." *Id.*

Based on its exhaustive review of the SOCE literature, the Task Force ultimately concluded that, while there was a "dearth of scientifically sound research on the safety of SOCE," the best available evidence suggested "attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts." *Id.* at 262. The Task Force

also described in detail "studies that report perceptions of harm," noting those studies "represent[] a serious concern." *Id.*

As to older, non-experimental studies, the Task Force observed, "[N]egative [side] effects of treatment are reported to have occurred for some people during and immediately following treatment." *Id.* For example, in John Bancroft's 1969 study, SOCE interventions "had harmful effects on 50% of the 16 research subjects who were exposed to it," including a 20% rate of anxiety, a 10% rate of suicidal ideation, a 40% rate of depression, a 10% rate of impotence, and a 10% rate of relationship dysfunction. *Id.* at 261-62; *see* John Bancroft, *Aversion Therapy of Homosexuality: A Pilot Study of 10 Cases*, 115 Brit. J. Psychiatry 1417 (1969). Other early studies of SOCE reported "cases of debilitating depression, gastric distress, nightmares, and anxiety," as well as "severe dehydration," and at least one case where a research participant "began to engage in abusive use of alcohol" requiring hospitalization. 2-SER-262.[11]

The Task Force noted more recent studies "document that there are people who perceive that they have been harmed through SOCE." *Id.* Among those studies,

---

[11] *See* J.T. Quinn et al., *An Attempt to Shape Human Penile Responses*, 8 Behav. Res. & Therapy 213 (1970); Steven H. Herman & Michael Prewett, *An Experimental Analysis of Feedback to Increase Sexual Arousal in a Case of Homo- and Heterosexual Impotence: A Preliminary Report*, 5 J. Behav. Therapy & Experimental Psychiatry 271 (1974); Basil James, *Case of Homosexuality Treated by Aversion Therapy*, 1 Brit. Med. J. 768 (1962).

"the reported negative social and emotional consequences include self-reports of anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated relationships with family, loss of social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, and sexual dysfunction."[12] *Id.*; *see id.* at 270. Participants in these studies also described "decreased self-esteem and authenticity to others"; "increased self-hatred and negative perceptions of homosexuality"; "an increase in substance abuse and high-risk sexual behaviors"; and a variety of harms to their relationships, including hostility towards their parents and the loss of lesbian, gay, and bisexual friends and potential romantic partners. *Id.* at 270-71. A 2020 study further documented the harms of SOCE: In a survey of over 8,000 sexual minority men in Canada, researchers found "[e]xposure to SOCE was positively associated with loneliness, regular illicit drug use, suicidal ideation, and suicide attempt." Travis Salway et al.,

---

[12] *See* A. Lee Beckstead & Susan L. Morrow, *Mormon Clients' Experiences of Conversion Therapy: The Need for a New Treatment Approach*, 32 Counseling Psychologist 651 (2004); Glenn Smith et al., *Treatments of Homosexuality in Britain Since 1950—An Oral History: The Experiences of Patients*, 328 Brit. Med. J. 427 (2004); Ariel Shidlo & Michael Schroder, *Changing Sexual Orientation: A Consumer's Report*, 33 Prof. Psych.: Res. & Prac. 249 (2002); Michael Schroder & Ariel Shidlo, *Ethical Issues in Sexual Orientation Conversion Therapies: An Empirical Study of Consumers*, 131 J. Gay & Lesbian Psychotherapy 131 (2001); Joseph Nicolosi et al., *Retrospective Self-Reports of Changes in Homosexual Orientation: A Consumer Survey of Conversion Therapy Clients*, 86 Psych. Rep. 1071 (2000); Kim W. Schaeffer et al., *Religiously-Motivated Sexual Orientation Change*, 19 J. Psych. & Christianity 61 (2000).

*Prevalence of Exposure to Sexual Orientation Change Efforts and Associated Sociodemographic Characteristics and Psychosocial Health Outcomes Among Canadian Sexual Minority Men*, 65 Can. J. Psychiatry 502, 502 (2020); *see also* Blosnich et al., *Sexual Orientation Change Efforts, Adverse Childhood Experiences, and Suicide Ideation and Attempt Among Sexual Minority Adults in the United States, 2016-2018*, 110 Am. J. Public Health 1024, 1027 (2020) (experiencing SOCE was "independently associated with suicidal ideation, suicide planning, and suicide attempts," even adjusting for adverse child experiences).

