Nos. 21-35815, 21-35856

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRIAN TINGLEY,

*Plaintiff-Appellant/Cross-Appellee*,

v.

ROBERT W. FERGUSON, in his official capacity as
Attorney General for the State of Washington; et al.,

*Defendants-Appellees/Cross-Appellants*,

EQUAL RIGHTS WASHINGTON,

*Intervenor-Defendant-Appellee*.

On Appeal from the United States District Court for the
Western District of Washington, Case No. 3:21-cv-05359-RJB
The Honorable Robert J. Bryan

# BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION
# OF WASHINGTON AND OTHER ORGANIZATIONS
# IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

DANIEL J. SHIH
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 373-7390

*Attorney for Amici Curiae American
Civil Liberties Union of Washington
and Other Organizations*

YVONNE CHIN · JULIA MIZUTANI
ANTOINETTE DAVIS · NANCY TALNER
JUSTIN ABBASI
ACLU OF WASHINGTON FOUNDATION
P.O. Box 2728
Seattle, WA 98111
(206) 624-2184

*Attorneys for Amicus Curiae American
Civil Liberties Union of Washington*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned counsel states that the American Civil Liberties Union of Washington; the Center for Children & Youth Justice; Gender Diversity; Lavender Rights Project; Legal Counsel for Youth and Children; Legal Voice; Lincoln LGBTQ+ Rights Clinic; The Mockingbird Society; the National Association of Social Workers and the Washington State Chapter of the National Association of Social Workers; Odyssey Youth Center dba Odyssey Youth Movement; TeamChild; Trans Families; UTOPIA Washington; and the Washington Chapter of the American Academy of Pediatrics (collectively, "*Amici*") are not publicly held corporations. Other than Lincoln LGBTQ+ Rights Clinic, which is part of The Corporation of Gonzaga University (a tax-exempt charitable organization), *Amici* do not have any parent corporation. No publicly held corporation owns 10 percent or more of any *Amici* corporation's stock.

Dated: January 21, 2022        By:  */s/ Daniel J. Shih*

DANIEL J. SHIH
  dshih@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 516-3861

## <u>TABLE OF CONTENTS</u>

I.  STATEMENT OF *AMICI CURIAE* ...............................................................1

II.  SUMMARY OF ARGUMENT .....................................................................8

III.  ARGUMENT........................................................................................9

    A.  "Conversion" regimes are sham treatments that provide no therapeutic benefit and are harmful, and have accordingly been repudiated by the health professions. ...........................................9

    B.  The First Amendment does not prevent a state from regulating professional conduct, even if it imposes incidental burdens on speech. ...........................................................................12

    C.  Washington's ban on "conversion therapy" does nothing more than prohibit medically improper conduct and therefore satisfies the First Amendment. ...........................................15

IV.  CONCLUSION.............................................................................19

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. ACLU*,
    535 U.S. 564 (2002) ....................................................................................12

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) ........................................................................13

*NAACP v. Button*,
    371 U.S. 415 (1963) ....................................................................................14

*Nat'l Ass'n for Advancement of Psychoanalysis v. California Bd. of*
    *Psychology*,
    228 F.3d 1043 (9th Cir. 2000) ......................................................................13

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) [*NIFLA*] ...................................................... 12, 17, 18

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978) .............................................................................. 12, 14

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) ............................................................ 12, 17, 18

*Pickup v. Newsom*,
    139 S. Ct. 2622 (2019) .................................................................................17

*Sable Commc'ns of Cal. v. FCC*,
    492 U.S. 115 (1989) ....................................................................................16

*Tennessee Secondary Sch. Athletic Ass'n v. Brentwood Acad.*,
    551 U.S. 291 (2007) ....................................................................................14

*Thomas v. Collins*,
    323 U.S. 516 (1945) ....................................................................................13

## STATUTES

Wash. Rev. Code § 18.130.040 ............................................................... 15, 16

Wash. Rev. Code § 18.130.180 ....................................................................16

