**Nos. 21-35815 & 21-35856**

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

_____

BRIAN TINGLEY,
*Plaintiff-Appellant/Cross-Appellee*,

v.

ROBERT W. FERGUSON, IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL FOR THE STATE OF WASHINGTON, ET AL.,
*Defendant-Appellees/Cross-Appellants,*

EQUAL RIGHTS WASHINGTON,
*Intervenor-Defendant-Appellee,*

_____

On Appeal from the United States District Court
for the Western District of Washington
No. 3:21-CV-05359-RJB
Hon. Robert J. Bryan

_____

**BRIEF OF *AMICI CURIAE* FRED T. KOREMATSU CENTER FOR LAW
AND EQUALITY, AOKI CENTER FOR CRITICAL RACE AND NATION
STUDIES, THE CENTER ON RACE, INEQUALITY, AND THE LAW AT
NEW YORK UNIVERSITY SCHOOL OF LAW, AND THE LOYOLA LAW
SCHOOL ANTI-RACISM CENTER IN SUPPORT OF DEFENDANT-
APPELLEES**

_____

Paul F. Rugani
ORRICK, HERRINGTON & SUTCLIFFE LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104
(206) 839-4316
prugani@orrick.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), undersigned counsel for amici curiae make the following disclosures. The Fred T. Korematsu Center for Law and Equality, the Aoki Center for Critical Race and Nation Studies, the Center on Race, Inequality, and the Law at New York University School of Law, and the Loyola Law School Anti-Racism Center are not publicly-held corporations, do not issue stock, and do not have parent corporations and consequently there exist no publicly held corporations which own 10 percent or more of their stock.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................. 1

INTRODUCTION ............................................................................... 2

ARGUMENT ..................................................................................... 4

    I.    Opponents of Civil Rights Legislation Have Long Tried to Ground a Right to Discriminate in Free Speech or Free Exercise Theories ........................................................... 4

    II.    States Have the Inherent Authority to Protect Youth From Harmful Medical Treatments ................................................ 8

    III.    Ruling in Tingley's Favor Would Threaten Longstanding and Hard Fought Civil Rights Protections ................................. 13

CONCLUSION ................................................................................ 18

APPENDIX A - AMICI CURIAE STATEMENTS OF INTEREST ................... 19

CERTIFICATE OF COMPLIANCE ..................................................... 22

CERTIFICATE OF SERVICE ............................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barsky v. Bd. of Regents,*
347 U.S. 442 (1954)..........................................................................................10

*Bd. of Dirs. Of Rotary Int'l v. Rotary Club of Duarte,*
481 U.S. 537 (1987)............................................................................................7

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983)..........................................................................................14

*Brown v. Bd. of Educ.,*
347 U.S. 483 (1954)............................................................................................5

*Chestnut Hill Coll. v. Pa. Human Relations Comm'n,*
158 A.3d 251 (Pa. Commw. Ct. 2017) .............................................................15

*Civil Rights Cases,*
109 U.S. 3 (1883)................................................................................................4

*Fulton v. City of Phila.,*
141 S. Ct. 1868 (2021)........................................................................................9

*Heart of Atlanta Motel, Inc. v. United States,*
379 U.S. 241 (1964)............................................................................................7

*Hishon v. King & Spalding,*
467 U.S. 69 (1984)..............................................................................................7

*Jehovah's Witnesses v. King Cnty. Hosp.,*
390 U.S. 598 (1968)............................................................................................9

*McLaurin v. Okla. State Regents for Higher Educ.,*
339 U.S. 637 (1950)............................................................................................5

*Morgan v. Virginia,*
328 U.S. 373 (1946)............................................................................................5

*N. Coast Women's Care Med. Grp., Inc. v. Superior Ct.*,
189 P.3d 959 (2008).........................................................................10

*N.Y. v. Ferber*,
458 U.S. 747 (1982)...........................................................................9

*Newman v. Piggie Park Enters., Inc.*,
390 U.S. 400 (1968), (D.S.C. 1966) ...................................................7

*Prince v. Massachusetts*,
321 U.S. 158 (1944)...........................................................................9

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)...........................................................................7

*Romer v. Evans*,
517 U.S. 620 (1996).....................................................................9, 10

*Smith v. Allwright*,
321 U.S. 649 (1944)...........................................................................5

*State v. Arlene's Flowers, Inc.*,
441 P.3d 1203 (Wash. 2019) .............................................................8

*State v. Motherwell*,
788 P.2d 1066 (Wash. 1990) .............................................................9

*Sweatt v. Painter*,
339 U.S. 629 (1950)...........................................................................5