In addition to the *direct* harms posed by SOCE (which may present as mental health issues, physical ailments, sexual dysfunction, or substance abuse), SOCE also have the potential to cause *indirect* harms like loss of time, energy, and money. *See* 2-SER-270. Moreover, some SOCE recipients may suffer an indirect harm in the form of disappointment or psychological damage from the ineffectiveness of a therapy they thought would be effective. Indeed, the Report found "[i]ndividuals who failed to change sexual orientation, while believing they should have changed with such efforts, described their experiences as a significant cause of emotional and spiritual distress and negative self-image." *Id.* at 223; *see id.* at 270 (some participants in SOCE studies reported "anger at and a sense of betrayal by SOCE providers" or they "blamed themselves for the failure" of SOCE to work as expected); *id.* at 271 (some SOCE recipients reported "stress due to the negative

emotions of spouses and family members because of expectations that SOCE would work"). Because SOCE are unlikely to be effective, SOCE risk psychological harms by promising a result unlikely to occur.

The one SOCE efficacy study with a scientifically-valid design published since the Report found significant reduction in psychological distress among the SOCE participants the study followed over six to seven years. *See* Jones & Yarhouse, *supra*.[13] Because the SOCE studied in this research were conducted by

---

[13] There have been other studies of SOCE published since the Report that do not meet APA's standards for efficacy studies. As discussed above, these studies may nonetheless be useful in understanding the motivations and experiences of those who have participated in SOCE. *See supra* at 8-9. Some participants in more recent studies have reported harmful effects of SOCE. For example, one 2015 study on SOCE for individuals affiliated with the Church of Jesus Christ of Latter-day Saints reported 37% of study participants found their therapy to be moderately to severely harmful and there was "clear evidence" that "dutiful long-term psychotherapeutic efforts to change [sexual orientation] are not successful and carry significant risk of harm." Bradshaw et al., *supra*, at 391, 409-10. In another 2018 study focused specifically on young adults aged 21-25, researchers found "[a]ttempts by parents/caregivers and being sent to therapists and religious leaders for conversion interventions were associated with depression, suicidal thoughts, suicidal attempts, less educational attainment, and less weekly income." Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. Homosexuality 159, 159 (2018); *see id.* at 10.
The U.S. government and the United Nations have recently raised concerns about SOCE. *See* 2-SER-354-412 (SAMSHA Report); UN HRC 44/53, Report on Conversion Therapy, May 2020 at 13, (May 2020), https://undocs.org/A/HRC/44/53. In addition, as of January 2022, at least 20 states, D.C., and more than 80 municipalities in the United States have adopted laws or statewide regulations prohibiting licensed mental health practitioners from using SOCE with minors. *See* Movement Advancement Project, *Conversion "Therapy" Laws*,

group ministries, this result is consistent with earlier studies showing some participants reported benefits from the social support of others who shared their concerns about their sexual orientation. *See* 2-SER-261. As the Task Force suggests in the alternative therapeutic model it presented, this benefit is not specific to SOCE. Indeed, many of the purported benefits of SOCE (like stress reduction and experiencing empathy) "are not unique" and may be achieved by talk therapy and/or treatment approaches that do not attempt to change sexual orientation. *Id.* at 288; *see id.* at 223; John C. Norcross & Clara E. Hill, *Empirically Supported Therapy Relationships*, 57 Clinical Psychologist 19 (2004).

Like SOCE, research shows GICE also lead to adverse outcomes like emotional distress, loss of relationships, and low self-worth. In a recent study of over 27,000 transgender adults in America, the authors found GICE were "significantly associated with increased odds of severe psychological distress during the previous month and lifetime suicide attempts compared with transgender adults who had discussed gender identity with a professional but who were not exposed to [GICE]." Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68, 69 (2020). Another study from 2015

---

https://www.lgbtmap.org/equality-maps/conversion_therapy (data current as of Jan. 7, 2022).

reported that individuals who had experienced GICE were "[f]ar more likely to currently be experiencing serious psychological distress" than those who did not, were "[m]ore likely to have attempted suicide," "[n]early three times as likely to have run away from home," "[m]ore likely to have ever experienced homelessness," and "[m]ore likely to have ever done sex work" than those who had not experienced GICE. *See* Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, National Center for Transgender Equality at 110 (Dec. 2016), https://transequality. org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

**B. Minors Are Particularly Vulnerable to Harm from SOCE and GICE.**

Importantly, the Report also discusses the considerable ethical issues with providing SOCE to minors. *See* 2-SER-291-300. In the absence of scientifically valid studies of efficacy showing safety of SOCE and in the presence of retrospective reports of harm, the potential for SOCE to harm minors is of great concern to licensed mental health professionals ("LMHPs"), *amicus*, and the public.