**OTHER AUTHORITIES**

American Psychological Ass'n,
*Report of the American Psychological Association Task Force on*
*Appropriate Therapeutic Responses to Sexual Orientation* (Aug.
2009) [*APA Task Force Report*] ..................................................................10

American Psychological Ass'n,
*Resolution on Appropriate Affirmative Responses to Sexual*
*Orientation Distress and Change Efforts* (Aug. 5, 2009) [*APA 2009*
*Resolution*] ...............................................................................................9, 11

American Psychological Ass'n,
*Resolution on Gender Identity Change Efforts* (Feb. 2021) [*APA 2021*
*Resolution*] ...............................................................................................9, 11

Frederick Schauer,
*The Boundaries of the First Amendment: A Preliminary Exploration*
*of Constitutional Salience*, 117 HARV. L. REV. 1765 (2004) ......................15

National Ass'n of Social Workers,
*Lesbian, Gay, and Bisexual Issues*, SOCIAL WORK SPEAKS (11th ed.
2018) ...............................................................................................................6

National Ass'n of Social Workers,
*Sexual Orientation Change Efforts (SOCE) and Conversion Therapy*
*with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May
2015) [*NASW Statement*] ..........................................................................7, 11

# I.    STATEMENT OF *AMICI CURIAE*[1]

*Amici Curiae* are fourteen organizations that support affirmance, as identified herein.

The **American Civil Liberties Union of Washington** (ACLU-WA) is a statewide, nonpartisan, nonprofit organization with over 135,000 members and supporters. The ACLU-WA uses multiple advocacy tools to protect and advance the civil rights and civil liberties of everyone in Washington State. These tools include litigation, legislation, activism, public education, and policy advocacy, among others. We work with community members, the courts, and the legislature to protect basic rights, including the right of the people to be fully informed about their government.

ACLU-WA has long defended free speech rights and equal rights for lesbian, gay, bisexual, and transgender people. Over the years, ACLU-WA has defended First Amendment rights in cases involving citizens protesting in the Black Lives Matter movement (*Black Lives Matter Seattle-King County v. City of Seattle* and *Selah Alliance for Equality, et al. v. City of Selah*); an emergency room physician's right to expose COVID-19-safety deficiencies at his hospital (*Lin v. PeaceHealth*);

---

[1] Pursuant to FRAP 29(a)(2), all parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), *Amici* state that no party's counsel authored any portion of this brief and no party, party counsel, or person other than *Amici* or their counsel paid for preparing or submitting this brief.

challenges to the City of Seattle's unconstitutional permit ordinance (*Real Change, et al. v. City of Seattle, et al.*); and a person's right to purchase any public good, service, or merchandise without being discriminated against based on their sexual orientation (*Ingersoll v. Arlene's Flowers*).

The **Center for Children & Youth Justice** (CCYJ) is a 501(c)(3) non-profit organization with a mission to create better lives for generations of children and youth by reforming the child welfare and youth justice systems. CCYJ works to ensure that such systems are integrated, equitable and unbiased, fueled with innovative ideas, and backed by rules and programs to achieve the best outcomes for children, youth, and young adults. For over ten years, CCYJ has led efforts to create better supports and safer and more affirming environments for LGBTQ+ youth and has participated as *amicus curiae* in a number of cases involving LGBTQ+ issues.

**Gender Diversity** is a national educational organization that increases the awareness and understanding of the wide range of gender diversity in children, adolescents, and adults. It does this by providing family support, building community, increasing societal awareness, and improving well-being for people of all gender identities and expressions. Gender Diversity strongly supports gender-diverse youth and their families and has participated as *amicus curiae* in national cases addressing gender identity discrimination.

**Lavender Rights Project** elevates the power, autonomy, and leadership of the Black intersex and gender diverse community through intersectional legal and social services. We utilize the law as an organizing principle to affirm our civil rights and self-determination.