**Statutes**

2018 Wash. Sess. Laws ch. 300.........................................................8

An Act to amend the Criminal Code (conversion therapy), S.C. 2021,
c. 24 (Can.)......................................................................................12

Pennsylvania Fair Educational Opportunities Act................................15

RCW 69.04.570................................................................................10

**Legislative Documents**

S. Rep. No. 88-872 (1964), *as reprinted in* 1964 U.S.C.C.A.N. 2355 ......................5

iv

## Other Authorities

G. Andrade & M. Campo Redondo, *Is Conversion Therapy Ethical? A Renewed Discussion in The Context of Legal Efforts to Ban It*, Ethics, Med. & Pub. Health (Feb. 2022), https://doi.org/10.1016/j.jemep.2021.100732 ........................................ 11

Lorraine Boissoneault, *In 1968, Three Students Were Killed by Police. Today, Few Remember the Orangeburg Massacre*, Smithsonian Mag. (Feb. 7, 2018), https://tinyurl.com/yed9rsbd .............................................. 6

Julian Bond, *Julian Bond's Time to Teach: A History of the Southern Civil Rights Movement* (Pamela Horowitz & Jean Theoharis eds. 2021) ...................................................................................................... 6

Sam Brinton, Opinion, *I Was Tortured in Gay Conversion Therapy and It's Still Legal in 41 States*, N.Y. Times (Jan. 24, 2018), https://tinyurl.com/4vmuw7dn ............................................................... 11

Katie Burkholder, *Sandy Springs Man Denied Landscaping Service Because of Sexuality*, GA Voice (Oct. 19, 2018), https://tinyurl.com/5n7j6yhu ................................................................ 17

William Byne, *Regulations Restrict Practice of Conversion Therapy*, LGBT Health (Apr. 5, 2016), https://doi.org/10.1089/lgbt.2016.0015 .............................................. 11

Daniel E. Conine et al., *LGBTQ+ Conversion Therapy and Applied Behavior Analysis: A Call to Action*, J. Applied Behav. Analysis, Winter 2022, https://doi.org/10.1002/jaba.876 ................................... 11

*Conversion Therapy is Torture*, International Rehabilitation Council for Torture Victims (Apr. 23, 2020), https://tinyurl.com/yx4rrmek ................. 12

*Conversion Therapy Laws*, Movement Advancement Project, https://tinyurl.com/29a86xdt (last updated Jan. 7, 2022) ................................... 12

Complaint, *Fatihah v. Neal*, No. 16-cv-00058 (E.D. Okla. Feb. 17, 2016), ECF No. 3 ................................ 16

Complaint, *Holston v. Becerra*, No. 2:21-CV-00185 (E.D. Tenn. Dec. 2, 2021), ECF No. 1 ............................. 15

Defendants' Brief in Support of Motion to Dismiss and/or for
Summary Judgment, *Fatihah v. Neal*,
No. 16-cv-00058 (E.D. Okla. Apr. 28, 2017), ECF No. 67................................16

Defendants' Response in Opposition to Plaintiff's Motion for
Summary Judgment, *Fatihah v. Neal*,
No. 16-cv-00058 (E.D. Okla. May 12, 2017), ECF No. 77 ..............................16

Order, *Fatihah v. Neal*,
No. 16-cv-00058 (E.D. Okla. Dec. 19, 2018), ECF No. 97 ..............................16

Amy E. Green et al., *All Black Lives Matter: Mental Health of Black
LGBTQ Youth*, The Trevor Project, 2020,
https://tinyurl.com/msdmmtjx..................................................................12

Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality
Among US LGBTQ Youths and Young Adults,* 110 Am. J. of Pub.
Health 1221 (Aug. 1, 2020) ................................................................13

Brian K. Landsberg, *Public Accommodations and the Civil Rights Act
of 1964: A Surprising Success?*, 36 Hamline J. Pub. L. & Pol'y 1
(2014)............................................................................................7

*LGTBQ Nondiscrimination in the States: Georgia*, Freedom for All
Americans, https://freedomforallamericans.org/category/states/ga/
(updated Jan. 5, 2021)........................................................................17

P.R. Lockhart, *A Venue Turned Down an Interracial Wedding, Citing
Christian Belief. It's Far From the First to Do So*, Vox (Sept. 3,
2019), https://perma.cc/5WWN-JPW2 ..................................................14

*National LGBT Survey: Research Report*, Government Equalities
Office, July 2018, https://tinyurl.com/5hyww7n4 ......................................13

*Position Statement on Conversion Therapy and LGBTQ Patients,* Am.
Psychiatric Ass'n (Dec. 2018), https://tinyurl.com/mr3jj27u ..........................11