Generally, youth may be particularly vulnerable to the potential harms of SOCE because they have been exposed to negative messages about sexual minorities but have not yet developed the resources to reject these messages. *See, e.g.*, 2-SER-374-75, 381. The 2009 Report therefore advised LMHPs to "take steps to ensure that minor clients have a developmentally appropriate understanding of treatment" and "support adolescents' exploration of identity." 2-SER-296. Given "[t]here is no

research demonstrating that providing SOCE to children or adolescents has an impact on adult sexual orientation," *id.* at 224; *see id.* at 293, the Report also recommended LMHPs "provide multiculturally competent and client-centered therapies" to children and adolescents, "rather than SOCE," *id.* at 300. Ultimately, the Task Force concluded it had "concerns that [SOCE-type] interventions may increase self-stigma and minority stress and ultimately increase the distress of children and adolescents." *Id.* at 224.

More recent studies affirm SOCE and GICE may present unique threats to youth. Studies show minors who have been subjected to SOCE or GICE report more suicide attempts than those who have not. *See, e.g.*, Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among U.S. LGBTQ Youths and Young Adults*, 110 Am J. Public Health 1221, 1221 (2020) (youth who "underwent [SOCE or GICE] were more than twice as likely to report having attempted suicide and having multiple suicide attempts" than youth who did not); *see also* Ryan et al., *supra*, at 167-68; 2-SER-354-412.

### C. Licensed Mental Health Providers Have a Duty to Avoid Harm to Members of the Public Whom They Are Licensed to Serve.

"Do no harm" has long been foundational to the practice of healthcare professionals. This means certain aspirational principles (like the patient's self-determination) must be balanced against other principles, including beneficence and non-malfeasance. *See* Am. Psychological Ass'n, *Ethical Principles of Psychologists*

*and Code of Conduct*, at Principles A, E (Jan. 1, 2017), https://www.apa.org/ ethics/code. For this reason, an ethical psychologist would be required to resist patient requests that would harm the patient's health, or for which no evidentiary basis exists; for example, a psychologist would decline a request for a weight loss program from a patient with anorexia nervosa. Self-determination, while important, is not the only ethical principle—or even the most important ethical principle—in clinical decision-making. *See* Ariel Shidlo & John C. Gonsiorek, *Psychotherapy with Clients Who Have Been Through Sexual Orientation Change Interventions or Request to Change Their Sexual Orientation*, *in Handbook of Sexual Orientation and Gender Diversity in Counseling and Psychotherapy* 291 (Kurt A. DeBord et al., eds., 2017). Phrased simply, self-determination does not justify dispensing with other ethical obligations regarding patient care.

Accordingly, "the APA urges psychologists to assist patients seeking SOCE to understand the dangers of SOCE, the lack of research showing efficacy, the societal contexts of heterosexism and monosexism, and the internalized stigma that results from these contexts, and to use acceptance, support, comprehensive assessment, active coping, social support, and identity exploration and development, within a culturally competent framework." 2-ER-77. Similarly, the 2021 GICE Resolution notes, "[P]rofessional consensus recommends affirming therapeutic interventions for transgender and gender nonbinary adults who request that a

26

therapist engage in GICE, and for trans youth whose parents/guardians or other custodians (e.g., state, foster care) request that a therapist engage in GICE." *Id.* at 87.

## IV. **Appellant Misstates and Misrepresents the Science on SOCE and GICE.**

Both here and below, Appellant has mischaracterized key aspects of the APA's Report and 2021 Resolutions regarding the scientific research on SOCE, the possibility of harm from SOCE and GICE, and the methodological approaches the Task Force used when evaluating reports of SOCE benefits.

*First*, Appellant wrongly claims no scientific consensus on the harm of SOCE or GICE exists, because the 2009 Report acknowledged the lack of published research on SOCE. *See* Appellant's Br. at 53-54; ER-319-20. Appellant ignores the fount of research conducted in the twelve years since the 2009 Report, confirming SOCE, and GICE, expose recipients to considerable risk of psychological harm. *See supra* § III. Moreover, though the Report acknowledged scientifically valid efficacy research on SOCE was limited, *see* 2-SER-226-27, 262, a body of research exists that is not efficacy studies, but does find some participants in SOCE retrospectively report harms.