**Legal Counsel for Youth and Children** (LCYC) is a nonprofit legal aid organization that protects the interests and safety of youth in Washington State by advancing their legal rights. LCYC provides holistic, child-centered legal advocacy to young people—up to age 24—through four main programs: child welfare, juvenile court, youth and family immigration, and youth homelessness. LCYC supports youth in King, Walla Walla, Benton, and Franklin Counties, and through a Virtual Lawyering Program that serves young people statewide. LGBTQ+ youth experience homelessness at disproportionate rates and are over-represented among LCYC's clients. LCYC knows that conversion therapy is harmful to LGBTQ+ youth and has a direct, negative impact on youth safety, housing stability, mental health, and well-being.

**Legal Voice** is a non-profit public interest organization that works to advance the rights of girls, women, and LGBTQ+ people through litigation, legislation, and legal rights education. Since its founding, Legal Voice has worked to protect and advance individual bodily autonomy and to establish and improve legal protections for survivors of intimate partner violence. Toward that end, Legal Voice has pursued

3

legislation and has participated as counsel and as *amicus curiae* in cases throughout the Northwest and the country.

The **Lincoln LGBTQ+ Rights Clinic** (Lincoln Clinic) is a non-profit law firm and Clinical Legal Program within the Center for Civil and Human Rights at Gonzaga University School of Law. The Lincoln Clinic works to protect and advance the equal rights and dignity of individuals who identify as LGBTQ+. Through education, programing, advocacy, research, and legal representation, the Lincoln Clinic focuses on promoting reforms that support people who are marginalized and underserved because of their sexual orientation, gender identity, or gender expression. The Lincoln Clinic has a particular interest in protecting the rights and health of LGBTQ+ youth.[2]

**The Mockingbird Society** (TMS) is a 501(c)(3) non-profit advocacy organization that works with young people and families to transform foster care and end youth homelessness. TMS trains youth who have experienced homelessness or foster care to be their own best advocates. By advocating for themselves, youth help change policies and perceptions that stand in the way of every child having a safe and stable home. An estimated 30% of youth in foster care, and 40% of youth and

---

[2] The opinions, work product, and positions advanced by the faculty and students working in the various clinics operated by Gonzaga Law School Clinical Legal Programs do not necessarily reflect the opinions or positions of Gonzaga University or the School of Law.

young adults experiencing homelessness, identify as LGBTQ+. Over the past 20 years, youth advocates with TMS have frequently raised concerns about the experiences of LGBTQ+ youth in foster care and/or experiencing homelessness and made recommendations for improvements in both systems to better serve LGBTQ+ youth. TMS has previously sought and received leave to file amicus briefs on issues related to the treatment of young people, particularly when those issues significantly impact dependent (foster) youth and/or young people experiencing homelessness.

The **National Association of Social Workers** (NASW), founded in 1955, is the largest association of professional social workers in the United States with 110,000 members in 55 chapters. NASW has worked to develop high standards of social work practice while unifying the social work profession. NASW promulgates professional policies, conducts research, publishes professional studies and books, provides continuing education, and enforces the NASW Code of Ethics. In alignment with its mission to ensure the efficacy and quality of practicing social workers, NASW provides resources and develops policy statements on issues of importance to the social work profession. Consistent with those statements, NASW and the **Washington State Chapter of the National Association of Social Workers** have strongly condemned the use of Sexual Orientation Change Efforts (SOCE) or so-called reparative therapies since at least 2000. Furthermore, public dollars should not be spent on programs that support SOCE. NASW supports the

adoption of local, state, federal, and international policies and legislation that ban all forms of discrimination based on sexual orientation.[3]

NASW's National Committee on LGBT Issues asserts that conversion therapies/SOCE are an infringement of the guiding principles inherent to social worker ethics and values, a position affirmed by the NASW policy statement on "Lesbian, Gay, and Bisexual Issues." The practice of SOCE violates the very tenets of the social work profession as outlined in the NASW Code of Ethics. The NASW Code of Ethics enunciates principles that address ethical decision making in social work practice with lesbians, gay men, and bisexual and transgender people; for example:

1) social workers' commitment to clients' self-determination and competence, and to achieving cultural competence and understanding social diversity,

2) social workers' ethical responsibilities to colleagues, their commitment to interdisciplinary collaboration, and their responsibility to report unethical conduct of colleagues,

3) social workers' ethical responsibilities as professionals—maintaining competence, fighting discrimination, and avoiding misrepresentation, and

---

[3] National Ass'n of Social Workers, *Lesbian, Gay, and Bisexual Issues*, SOCIAL WORK SPEAKS 211, 215, 216 (11th ed. 2018).