Joseph William Singer, *We Don't Serve Your Kind Here: Public
Accommodations and the Mark of Sodom*, 95 B.U. L. Rev. 929
(2015)...........................................................................................17

*The Year in Hate and Extremism 2019*, Southern Poverty Law Center
(2020), https://perma.cc/YJQ8-EFYZ ...................................................................3

Tyler Whetstone, *Tennessee-Based Adoption Agency Refuses To Help Couple
Because They're Jewish*, Knoxville News (Jan. 19, 2022),
https://tinyurl.com/yckkdhvd...............................................................................15

*White Citizens' Councils*, The Martin Luther King, Jr. Rsch. & Educ.
Inst. at Stanford, https://tinyurl.com/56phn7x3 .................................................5

C. Vann Woodward, *The Strange Career of Jim Crow* (3d rev. ed.
2002) ....................................................................................................................4

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE[1]

Amici curiae, the Fred T. Korematsu Center for Law and Equality at Seattle University School of Law, Aoki Center for Critical Race and Nation Studies, The Center on Race, Inequality, and the Law at New York University School of Law, and the Loyola Law School Anti-Racism Center are academic centers at their respective law schools that focus on research, education, and advocacy on issues regarding race and racial justice.[2]  Amici are acutely aware of the harm disadvantaged minorities can suffer when laws passed for their protection are subject to challenge by those claiming a constitutional privilege to target them for adverse treatment because of their minority status.  Amici submit this brief in support of affirmance because they believe states must be able to exercise their legislative authority to guarantee equal treatment to all Americans and prevent disadvantaged minorities from harmful treatment on account of their minority status.

---

[1] Pursuant to Fed. R. App. P. 29, amici note they have obtained consent from all parties to file this brief.  In addition, Amici certify that, pursuant to Federal Rules of Appellate Procedure 29(a)(4)(E) and 29(b)(3), no party's counsel authored this brief in whole or in part, nor did any party or party's counsel contribute money that was intended to fund preparing or submitting this brief.  No person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

[2] Amici and their interests are detailed individually in Appendix A.

1

## INTRODUCTION

Throughout this country's history, valid exercises of states' inherent police power to protect disadvantaged minorities from harmful treatment have been subject to legal challenges by those who wish to deny those minorities equal protection under the law.  Cloaked in invocations of free speech or free exercise, challengers contend they have a constitutional privilege to harm disadvantaged populations on account of their minority status.  Time and again, courts reject such arguments, finding no First Amendment right to, among other things, exclude members of certain races from restaurants, bar students in interracial relationships from attending schools, or prevent organizations from admitting members of other genders to their ranks.

Amici know all too well what it means to be singled out for harmful treatment based on their minority status. And amici are troubled to see these same arguments being raised to challenge laws that ensure members of the lesbian, gay, bisexual, transgender, and/or questioning (or queer) ("LGBTQ+") community are not singled out for harmful treatment based on their sexual orientation. Washington's law prohibiting conversion therapy is a quintessential exercise of police power; it bars licensed medical practitioners from performing treatments that harm the minority children who receive them.  The right to inflict such harm is not constitutionally protected. Instead, the state's enactment of laws and

2

regulations to ensure protection from harm is an ordinary and lawful exercise of power.

If this Court were to find that Tingley enjoys a constitutional privilege to target disadvantaged minorities for harmful treatment, amici and the communities they represent would be exposed to similar harm. While much progress has been made in eradicating segregation and other forms of invidious discrimination, racial and ethnic minorities continue to suffer from pervasive discrimination, as evidenced by the recent increase in hate crimes across the country. *See The Year in Hate and Extremism 2019*, Southern Poverty Law Center (2020), https://perma.cc/YJQ8-EFYZ. Moreover, while the law Tingley challenges here involves regulating the conduct of licensed professionals, the arguments he raises threaten to undermine fundamental public accommodation and anti-discrimination laws that guarantee equal treatment across all sectors of our society.

Amici submit this brief to highlight the extent to which "free speech" and "free exercise" have been invoked historically to justify harmful and discriminatory practices directed toward disadvantaged minorities. Amici further address why licensed medical practitioners' speech and religious interests in particular cannot supplant the rights of disadvantaged minorities to be protected from harmful conduct based on their minority status.

## ARGUMENT

I.  **Opponents of Civil Rights Legislation Have Long Tried to Ground a Right to Discriminate in Free Speech or Free Exercise Theories.**

Since this country's founding, racial, ethnic, and other minorities have faced discriminatory laws and practices subjecting them to unique harm on the basis of their minority status. The fundamental message of these laws is that minorities were "other" and should not be able to enjoy the same privileges as "ordinary" Americans. One of Congress's first major attempts to prevent this harm, the Civil Rights Act of 1875, was found to have exceeded Congress's power under the Thirteenth and Fourteenth Amendments. *Civil Rights Cases*, 109 U.S. 3 (1883). In a now infamous passage, Justice Bradley held that racial minorities should not be treated as "the special favorite of the law[]." *Id*. at 25.