Numerous researchers and LMHPs have concluded SOCE and GICE should be neither studied nor provided precisely ***because they may cause harm to patients***. *See, e.g.*, *id.* at 311 ("Some authors have stated that SOCE should not be investigated

or practiced until safety issues have been resolved.");[14] *id.* at 244 ("Following the removal of homosexuality from the *DSM* [in 1973], the publication of studies of SOCE decreased dramatically").

Modern LMHPs' concerns find significant support in early studies on SOCE. The 2009 Report recognizes "[h]igh dropout rates characterize early [SOCE] studies and may be an indicator that research participants experience these treatments as harmful." *See id.* at 262; *see* Scott O. Lillenfeld, *Psychological Treatments that Cause Harm*, 2 Persp. on Psych. Sci. 53 (2007). As just one example, a 1973 study on SOCE included one respondent who "dropped out" after "lo[sing] all sexual feeling" and six others who reported some form of depression. 2-SER-261; *see* Neil McConaghy & R.F. Barr, *Classical, Avoidance, and Backward Conditioning Treatment of Homosexuality*, 122 Brit. J. Psychiatry 151 (1973).

Thus, the relative lack of empirical studies is not evidence of lack of harm from SOCE or GICE, as Appellant appears to suggest. If anything, the lack of studies may indicate the **risk** of harm. Newer research on SOCE and GICE harm only confirms this point. *See supra* § III.A.

---

[14] *See, e.g.*, Gregory M. Herek, *Evaluating Interventions to Alter Sexual Orientation: Methodological and Ethical Considerations*, 32 Archives Sexual Behav. 438 (2003); Gerald C. Davison, *Homosexuality: The Ethical Challenge*, 44 J. Consulting & Clinical Psych. 157 (1976).

*Second,* Appellant downplays the harm of "consensual" SOCE and GICE, suggesting individuals who allegedly seek SOCE or GICE voluntarily face less risk of harm. Appellant's Br. at 52, 53. But SOCE and GICE cannot be justified by invoking client autonomy or self-determination. *See supra* § III.C. As the 2009 Report recognized, "simply providing SOCE to clients who request it does not necessarily increase self-determination but rather abdicates the responsibility of [LMHPs] to provide competent assessment and interventions that have the potential for benefit with a limited risk of harm." 2-SER-289. Moreover, the concept of self-autonomy with respect to minors who "opt into" SOCE or GICE is simply wrong, because minors are typically emotionally and financially dependent on adults. *See id.* at 297, 341.

*Third*, Appellant wrongly claims SOCE and GICE can "increase well-being" and reduce suicidality, and implies affirming therapy can cause harm. Appellant's Br. at 52. Research shows the opposite is true. *See supra* § III. Rather than harm, gender-affirming therapy has been shown to have positive outcomes for its participants. *See* 2-ER-87; *see also* Tiffiny A. Ainsworth & Jeffrey H Spiegel, *Quality of Life of Individuals With and Without Facial Feminization Surgery or Gender Reassignment Surgery*, 19 Qual. Life Res. 1019, 1019 (2010) (gender affirming care for transwomen is associated with "improved mental health-related quality of life"); Annelou L. C. de Vries et al., *Young Adult Psychological Outcome*

*After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696 (2014) (linking gender-affirming care to improved psychological well-being for transgender young adults).

## **CONCLUSION**

For the foregoing reasons, the district court's Order should be affirmed.

January 21, 2022

Respectfully submitted,

/s/ *Tassity Johnson*

Nathalie F.P. Gilfoyle
Deanne M. Ottaviano
AMERICAN PSYCHOLOGICAL
   ASSOCIATION
750 First Street NE
Washington, DC 20002
(202) 336-6100

*Counsel for American
Psychological Association*

Tassity Johnson
   *Counsel of Record*
Jessica Ring Amunson
Jessica Sawadogo
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite #900
Washington, DC 20001
(202) 637-6303
tjohnson@jenner.com

*Counsel for Amicus Curiae*

30

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) because it contains 6,969 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

/s/ *Tassity Johnson*
Tassity Johnson

*Counsel for Amicus Curiae*

January 21, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of January, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notice to all counsel of record in this matter.

/s/ *Tassity Johnson*
Tassity Johnson

*Counsel for Amicus Curiae*

January 21, 2022