    4)    social workers' ethical responsibilities to the social work profession, to evaluation, and to research.[4]

**Odyssey Youth Movement** is a regional youth organization promoting equity for LGBTQ+ young folx ages 13–24. Over the past 30 years, Odyssey has advocated alongside youth with a vision of a thriving LGBTQ+ community in the Inland Northwest.

**Trans Families** inspires hope, increases understanding, and creates a visible pathway to support trans and gender-diverse children and all those who touch their lives.

**UTOPIA Washington** is a grassroots organization born out of the struggles, challenges, strength, and resilience of the queer and trans Pacific Islander community in South King County. The organization strongly supports LGBTQIA+ youth and their well-being.

The **Washington Chapter of the American Academy of Pediatrics** (WCAAP) is a 501(c)(3) organization that represents over 1,100 pediatric health care providers. WCAAP champions the health and well-being of children, adolescents, and families through advocacy, education, and partnership.

---

[4] National Ass'n of Social Workers, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* at 5 (May 2015) [hereinafter *NASW Statement*].

## II.    SUMMARY OF ARGUMENT

The overwhelming medical consensus is that treatment regimes seeking to change a person's sexual orientation or gender identity provide no therapeutic benefit and are harmful, especially to minors. They are sham therapies repudiated by the health professions for attempting to "treat" something that is not a disorder while endangering patients.

The speech protections of the First Amendment ensure the free exchange of ideas. The challenged Washington law regulating health professionals does nothing to impede the exchange of ideas. It solely addresses conduct that violates the professional standard of care and is most likely to cause harm—namely, performing "conversion therapy" on minors. As such, it raises no First Amendment concerns.

The law has long recognized that the First Amendment does not prevent restrictions directed at professional conduct from imposing incidental burdens on speech, as here. This Court properly applied this principle in *Pickup*, and the Supreme Court reaffirmed it in *NIFLA*. This Court should reject the radical departure from this established doctrine that Appellant Tingley and *amici* supporting him seek.

### III.   ARGUMENT

**A.    "Conversion" regimes are sham treatments that provide no therapeutic benefit and are harmful, and have accordingly been repudiated by the health professions.**

Every major medical and mental health association has rejected the notion that being lesbian, gay, bisexual, nonbinary, or transgender is a mental illness. "The longstanding consensus of the behavioral and social sciences and the health and mental health professions is that homosexuality per se is a normal and positive variation of human sexual orientation." American Psychological Ass'n, *Resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts* at 29 (Aug. 5, 2009) [hereinafter *APA 2009 Resolution*].[5] Further, "gender nonbinary identities and expressions are healthy, [and] incongruence between one's sex and gender is neither pathological nor a mental health disorder." American Psychological Ass'n, *Resolution on Gender Identity Change Efforts* at 2 (Feb. 2021) [hereinafter *APA 2021 Resolution*].[6]

The recognition that diversity in sexual orientation or gender identity is normal came after a history of pervasive social opprobrium of LGBTQ+ people in this country. Prejudice and stigma fueled the pathologization of LGBTQ+ people by