Emboldened by the *Civil Rights Cases*, a wave of post-Reconstruction segregation laws, ordinances, and customs "lent the sanction of law to a racial ostracism that extended to churches and schools, to housing and jobs, to eating and drinking" and "to virtually all forms of public transportation, to sports and recreations, to hospitals, orphanages, prisons, and asylums, and ultimately to funeral homes, morgues, and cemeteries." C. Vann Woodward, *The Strange Career of Jim Crow* 7 (3d rev. ed. 2002). From the cradle to the grave, segregation laws sanctioned harmful conduct against racial minorities solely based on the color of their skin.

4

Federal and state legislatures attempted to combat this unequal treatment through the passage of civil rights legislation and public accommodation laws—most notably, the Civil Rights Acts of 1957 and 1964. Title II of the Civil Rights Act of 1964 was a watershed moment in civil rights legislation, aiming to eliminate the loss of "personal dignity that surely accompanies denials of equal access to public establishments." S. Rep. No. 88-872 (1964), *as reprinted in* 1964 U.S.C.C.A.N. 2355, 2370. Alongside those legislative efforts, strategic lawsuits resulted in recognition and affirmation of the fundamental right to equality across all walks of life. In the 1940s and 1950s, minorities won crucial victories to prevent discrimination in access to voting (*Smith v. Allwright*, 321 U.S. 649 (1944)), interstate buses (*Morgan v. Virginia*, 328 U.S. 373 (1946)), graduate school facilities (*McLaurin v. Okla. State Regents for Higher Educ.*, 339 U.S. 637 (1950)), law school admissions (*Sweatt v. Painter*, 339 U.S. 629 (1950)), and, most famously, public school education (*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)).

This groundbreaking progress was often met with vehement resistance. Much of the resistance was extra-legal. Opponents of desegregation formed White Citizens' Councils to mobilize white business and civic leaders to oppose segregation and promote white supremacy in their communities through economic coercion, social pressure, and even violence. *White Citizens' Councils*, The Martin Luther King, Jr. Rsch. & Educ. Inst. at Stanford, https://tinyurl.com/56phn7x3.

5

These White Citizens' Councils, in addition to the newly reinvigorated Ku Klux Klan, "created a firm organizational base for terror and intimidation in each of the Southern states." Julian Bond, *Julian Bond's Time to Teach: A History of the Southern Civil Rights Movement* 44 (Pamela Horowitz & Jean Theoharis eds. 2021). As the march of civil rights laws and judicial victories proceeded, so too did the violent response, with attacks levied against those who integrated schools,[3] buses,[4] interstate transportation,[5] and places of public accommodation.[6]

But opponents of civil rights advances also fought progress in the courts, challenging new laws on the basis that they interfered with the challengers' First Amendment rights. As one commentator notes, opponents of Title II of the Civil Rights Act of 1964 argued that the law "violated the rights of owners of public

---

[3] *Supra*, Bond, Ch. 8 (describing physical and verbal abuse of the first Black students to integrate Little Rock Central High School).

[4] *Supra*, Bond, Ch. 6 (describing attacks against participants in the Montgomery bus boycotts).

[5] *Supra*, Bond, Ch. 12 (describing attacks against the Freedom Riders).

[6] *See, e.g.*, *Supra*, Bond, Ch. 22 (white gas station owner shot and killed a black civil rights activist named Samuel Younge after Younge used a "whites only" bathroom in Tuskegee, Alabama); Lorraine Boissoneault, *In 1968, Three Students Were Killed by Police. Today, Few Remember the Orangeburg Massacre*, Smithsonian Mag. (Feb. 7, 2018), https://tinyurl.com/yed9rsbd.

accommodations to decide whom to serve, characterizing this as both an individual right of association and a property right." Brian K. Landsberg, *Public Accommodations and the Civil Rights Act of 1964: A Surprising Success?*, 36 Hamline J. Pub. L. & Pol'y 1, 4 (2014).