---

[5] Available at https://www.apa.org/about/policy/sexual-orientation.pdf.
[6] Available at https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

the medical and mental health professions. Prior to 1973, for example, the American Psychiatric Association included homosexuality on its official list of mental disorders. The pathologization of LGBTQ+ people led licensed mental health professionals to subject patients to so-called psychotherapies and behavioral interventions—ranging from the non-affirming to the barbaric—to alter their sexual orientation or gender identity. Conversion efforts included "reframing desires," "redirecting thoughts," "assertiveness" training, "using hypnosis," and "sexual intercourse with the other sex," as well as "aversion treatments" such as "inducing nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual became aroused to same-sex erotic images or thoughts," and "covert sensitization, shame aversion, systematic desensitization, orgasmic reconditioning, and satiation therapy." American Psychological Ass'n, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* at 22 (Aug. 2009) [hereinafter *APA Task Force Report*].[7]

Conversion efforts have now been repudiated by the profession. Conversion efforts have been studied, and the scientific and medical consensus is that they are deeply harmful and provide no therapeutic benefit—and that there is no evidence

---

[7] Available at https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf.

that they are even effective at achieving their intended "conversion." *See APA 2009 Resolution* at 30–31 (noting that "distress and depression were exacerbated" by sexual orientation change efforts while "there is insufficient evidence to support the use of psychological interventions to change sexual orientation"); *NASW Statement* at 4 ("[N]o data demonstrate that . . . conversion therapy is effective, rather have succeeded only in short term reduction of same-sex sexual behavior and negatively impact the mental health and self-esteem of the individual."); *APA 2021 Resolution* at 2–3 (noting that gender identity change efforts "have not been shown to alleviate or resolve gender dysphoria" and are associated with harms including "depression, anxiety, suicidality, loss of sexual feeling, impotence, deteriorated family relationships, a range of post-traumatic responses, and substance abuse").

Accordingly, the overwhelming medical and mental health consensus is that efforts seeking to change a person's sexual orientation or gender identity are inappropriate and should not be performed. *See APA 2009 Resolution* at 30; *APA 2021 Resolution* at 3–4; *id.* at 2 (noting endorsement of the United States Joint Statement Against Conversion Efforts by professional organizations including the American Academy of Family Physicians; American Academy of Nursing; American Association of Sexual Educators, Counselors, and Therapists; American Counseling Association; American Medical Association; American Psychoanalytic Association; Clinical Social Work Association; and others); *Pickup v. Brown*, 740

F.3d 1208, 1232 (9th Cir. 2014) (identifying other organizations that opposed conversion therapy, including the American Academy of Pediatrics, National Association of Social Workers, and American School Counselor Association).

**B.     The First Amendment does not prevent a state from regulating professional conduct, even if it imposes incidental burdens on speech.**

The First Amendment "embodies 'our profound national commitment to the free exchange of ideas.'" *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). As a result, government restrictions on expression "because of its message, its ideas, its subject matter, or its content" are normally subject to strict scrutiny. *Id.* But exceptions apply. The U.S. Supreme Court has long recognized that states may regulate professional conduct and impose restrictions on such conduct, even if the conduct involves speaking, without the application of strict scrutiny. *E.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (holding that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity"). In *NIFLA*, the Supreme Court reaffirmed this longstanding approach to regulation of professional conduct and expressly upheld the doctrinal distinction between prohibitions on speech and regulation of conduct that may involve speaking. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018) [hereinafter *NIFLA*].

Even professions that might be characterized as all about talking are still subject to such conduct regulation. For example, this Court has rejected the notion

that psychoanalysis, as a "talking cure" alleged to be "pure speech," should warrant special First Amendment protection. The Court recognized that "the key component of psychoanalysis is the treatment of emotional suffering and depression, not speech. . . . That psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amendment protection." *Nat'l Ass'n for Advancement of Psychoanalysis v. California Bd. of Psychology*, 228 F.3d 1043, 1054 (9th Cir. 2000) (internal quotation marks omitted).

This is not to say that regulation of professional conduct receives no First Amendment protection when it restricts what professionals can say. For example, this Court held that a regulation prohibiting doctors from conveying a medically sound viewpoint to patients did not survive First Amendment scrutiny. *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (addressing prohibition on expressing "that medical marijuana would likely help a specific patient"). And strict scrutiny presumably would apply to regulations that prevent doctors from contributing to public discourse. *See Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("[T]he state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.").