The Supreme Court has repeatedly and without reservation rejected such challenges. In the first major challenge to Title II, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964), the Court "rejected the claim" that the law violated property owners' speech rights. Similarly, the Court has rejected free exercise challenges to anti-discrimination laws, rejecting the arguments of a restaurant chain owner who refused to integrate his establishments on the basis that Title II violated his First Amendment rights. *Newman v. Piggie Park Enters., Inc*., 390 U.S. 400 (1968) (per curiam), *aff'g* 256 F. Supp. 941 (D.S.C. 1966). Civil rights laws protecting other disadvantaged minorities similarly have been upheld against First Amendment challenges. *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69 (1984) (rejecting First Amendment defense against Title VII enforcement); *Bd. of Dirs. Of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) (rejecting assertion of First Amendment right to bar women from Rotary Club membership, in violation of state civil rights law); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) (no First Amendment right to discriminate on the basis of gender);

7

*State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019) (upholding

Washington Law Against Discrimination over free exercise challenge).

The underlying rights those challengers unsuccessfully sought to vindicate

are not fundamentally different from the rights Tingley asserts here.  Tingley

professes a belief "that sexual relationships are beautiful and healthy, but only if

lived out in a particular context—namely, between one man and one woman

committed to each other through marriage."  Appellant's Br. at 6-7.  And he claims

that belief entitles him to provide conversion therapy treatment to LGBTQ+

patients on "gender, gender identity, gender expression, sexual orientation, and

sexual behaviors," *id*. at 10, regardless of the harm such treatment causes.  The

challengers in these other cases similarly held viewpoints or beliefs, religious or

otherwise, that members of different races, genders, or other minority communities

should be subjected to different treatment based on their minority status.  Those

challenges failed in those cases and should likewise be rejected here.

## II.     States Have the Inherent Authority to Protect Youth From Harmful Medical Treatments.

Washington enacted the law at issue to further its "compelling interest in

protecting the physical and psychological well-being of minors, including lesbian,

gay, bisexual, and transgender youth, and in protecting its minors against exposure

to serious harms caused by conversion therapy." 2018 Wash. Sess. Laws ch. 300,

§ 1.  These interests are at the heart of states' power to legislate.  States have an "interest in the protection of children [that] is unquestionably of the utmost importance."  *State v. Motherwell*, 788 P.2d 1066, 1072 (Wash. 1990).  Courts routinely uphold "legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights."  *N.Y. v. Ferber*, 458 U.S. 747, 757 (1982).  The state's authority in this regard is not nullified even when a challenger grounds their objection to the law "on religion or conscience."  *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).  *See, e.g.*, *Motherwell*, 788 P.2d 1066 (state may compel reporting of child abuse); *Jehovah's Witnesses v. King Cnty. Hosp.*, 390 U.S. 598 (1968) (per curiam), *aff'g* 278 F. Supp. 488 (W.D. Wash. 1967) (state's interest in providing minor child with blood transfusion).

Washington's law further vindicates states' "weighty" interest in protecting LGBTQ+ people from being "treated as social outcasts or as inferior in dignity and worth."  *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1882 (2021) (internal quotation marks omitted).  And although not expressly enacted as an anti-discrimination law, amici see the statute fulfilling the fundamental role state governments have in protecting vulnerable classes of people to promote their equal treatment.  "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'"  *Romer v. Evans*, 517 U.S. 620, 634-35 (1996).  *Romer* recognized that

9

anti-discrimination laws need not be limited to groups that received "the protection of heightened equal protection scrutiny" under Supreme Court precedent, but instead can encompass "an extensive catalog of traits which cannot be the basis for discrimination, including . . . sexual orientation." *Id*. at 628-29. *Romer* further held that preventing a state government from protecting a class of citizens is antithetical to the Constitution. *Id.* at 635. This protection extends to prevention of healthcare regimes specifically harming LGBTQ+ patients. *See N. Coast Women's Care Med. Grp., Inc. v. Superior Ct.*, 189 P.3d 959, 966-68 (2008) (rejecting practitioners' free speech and free exercise challenges and holding that lesbian patients may not be singled out for denial of fertility treatment).

Beyond the significant interests articulated above, states further have inherent authority to regulate the professional practice of medicine to prevent citizens from harm caused by unsafe or unsound treatments. The Supreme Court has upheld the state's "broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there" with ample discretion extending to "the regulation of all professions concerned with health." *Barsky v. Bd. of Regents*, 347 U.S. 442, 449-51 (1954). For example, it is unlawful in Washington to introduce or deliver new drugs that have not been approved by the FDA (RCW 69.04.570), even if the practitioner has a sincerely held view, religious or otherwise, that the drugs would be therapeutic to their patients.