As the Supreme Court has explained, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area [of speech]

13

only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963). However, when a regulation does not broadly encroach upon the ability of a person to express their views and only regulates conduct of legitimate concern, there is generally no First Amendment issue. *See Tennessee Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 299 (2007) ("Given that TSSAA member schools remain free to send brochures, post billboards, and otherwise advertise their athletic programs, TSSAA's limited regulation of recruiting conduct [prohibiting high school coaches from directly recruiting middle school students] poses no significant First Amendment concerns."); *id.* at 296 ("Our cases teach that there is a difference of constitutional dimension between rules prohibiting appeals to the public at large and rules prohibiting direct, personalized communication in a coercive setting." (citation omitted)).

If a professional regulation imposes appropriate restrictions on conduct, then it makes little sense to assess the regulation for content or viewpoint neutrality. Much regulation of conduct is necessarily based on the impact of the conduct. *See Ohralik*, 436 U.S. at 456 ("Numerous examples could be cited of [content-based] communications that are regulated without offending the First Amendment, such as the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees." (citations omitted));

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 HARV. L. REV. 1765, 1783–84 (2004) (describing other content-based regulations of conduct not subjected to strict scrutiny including sexual harassment, regulation of trademarks, the law of fraud, "almost all of the regulation of professionals, virtually the entirety of the law of evidence, large segments of tort law, and that vast domain of criminal law that deals with conspiracy and criminal solicitation" (footnotes omitted)). Whether a professional conduct regulation incidentally burdens speech in a content-based manner is immaterial to the First Amendment analysis.

**C.    Washington's ban on "conversion therapy" does nothing more than prohibit medically improper conduct and therefore satisfies the First Amendment.**

Washington's conversion therapy ban does not violate the First Amendment because it applies with narrow specificity to a course of conduct and constitutes a reasonable medical regulation of such conduct. The challenged law only applies to covered health professionals, such as hypnotherapists, mental health counselors, family therapists, and social workers. Wash. Rev. Code § 18.130.040(2)(a)(ix), (x). Nothing in the challenged law prevents covered professionals from expressing their views about conversion therapy or about sexual orientation, gender identity, or any other topic. Covered professionals are fully able to express their disagreement

(despite all evidence to the contrary) with the professional consensus that conversion therapy is spurious—a harmful, sham treatment.

The challenged law is narrowly specific in what it addresses: "Performing conversion therapy on a patient under age eighteen." Wash. Rev. Code § 18.130.180(27). That language expressly and solely addresses medically improper conduct, and it applies only to covered health professionals, *see* Wash. Rev. Code § 18.130.040. Further, the ban applies only with respect to minor patients, reflecting a further narrowing—not required by the First Amendment—to an especially vulnerable group at heightened risk of coercion, abuse, and lack of informed consent. *See Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors."); *NASW Statement* at 4 (noting that "media campaigns, often coupled with coercive messages from family and community members, can create an environment in which LGBT persons are pressured to seek conversion therapy").

In *Pickup*, this Court correctly applied longstanding First Amendment doctrine permitting regulation of professional conduct to California's ban on conversion therapy. The Court reasoned: "At the other end of the continuum, and where we conclude that SB 1172 lands, is the regulation of professional conduct, where the state's power is great, even though such regulation may have an incidental

effect on speech." 740 F.3d at 1229. *Pickup* is indistinguishable and unquestionably controls here.

Similarly, *NIFLA* cannot seriously be viewed as overturning First Amendment jurisprudence on regulating professional conduct or even calling it into question. Indeed, the Supreme Court expressly reaffirmed the doctrine, explaining:

> The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech, and professionals are no exception to this rule. Longstanding torts for professional malpractice, for example, fall within the traditional purview of state regulation of professional conduct. While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it, and the line is long familiar to the bar.