10

There can be no question that the law at issue here furthers all these compelling interests. Washington legislated here on a record of unspeakable harm conversion therapy causes to LGBTQ+ children on account of their sexual orientation and/or gender identity. Conversion therapy "targets adolescents who lack the legal authority to make medical decisions on their own behalf,"[7] with at least 20,000 LGBTQ+ teens likely to "receive conversion therapy from a health care professional before they turn 18."[8] Conversion therapy is highly damaging to a child's psyche and development.[9] The American Psychiatric Association considers it unethical and encourages legislation banning it.[10] Twenty US states

---

[7] William Byne, *Regulations Restrict Practice of Conversion Therapy*, LGBT Health, (Apr. 5, 2016), at 97–99, https://doi.org/10.1089/lgbt.2016.0015.

[8] Sam Brinton, Opinion, *I Was Tortured in Gay Conversion Therapy and It's Still Legal in 41 States*, N.Y. Times (Jan. 24, 2018), https://tinyurl.com/4vmuw7dn.

[9] *See* G. Andrade & M. Campo Redondo, *Is Conversion Therapy Ethical? A Renewed Discussion in The Context of Legal Efforts to Ban It*, Ethics, Med. & Pub. Health (Feb. 2022), https://doi.org/10.1016/j.jemep.2021.100732; Daniel E. Conine et al., *LGBTQ+ Conversion Therapy and Applied Behavior Analysis: A Call to Action*, J. Applied Behav. Analysis, Winter 2022, https://doi.org/10.1002/jaba.876.

[10] *Position Statement on Conversion Therapy and LGBTQ Patients,* Am. Psychiatric Ass'n (Dec. 2018), https://tinyurl.com/mr3jj27u.

and Washington D.C. have banned conversion therapy on minors,[11] and Canada has criminalized conversion therapy completely.[12] The International Rehabilitation Council for Torture Victims recognizes it as a form of torture.[13]

The harms visited by conversion therapy are particularly acute for LGBTQ+ children who are also racial minorities. Such youth are already more susceptible to negative experience, structural disadvantages, and poor health outcomes, sitting as they do at the intersection of multiple marginalized identities.[14] Compounding those issues, people of color may be more likely to be subject to conversion therapy. A 2018 study of people aged thirteen to twenty-four found that both Hispanic and Black respondents were far more likely than white respondents—

---

[11] *Conversion Therapy Laws*, Movement Advancement Project, https://tinyurl.com/29a86xdt (last updated Jan. 7, 2022).

[12] The criminal code specifically prohibits (1) causing another person to undergo conversion therapy; (2) removing a minor from Canada to subject them to conversion therapy abroad; (3) profiting from providing conversion therapy; and (4) advertising or promoting conversion therapy. An Act to amend the Criminal Code (conversion therapy), S.C. 2021, c. 24 (Can.).

[13] *Conversion Therapy is Torture*, International Rehabilitation Council for Torture Victims (Apr. 23, 2020), https://tinyurl.com/yx4rrmek.

[14] Amy E. Green et al., *All Black Lives Matter: Mental Health of Black LGBTQ Youth*, The Trevor Project, 2020, https://tinyurl.com/msdmmtjx.

fifty-two percent more and twenty-eight percent more, respectively—to have undergone conversion therapy.[15] Black LGBTQ+ youth subject to conversion therapy experience a fifty percent increase in attempted suicide.[16] Invalidating the law here would surely subject disadvantaged minority children to serious harm.

## III. Ruling in Tingley's Favor Would Threaten Longstanding and Hard Fought Civil Rights Protections.

If Tingley enjoys a constitutional privilege to engage in harmful treatment of LGBTQ+ children under the guise of free speech or free exercise, then by extension holders of discriminatory beliefs can claim the same privilege to evade civil rights laws and engage in harmful treatment of disadvantaged minorities in other contexts. This result would undermine civil rights protections for minorities at a time when such protections remain critical to ensuring equal protection for all Americans.

---

[15] Amy E. Green et al., *Self-Reported Conversion Efforts and Suicidality Among US LGBTQ Youths and Young Adults,* 110 Am. J. of Pub. Health 1221, 1227 (Aug. 1, 2020), https://doi.org/10.2105/AJPH.2020.305701. Similarly, a 2018 national survey in England revealed that respondents of color were nearly twice as likely as white respondents to have undergone or been offered conversion therapy. *National LGBT Survey: Research Report*, Government Equalities Office, July 2018, 83-84, https://tinyurl.com/5hyww7n4.

[16] Green, *All Black Lives Matter*, *supra* note 14.