*NIFLA*, 138 S. Ct. at 2373 (citations and internal quotation marks omitted). Further confirming that *Pickup* still stands, the Supreme Court denied a petition for certiorari in that case where the petitioner argued that *NIFLA* "explicitly said that the *Pickup* decision was demonstrably wrong." *Pickup v. Newsom*, 139 S. Ct. 2622 (2019) (denying petition); Petition for Writ of Certiorari, *Pickup v. Newsom*, 139 S. Ct. 2622 (No. 12-17681), at 14. If the petition had been meritorious, the expected result would have been for the Supreme Court simply to grant certiorari, vacate, and remand for further proceedings in light of *NIFLA*. It did not.

What *NIFLA* did call into question was certain dicta in *Pickup*. *Pickup* described three parts of a supposed continuum of First Amendment speech protections applicable to professionals. At one end of the continuum was "a

professional . . . engaged in a public dialogue"—such as "a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream"—where "First Amendment protection is at its greatest." *Pickup*, 740 F.3d at 1227. At the other end of the continuum was "the regulation of professional conduct, where the state's power is great, even though such regulation may have an incidental effect on speech." *Id.* at 1229. *NIFLA* raised no issue with either of these descriptions or with this Court's conclusion that the disputed law fell within the latter category. Rather, *NILFA* took issue with *Pickup*'s description of the midpoint of the continuum consisting of "a professional's speech" occurring "within the confines of a professional relationship," where this Court described First Amendment protection as "somewhat diminished." *Id.* at 1228. The Supreme Court explained it "has not recognized 'professional speech' as a separate category of speech," *NIFLA*, 138 S. Ct. at 2371–72, thus calling into question *Pickup*'s characterization of the midpoint category—all of which was dicta. The Supreme Court then proceeded to reaffirm the actual basis of the *Pickup* decision: "[U]nder our precedents, States may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 138 S. Ct. at 2372. Accordingly, *Pickup* remains the law of this Circuit and

fully determines this case, and the district court properly applied *Pickup* to uphold the challenged law.[8]

### IV.   CONCLUSION

For the foregoing reasons, to the extent the Court exercises jurisdiction in this case, *Amici Curiae* respectfully ask this Court to affirm the judgment of the district court.

Dated: January 21, 2022                Respectfully submitted,

By: */s/ Daniel J. Shih*

DANIEL J. SHIH
   dshih@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 516-3861

*Counsel for Amici Curiae American Civil Liberties Union of Washington; Center for Children & Youth Justice; Gender Diversity; Lavender Rights Project; Legal Counsel for Youth and Children; Legal Voice; Lincoln LGBTQ+ Rights Clinic; The Mockingbird Society; National Association of Social Workers; Odyssey Youth Center dba Odyssey Youth Movement; TeamChild; Trans Families; UTOPIA Washington; Washington Chapter of the American Academy of Pediatrics; and Washington*

---

[8] *Amici* agree with Appellees Ferguson and Equal Rights Washington that Tingley fails to present a colorable Free Exercise claim.

*State Chapter of the National Association of Social Workers*

By: */s/ Yvonne Chin*

JUSTIN ABBASI, COOPERATING ATTORNEY
   justinabbasi9@hotmail.com
YVONNE CHIN
   ychin@aclu-wa.org
JULIA MIZUTANI
   jmizutani@aclu-wa.org
ANTOINETTE DAVIS
   tdavis@aclu-wa.org
NANCY TALNER
   talner@aclu-wa.org
ACLU OF WASHINGTON FOUNDATION
P.O. Box 2728
Seattle, WA 98111
(206) 624-2184

*Counsel for Amicus Curiae*
*American Civil Liberties Union of*
*Washington*

(The ACLU of Washington would like to thank intern Niloofar Irani for her work and contribution to this brief.)

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-35815, 21-35856

I am the attorney or self-represented party.

**This brief contains** | 3,920 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Daniel J. Shih | **Date** | Jan 21, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/2018*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of *Amici Curiae* American Civil Liberties Union of Washington and Other Organizations in Support of Defendants-Appellees and Affirmance with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system on January 21, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 21, 2022       By: */s/ Daniel J. Shih*

DANIEL J. SHIH
   dshih@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 516-3861