The arguments Tingley employs to oppose Washington's legal protections for LGBTQ+ youth are similar to those employed against legal protections for other minorities. For example, Bob Jones University long maintained a policy prohibiting students from engaging in interracial marriage—although the IRS revoked the university's tax-exempt status due to the policy in 1976, the university maintained it until 2000. Bob Jones University challenged the IRS determination in court, arguing that the IRS had abridged its religious liberty. When the case reached the Supreme Court, the majority roundly rejected the university's argument, finding that the religious exercise objection did not overcome the government's interest in combatting race-based discrimination. *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983). Unfortunately, some people continue to use religious beliefs as a guise for discriminating against those involved in interracial relationships: as recently as 2019, a wedding venue refused to rent to an interracial couple citing religious beliefs. P.R. Lockhart, *A Venue Turned Down an Interracial Wedding, Citing* Christian Belief. *It's Far From the First to Do So*, Vox (Sept. 3, 2019), https://perma.cc/5WWN-JPW2. Even today, organizations—including those receiving public funds—attempt to invoke a religious right to discriminate against protected classes.[17]

---

[17] In December 2021 a faith-based adoption agency sued the Biden administration, arguing that its religious beliefs should allow it to discriminate on the basis of

Analogous First Amendment arguments have been raised to justify excluding individuals from public accommodations like bars, restaurants, and stores across the country. In 2015, for example, a student filed a complaint against his former college with the Pennsylvania Human Rights Commission ("PHRC"), alleging that the college expelled him for racially discriminatory reasons. *Chestnut Hill Coll. v. Pa. Human Relations Comm'n*, 158 A.3d 251, 256 (Pa. Commw. Ct. 2017). In the ensuing lawsuit, the college, a Catholic institution, argued that religiously affiliated private colleges are not public accommodations under the applicable nondiscrimination statute, the Pennsylvania Fair Educational Opportunities Act ("PFEOA"), and that the religion clauses of the First Amendment precluded the PHRC from reviewing its expulsion decisions. The Pennsylvania Commonwealth Court rejected both arguments, finding instead that "[t]here is no dispute that the [PFEOA] is a neutral law" that can be applied to religiously affiliated colleges without infringing their religious autonomy. Just like Washington's law prohibiting conversion therapy applies to all licensed therapists acting in their licensed capacity in Washington, the PFEOA applies to all

---

religion, sex, sexual orientation, gender identity and same-sex marriage status. Complaint at ¶ 146-70, *Holston v. Becerra*, No. 2:21-CV-00185 (E.D. Tenn. Dec. 2, 2021), ECF No. 1. Just this week, that agency was itself sued after allegedly refusing to place a child with a Jewish couple on the basis of their religion. Tyler Whetstone, *Tennessee-Based Adoption Agency Refuses To Help Couple Because They're Jewish*, Knoxville News (Jan. 19, 2022), https://tinyurl.com/yckkdhvd.

Pennsylvania colleges to protect all students from the harms of racial discrimination.

In 2016, several businesses similarly raised First Amendment defenses to challenge the application of an Oklahoma state non-discrimination statute after those business refused service to Muslim customers.  Complaint at ¶ 24, *Fatihah v. Neal*, No. 16-cv-00058 (E.D. Okla. Feb. 17, 2016), ECF No. 3.  In that case, the owners of a gun range publicly posted signs declaring their business was a "Muslim free establishment" and denied service to an African American Muslim U.S. Army Reserve member.  *Id*. at ¶¶ 24, 32.  The defendants argued that their sign amounted to protected First Amendment speech and that the First Amendment barred any cause of action premised on those signs.  Defendants' Brief in Support of Motion to Dismiss and/or for Summary Judgment at 16-17, *Fatihah*, No. 16-cv-00058 (E.D. Okla. Apr. 28, 2017), ECF No. 67; Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment at 27-29, *Fatihah*, No. 16-cv-00058 (E.D. Okla. May 12, 2017), ECF No. 77.  The court rejected that argument, holding that "[t]he First Amendment is not a defense to a discrimination claim." Order at 10, *Fatihah*, No. 16-cv-00058 (E.D. Okla. Dec. 19, 2018), ECF No. 97.

Lawsuits challenging discriminatory denials of service in public accommodations capture only a small subset of the harmful and longstanding

16

discrimination against minorities that occurs in this country. Often, such conduct is not challenged in court but nevertheless occurs in the course of everyday life. For example, in 2013, a nightclub refused to service people of Korean ancestry because of their race and national origin. Joseph William Singer, *We Don't Serve Your Kind Here: Public Accommodations and the Mark of Sodom*, 95 B.U. L. Rev. 929, 930 (2015). In 2018, a landscaper in Georgia, a state which lacks comprehensive LGBTQ+ protections,[18] refused services for a gay couple because of their sexuality and even admitted to doing so against other LGBTQ+ customers as a matter of course. Katie Burkholder, *Sandy Springs Man Denied Landscaping Service Because of Sexuality*, GA Voice (Oct. 19, 2018), https://tinyurl.com/5n7j6yhu.

These examples are merely the tip of the iceberg of discrimination in public places in America, but they demonstrate that robust legal protections are necessary to prevent harmful treatment of minorities. But if Tingley's First Amendment arguments prevail, such protections will be severely undermined. A free speech or free exercise right to visit harmful treatments on disadvantaged patients could readily spread into a right to visit other harms on minority populations,

---

[18] *LGTBQ Nondiscrimination in the States: Georgia*, Freedom for All Americans, https://freedomforallamericans.org/category/states/ga/ (updated Jan. 5, 2021).

undermining decades of efforts to combat discrimination and to erect legal and structural protections that guarantee equal rights to all citizens.

## CONCLUSION

For the foregoing reasons, this Court should affirm the order below and allow the Washington law to fulfill its salutary purpose of protecting disadvantaged minority children from harm.

Respectfully submitted,

/s/ Paul F. Rugani

Paul F. Rugani
ORRICK, HERRINGTON &
SUTCLIFFE LLP
701 5th Avenue, Suite 5600
Seattle, WA 98104
(206) 839-4316
prugani@orrick.com

January 21, 2022

18

## APPENDIX A: AMICI CURIAE STATEMENTS OF INTEREST

The Fred T. Korematsu Center for Law and Equality (Korematsu Center) is a non-profit organization based at Seattle University School of Law that works to advance justice through research, advocacy, and education. Inspired by the legacy of Fred Korematsu, who defied the military orders during World War II that ultimately led to the incarceration of 120,000 Japanese Americans, the Korematsu Center works to advance social justice for all. The Korematsu Center has a strong interest in ensuring that the government is empowered to protect vulnerable groups, including LGBTQ youth, from harm. The Korematsu Center does not, in this brief or otherwise, represent the official views of Seattle University.

The Aoki Center for Critical Race and Nation Studies at King Hall, UC Davis School of Law, fosters multi-disciplinary scholarship and practice that critically examine the law through the lens of race, ethnicity, indigeneity, citizenship, and class. Named to honor the memory of Keith Aoki, the Aoki Center seeks to deepen our understanding of issues that have a significant impact on our culture and society. The Aoki Center seeks to promote the role of law in redressing structural racism and safeguarding against the discrimination of vulnerable groups, including LGBTQI+ youth. The Aoki Center does not in this brief or otherwise, represent the official views of the

19

University of Davis.

The Center on Race, Inequality, and the Law at New York University School of Law works to highlight and dismantle structures and institutions that have been infected by racial bias, plagued by inequality, and visit harm upon marginalized groups. The Center fulfills its mission through public education, research, advocacy, and litigation. It has a special interest in ensuring that states, and the federal government, exercise their lawful authority to protect the rights of oppressed and disadvantaged people and communities. The Center on Race, Inequality, and the Law does not, in this brief or otherwise, represent the official views of New York University or New York University School of Law.

The LLS Anti-Racism Center (LARC) of LMU Loyola Law School (LLS), embraces the moral and professional duty to engage, confront and dismantle individualized and structural racism. LARC draws upon the multiple lawyering strategies of LLS's diverse community members to challenge and transform legal regimes that reify structural racism and inequality. LARC connects legal scholarship and policy research, academic and policy forums, and the on-the-ground clinical work of the Loyola Social Justice Law Clinic to strengthen LLS's real world impact. By applying our collective skills, knowledge, and perspectives to initiatives defined and driven by the community, LARC takes a fundamental

20

step toward achieving equity and democracy under the law. LARC therefore, is

concerned with the ability of government to protect subordinated groups from

harm such as LGBTQ+ youth of color. LARC does not, in this brief or otherwise,

represent the official views of LMU Loyola Law School.

**CERTIFICATE OF COMPLIANCE**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**
**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 21-3815 and 21-35856

I am the attorney or self-represented party.

**This brief contains 4,349 words,** excluding the items exempted by Fed. R.

App. P. 32(f), but including appendix A. The brief's type size and typeface comply

with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), including Appendix A.

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/* Paul F. Rugani        **Date** January 21, 2022
*(use "s/[typed name]" to sign electronically-filed documents)*

22

# CERTIFICATE OF SERVICE

## When All Case Participants are Registered for the
## Appellate CM/ECF System

U.S. Court of Appeals Docket Numbers: **21-35815 & 21-35856**

I hereby certify that on January 21, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Paul F. Rugani*

Paul F. Rugani
ORRICK, HERRINGTON
& SUTCLIFFE LLP
701 5th Avenue
Seattle, WA 98104
Telephone: (206) 839-4316
Email: prugani@orrick.com

23