# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

BRIAN TINGLEY,

*Plaintiff-Appellant,*

v.

ROBERT W. FERGUSON, in his official capacity as Attorney General for the State of Washington; UMAIR A. SHAH, in his official capacity as Secretary of Health for the State of Washington; and KRISTIN PETERSON, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance Division of the Washington State Department of Health,

*Defendants-Appellees,*

and

EQUAL RIGHTS WASHINGTON,

*Intervenor-Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Washington
Case No. 3:21-cv-05359-RJB / Hon. Robert J. Bryan

## PETITION FOR REHEARING EN BANC

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

GREGORY D. ESAU
ELLIS LI MCKINSTRY
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101
(206) 682-0565
gesau@elmlaw.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION AND STATEMENT ................................................... 1

ARGUMENT .......................................................................................... 3

I.   To maintain uniformity within this circuit and consistency
     with other courts, this Court should rehear this case and
     overrule *Pickup*. ..................................................................... 3

     A.   Both the panel decision and *Pickup* conflict with how the
          Supreme Court and other circuits distinguish between
          conduct and speech. .......................................................... 3

     B.   The panel decision dangerously created an ahistorical
          allowance for content-based restrictions on speech. ............ 10

II.  The panel's decision on Free Exercise contradicts other circuit
     precedent. ................................................................................. 15

CONCLUSION ..................................................................................... 17

CERTIFICATE OF SERVICE .............................................................. 19

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*American Society of Journalists & Authors, Inc. v. Bonta*,
    15 F.4th 954 (9th Cir. 2021) ........................................................ 5, 7

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................... 17

*Brokamp v. District of Columbia*,
    2022 WL 681205 (D.D.C. Mar. 7, 2022) .......................................... 9

*Capital Associated Industries, Inc. v. Stein*,
    922 F.3d 198 (4th Cir. 2019) .......................................................... 5

*Chelsey Nelson Photography, LLC v. Louisville/Jefferson County
    Metro Government*,
    2022 WL 3972873 (W.D. Ky. Aug. 30, 2022) .................................. 8

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ...................................................................... 15

*Cohen v. California*,
    403 U.S. 15 (1971) .......................................................................... 3

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) ........................................... 6, 7, 14, 17

*Dent v. West Virginia*,
    129 U.S. 114 (1889) ...................................................................... 13

*Hawker v. People of New York*,
    170 U.S. 189 (1898) ...................................................................... 13

*Hines v. Quillivan*,
    2021 WL 5833886 (S.D. Tex. Dec. 9, 2021) .................................... 5

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .................................................................. 4, 7, 12

*Honeyfund.com, Inc. v. DeSantis*,
    2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) ................................... 3

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ................................................................. 15

*King v. Governor of New Jersey*,
    767 F.3d 216 (3d Cir. 2014) ............................................................. 9

*Lambert v. Yellowley*,
    272 U.S. 581 (1926) ............................................................... 13, 14

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
    138 S. Ct. 1719 (2018) ............................................................ 15, 16

*National Association for the Advancement of Psychoanalysis v. California Board of Psychology*,
    228 F.3d 1043 (9th Cir. 2000) ......................................................... 6

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ........................................................... passim

*New Hope Family Services v. Poole*,
    966 F.3d 145 (2d Cir. 2020) ....................................................... 16, 17

*New York State Rifle & Pistol Association v. Bruen*,
    142 S. Ct. 2111 (2022) ........................................................... passim

*Otto v. City of Boca Raton*,
    41 F.4th 1271 (11th Cir. 2022) ............................................. 7, 11, 14

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ............................................. 3, 8, 9, 12

*Pacific Coast Horseshoeing School, Inc. v. Grafilo*,
    315 F. Supp. 3d 1195 (E.D. Cal. 2018) ........................................... 6

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ......................................................... 6

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) ................................................ 1, 2, 6

*Stonewater Roofing, Ltd. Company v. Texas Department of Insurance,*
    641 S.W.3d 794 (Tex. Ct. App. 2022) ...............................................5

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ...............................................16

*Telescope Media Group v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) ...............................................7

*United States v. Alvarez,*
    567 U.S. 709 (2012) ...............................................11

*United States v. Sineneng-Smith,*
    140 S. Ct. 1575 (2020) ...............................................17

*United States v. Stevens,*
    559 U.S. 460 (2010) ...............................................7

*Upsolve, Inc. v. James,*
    2022 WL 1639554 (S.D.N.Y. May 24, 2022) ...........................5, 11

*Vizaline, LLC v. Tracy,*
    949 F.3d 927 (5th Cir. 2020) ...........................................4, 6

*Wollschlaeger v. Governor of Florida,*
    848 F.3d 1293 (11th Cir. 2017) .....................................1, 8, 9

## Other Authorities

Elena Kagan, *Regulation of Hate Speech and Pornography After R.A.V.*, 60 U. Chi. L. Rev. 873 (1993)...............................................10

Elliott A. Krause, DEATH OF THE GUILDS (1996) ....................................11

Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U. L. Rev. 885 (2000) ........13

S. David Young, THE RULE OF EXPERTS: OCCUPATIONAL LICENSING IN AMERICA (1987)...............................................11

## Rules

Fed. R. App. P. 35(b)(1) .......................................................... 1, 2

## INTRODUCTION AND STATEMENT

In *Pickup v. Brown*, 740 F.3d 1208, 1226–28 (9th Cir. 2014), this Court posited that "the First Amendment rights of professionals" exists on a "continuum," where "public dialogue" garners robust protection, professional speech earns "diminished" protection, and anything labelled "conduct" has no protection at all. But there is no "continuum." There is simply speech and nonspeech. *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc). And anything that qualifies as speech gets the same protection as "public dialogue." *Pickup*, 740 F.3d at 1227. By creating a continuum where professionals' speech receives *less* protection, *Pickup* upended how courts in this circuit analyze speech challenges under the First Amendment.

This case is fruit from *Pickup*'s poisonous tree. Only in a world where a professional's speech is treated differently than "other" speech could the panel conclude that mere conversations between Brian Tingley and his clients are somehow "conduct," not speech. As the Supreme Court and countless other courts have confirmed, the First Amendment draws the line between speech and conduct in the professional setting the same as elsewhere. This Court once followed that line and should do so again. The panel's failure to correct *Pickup*'s mistake—indeed, the panel's insistence on doubling down on it—puts this Court on a collision course with the Supreme Court, sister circuits, and even itself. En banc review is warranted. Fed. R. App. P. 35(b)(1)(A)–(B).

To support its professional-speech-is-now-conduct rule, the panel majority also articulated an alternative theory that Defendants did not present and which defies the historical record: "a long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders." Panel Op. at 42. But a tradition of regulating health-care practice is different than regulating health-care providers' *speech. See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022). This theory allows governments to regulate any speech a bureaucrat labels "medical treatment"—even counseling that involves no physical procedures whatsoever, merely talking and listening. *Actual* history shows the havoc governments can wreak by playing this "labeling game." *Pickup*, 740 F.3d at 1218 (O'Scannlain, J., dissenting in the denial of rehearing en banc). The panel's decision conflicts with how the Supreme Court has looked at both history and content-based restrictions on speech, and its correction is of "exceptional importance." Fed. R. App. P. 35(b)(1)(B).

Finally, the panel decision affords less protection to professionals' Free Exercise rights. The panel insisted that a censorship law that targets a recognized religious practice—provided and sought almost exclusively for religious reasons—was nonetheless evenhanded. By ignoring the law's actual effects, the panel decision ignored Supreme Court precedent. It must be corrected.

## ARGUMENT

I.  **To maintain uniformity within this circuit and consistency with other courts, this Court should rehear this case and overrule *Pickup*.**

The panel's decision conflicts with the Supreme Court and other circuits on core First Amendment questions. The problem partially stems from the panel's reliance on *Pickup*, an outlier case that was wrong when decided. But the problem also comes from the panel's mishandling of historical methodology. En banc review is necessary to correct both mistakes and maintain uniformity within this circuit and with other courts.

A.  **Both the panel decision and *Pickup* conflict with how the Supreme Court and other circuits distinguish between conduct and speech.**

When evaluating whether a law targets a professional's speech, courts draw the line between speech and conduct the same way they do outside the professional setting: by looking at what the regulation prohibits. As the Eleventh Circuit held in a factually indistinguishable case, if "the only conduct which the State [seeks] to punish [is] the fact of communication," then the State punishes speech, not conduct. *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020) (*Otto I*) (cleaned up). "And the telltale sign" that the State punishes "communication is that statutory violations are not based on conduct that is 'separately identifiable' from speech." *Honeyfund.com, Inc. v. DeSantis*, 2022 WL 3486962, at *8 (N.D. Fla. Aug. 18, 2022) (quoting *Cohen v. California*, 403 U.S. 15, 18 (1971)).

That is exactly how the Supreme Court draws the line. In *Holder v. Humanitarian Law Project*—a case that preceded *Pickup*—the challenged statute prohibited providing "material support" to certain organizations. 561 U.S. 1, 7 (2010). On its face, that prohibition targeted only conduct. But the plaintiffs wanted to provide certain organizations with "expert advice." *Id.* at 21–22. The government tried to characterize that advice as conduct too, but the Supreme Court rejected this alchemy: the only "conduct triggering coverage under the statute consist[ed] of communicating a message," and that was speech. *Id.* at 28.

After *Pickup*, the Supreme Court again applied this principle in the professional context. "Speech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) (*NIFLA*). The Court criticized precedents—including *Pickup* by name—that gave the government a freer hand in regulating speech such as "specialized advice." *Id.* at 2374. And it "stressed the danger of content-based regulations in the fields of medicine and public health, where information can save lives." *Id.* (cleaned up). *NIFLA* "reoriented courts toward the traditional taxonomy that draws the line between speech and conduct." *Vizaline, LLC v. Tracy*, 949 F.3d 927, 933 (5th Cir. 2020) (cleaned up).

In a host of "professional" settings, courts have followed this dichotomy. Regulations targeting a lawyers' communications "indisputably [target] speech," *Upsolve, Inc. v. James*, 2022 WL 1639554, at *11–12

(S.D.N.Y. May 24, 2022), while those that "focus more broadly on the question of who may conduct themselves as a lawyer" target conduct, *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 208 (4th Cir. 2019). Laws that stop a retired veterinarian from giving advice to pet owners without first physically examining the pet target "speech, and not conduct," because "all of [the veterinarian's] interactions with pet owners took the form of verbal and written communications." *Hines v. Quillivan*, 2021 WL 5833886, at *3 (S.D. Tex. Dec. 9, 2021). Even adjusting public insurance "necessarily and inextricably involves speech" and cannot be regulated when the government "points to nothing that a public insurance adjuster does that is simply conduct." *Stonewater Roofing, Ltd. Co. v. Tex. Dep't of Ins.*, 641 S.W.3d 794, 802 (Tex. Ct. App. 2022).

This Court has drawn the same line. For instance, this Court held that a law that classified between employees and independent contractors targeted "economic activity rather than speech" because it did not "limit what someone can or cannot communicate" or "restrict when, where, or how someone can speak." *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 961–62 (9th Cir. 2021). The Court appropriately focused on whether the law regulated speech itself.

Similarly, California enacted a law that prevented certain students from enrolling in private postsecondary schools, "regulat[ing] what kind of educational programs different institutions can offer to different students." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d

1062, 1068–69 (9th Cir. 2020). California maintained—and the district court concluded—that the law did "not implicate speech at all" because it did not constrain anyone from "imparting information, disseminating opinions, or communicating a message." *Id.* at 1068 (cleaned up). That conclusion came straight from *Pickup*'s loose treatment of speech as conduct. *Pac. Coast Horseshoeing Sch., Inc. v. Grafilo*, 315 F. Supp. 3d 1195, 1200 (E.D. Cal. 2018) (citing *Pickup*, 740 F.3d at 1230). But this Court recognized that *NIFLA* "abrogated" *Pickup*, and that anytime "there is a speaker who is willing to convey information"—even in the professional context—the First Amendment fully applies. *Pac. Coast Horseshoeing Sch.*, 961 F.3d at 1069–70 (cleaned up).

In fact, this Court has applied the "traditional taxonomy" in cases just like this one—those involving medical professionals and counselors. *Vizaline,* 949 F.3d at 933. In *Conant v. Walters*, this Court protected a doctor's right to "recommend" marijuana use (speech) against the government's contention that the recommendation was equivalent to a prescription (conduct). 309 F.3d 629, 637 (9th Cir. 2002). And in *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, this Court affirmed that the First Amendment protects "the *communication* that occurs during psychoanalysis." 228 F.3d 1043, 1054 (9th Cir. 2000) (emphasis added). In other words: though the State can regulate what a medical professional or counselor *does*, it cannot "dictate the content of what is *said*." *Conant*, 309 F.3d at 637 (emphasis added).

*Pickup* and the panel decision here are the outliers. In both cases, the challenged laws "limit what someone can or cannot communicate" and "restrict when, where, or how someone can speak." *Am. Soc'y of Journalists & Authors*, 15 F.4th at 961–62. And they "dictate[d] the content of what is said." *Conant*, 309 F.3d at 637. So this Court should have subjected these laws to strict scrutiny unless the government could point to "separately identifiable" conduct *other than speech*. Instead, both opinions alchemized speech into conduct by saying that speech is "treatment," and treatment is always conduct the government can regulate.

But "[s]peech is not conduct just because the government says it is." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). That's why in *Holder*, speech did not become conduct just because the government labeled it "material support." 561 U.S. at 28. So too here: Tingley's speech does not become conduct just because the government labels it a "treatment." "Talk therapy [may be] . . . a form of treatment," but it "consists—entirely—of words." *Otto v. City of Boca Raton*, 41 F.4th 1271, 1274 (11th Cir. 2022) (*Otto II*) (Grant, J., concurring in the denial of rehearing en banc). And outside a narrow band of "historic and traditional categories long familiar to the bar," words are constitutionally protected speech. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (cleaned up). No one—not the State, not the panel opinion, not the Court in *Pickup*—has identified any "separately identifiable" conduct that

Tingley engages in apart from the words he uses. The government cannot regulate pure speech merely by assigning it a "treatment" label.

Indeed, to recast words used in counseling sessions "as mere conduct (or speech incidental to conduct) would undermine core First Amendment protections and subject wide swaths of protected speech to regulation by the government." *Chelsey Nelson Photography, LLC v. Louisville/Jefferson Cnty. Metro Gov't*, 2022 WL 3972873, at *13 (W.D. Ky. Aug. 30, 2022) (cleaned up). As the Eleventh Circuit has held, if a counselor's speech can be transformed into conduct, so too could "teaching or protesting," "[d]ebating," and "[b]ook clubs."[1] *Otto I*, 981 F.3d at 865. Consider people discussing a self-help book about same-sex attraction. That discussion could involve someone with "training" or "certification." Panel Op. at 47. But that would not cause *anyone* to conclude that the

---

[1] The panel here derided these comparisons as "minimiz[ing] the rigorous training, certification, and post-secondary education that licensed mental health providers endure to be able to treat other humans for compensation." Panel Op. at 47. But these comparisons say nothing about the *veracity* of a trained counselor's speech versus that of a layperson's. They simply show that whether the forbidden words come from licensed counselors or from someone completely untrained, they are *speech*, not conduct. *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc) (cleaned up) ("Speech is speech, and it must be analyzed as such for purposes of the First Amendment."). To classify one as speech and the other as conduct based solely on training does exactly what the Supreme Court forbade in *NIFLA*: it gives the "States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018).

discussion was conduct instead of speech. Yet that is precisely what both *Pickup* and the panel here concluded.

Both *Pickup* and the panel decision run headlong into two other circuits that have examined censorship laws like Washington's and concluded that they regulate speech, not conduct.[2] New Jersey relied heavily on *Pickup* in defending its counseling ban, but the Third Circuit held that "the argument that verbal communications become 'conduct' when they are used to deliver professional services was rejected by *Humanitarian Law Project*." *King v. Governor of N.J.*, 767 F.3d 216, 228 (3d Cir. 2014). It criticized *Pickup*'s failure to "explain[ ] exactly *how* a court was to determine whether a statute regulate[s] 'speech' or 'conduct.'" *Id.* "That the counselor is speaking as a licensed professional," the court explained, "does not transmogrify her words into 'conduct.'" *Id.*

The Eleventh Circuit flatly "rejected the practice of relabeling controversial speech as conduct." *Otto I*, 981 F.3d at 861. It denounced such attempts as "unprincipled and susceptible to manipulation." *Id.* (quoting *Wollschlaeger*, 848 F.3d at 1308). Whether as a regulation on "medical practice" or on a "client-directed conversation," Boca Raton's counseling ban targeted "entirely speech." *Id.* at 865, 866 n.3.

---

[2] In a different context, one district court has also held that "counseling" "is speech, not conduct." *Brokamp v. District of Columbia*, 2022 WL 681205, at *1 (D.D.C. Mar. 7, 2022).

Though "[t]he speech/conduct line is hard to draw," "it retains much meaning in theory, and even more in practice." Elena Kagan, *Regulation of Hate Speech and Pornography After* R.A.V., 60 U. CHI. L. REV. 873, 884 (1993). Neither *Pickup* nor the panel here grappled with the distinction. Unlike almost every other court across the country, they divide speech from conduct by trusting labels the government attaches to speech, in direct conflict with Supreme Court authority, intracircuit uniformity, and cross-circuit consistency. This Court should rehear this case and overrule *Pickup*.

### B. The panel majority dangerously created an ahistorical allowance for content-based restrictions on speech.

The majority separately justified Washington's censorship law as consistent with a "heretofore unrecognized" historical regulation of health-care practice. Panel Op. at 42. Given this "tradition," the majority held that Washington could "impose restrictions on [Tingley's] speech based on the content of his words." *Id.* at 45. To start, that conclusion is impossible to square with the panel's first holding. How can Tingley's speech be *both* "conduct" *and* historically regulated "speech"? More important, the majority used history in a way that contradicts Supreme Court precedent. That error, too, merits en banc correction.

The Supreme Court has warned courts not "to exempt a category of speech from the normal prohibition on content-based restrictions." *NIFLA*, 138 S. Ct. at 2372 (cleaned up). States can regulate speech based

on content only if such regulation is "historically rooted in a tradition of regulation going back to the Founding." *Upsolve*, 2022 WL 1639554, at *14; *accord NIFLA*, 138 S. Ct. at 2373; *Bruen*, 142 S. Ct. at 2130. Traditionally, the list has been "tightly limited in number" to "defamation, incitement, fraud, and obscenity." *Upsolve*, 2022 WL 1639554, at *14. Yet the panel exerted a "freewheeling authority" to add a new category: the speech of "those who provide health care." Panel Op. at 42; *United States v. Alvarez*, 567 U.S. 709, 722 (2012).

But "there is *no* tradition of regulating professional speech"—not even speech related to medicine or therapy. *Otto II*, 41 F.4th at 1274 (Grant, J., concurring in the denial of rehearing en banc). There's not even a consistent history of regulating these *practices*. Though some states enacted professional regulations after the Revolution, most were repealed shortly thereafter as "inconsistent with the democratic political ideology." Elliott A. Krause, DEATH OF THE GUILDS 30 (1996) (cleaned up). That included medicine: "almost anyone could practice 'medicine,' and many did." *Id.*; *accord* S. David Young, THE RULE OF EXPERTS: OCCUPATIONAL LICENSING IN AMERICA 12 (1987) ("[B]y the mid-1800s the medical profession was open to almost anyone who chose to hang out a shingle."). Various medical "theories and approaches warred with one another" without any government interference. Krause, *supra*, at 30. Only in the 1880–1920s—well *after* the First and Fourteenth Amendments were ratified—did states consistently impose licensing laws.

Not only was there no consistent history of professional regulation—that asks the wrong historical question regardless. The panel equated a history of regulating medical *practices* with a history of regulating medical *speech*.[3] The two are not constitutionally equivalent. It is not enough to show that States have regulated medicine generally. Instead, there must be historical evidence that Washington's censorship law "is consistent with the Nation's historical tradition of" regulating *speech*. *Bruen*, 142 S. Ct. at 2130. To say that a State regulated medicine generally and can therefore regulate speech specifically is another way of saying that a statute generally regulates conduct and therefore can specifically regulate speech. *Contra Holder*, 561 U.S. at 28.

This faulty historiography is exactly what the Supreme Court rejected in *Bruen*. There, New York pointed to *some* historical regulations on firearms to argue that it could now ban *all* firearms. But New York needed to do more than point to some historical regulations; it bore the burden to provide "comparable" historical examples of regulations that burdened firearms as much as New York's challenged law. 142 S. Ct. at 2133. The lack of a historical analogue doomed New York's modern-day regulation.

---

[3] Tingley contests the conflation of his speech with medical practices. The conversations he has are "not medical at all" but are "a client-directed conversation consisting entirely of speech." *Otto v. City of Boca Raton*, 981 F.3d 854, 866 n.3 (11th Cir. 2020). This case is not about the "government's power to regulate medical treatments." *Contra* Panel Op. at 44.

As in *Bruen*, the historical silence here is decisive. Though New York could at least point to three colonial regulations, that was not enough to show a long-standing tradition. If three regulations did not carry the day in *Bruen*, then *zero* examples cannot do so here. *Id.* at 2142. There is *no* "historical evidence" that laws regulating medical practice allowed States to censor pure speech. *Id.* at 2130 (cleaned up). "[T]he historical practices at the time of the ratification of the First and Fourteenth Amendments show that the rendering of personalized advice to specific clients was not one of the 'well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem.'" Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE U. L. REV. 885, 957 (2000) (cleaned up).

Neither the State nor the panel provided contrary evidence. *See Bruen*, 142 S. Ct. at 2130 (placing the burden on the State to provide "historical evidence about the reach of the First Amendment's protections" (cleaned up)). Cases upholding regulations on medical licensing generally, *Dent v. West Virginia*, 129 U.S. 114, 122–23 (1889); *Hawker v. People of N.Y.*, 170 U.S. 189, 191 (1898), and prohibitions on prescribing alcohol, *Lambert v. Yellowley,* 272 U.S. 581, 590 (1926), involved conduct. To the extent those statutes regulated speech, they either implicated historically unprotected speech, such as "swear[ing] falsely" (i.e., fraud), *Dent*, 129 U.S. at 117, or speech truly incidental to

some conduct, like providing alcohol, *Lambert*, 272 U.S. at 589; *accord Conant*, 309 F.3d at 636–37 (differentiating between the conduct of providing a substance versus the pure speech of recommending it). In stark contrast, Tingley engages in no conduct; his practice involves nothing but words.

And even these inapposite cases came long after the First and Fourteenth Amendments were ratified. As *Bruen* made clear, "not all history is created equal." 142 S. Ct. at 2136. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* (cleaned up). And there's no evidence that the Framers in 1791 or their counterparts in 1868 would have understood the First Amendment's protection to exclude a medical professional's or a counselor's speech. "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. So in addition to the majority's cases being unable to demonstrate speech regulation, they shed no light on the First Amendment's original public meaning and are inapposite.

Though it should have been "impossible" to do so, the majority rewrote *NIFLA*—and countless other precedents—"to make a loophole for this one category of speech bans." *Otto II*, 41 F.4th at 1274 (Grant, J., concurring in the denial of rehearing en banc). The majority in *NIFLA*— which highlighted the historical dangers of governments "manipulat[ing] the content of doctor-patient discourse"—would be shocked to learn that there is, in fact, a long history in this country of regulating speech like

the "Soviet government" or "Nazi Germany." 138 S. Ct. at 2374. The majority's freewheeling use of history here contradicts the Supreme Court and creates a dangerous precedent. This Court should correct course.

## II.  The panel's decision on Free Exercise contradicts other circuit precedent.

The Free Exercise Clause protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). Given our Framers' "distrust of government attempts to regulate religion and suppress dissent," the Supreme Court has instructed courts to carefully guard against even the appearance of religious hostility. *Id.* In situations involving religious beliefs and human sexuality, the government must balance competing interests in a way that is "neutral and respectful." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727–29 (2018). The complete suppression of a religious viewpoint is anything but neutral and respectful. In turning a blind eye to this reality, the panel contradicted Supreme Court precedent, which also warrants en banc review.

To start, the panel ignored the "real operation" of Washington's censorship law. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534–35 (1993). Washington's law does not "evenhandedly" muzzle counselors or clients, as the panel contended, Panel Op. at 56, for

its real-world effect falls "almost exclusively" on a recognized "religious practice," *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 169 (2d Cir. 2020); 3-ER-370–71. If Washington prohibited counselors from praying with clients, that would violate the Free Exercise Clause, even though it too would prohibit prayer "for religious or non-religious reasons." Panel Op. at 56. But its effect would fall "almost exclusively on [counselors and clients] holding particular religious beliefs," and that "is some reason to suspect that the object of the law was to target those beliefs." *New Hope*, 966 F.3d at 169. In concluding otherwise, the panel contravened how the Supreme Court has instructed lower courts to guard against even "subtle departures from neutrality." *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

Second, the panel's analysis "assume[d] the worst when people" provide or seek counsel for religious reasons while "assum[ing] the best when" they do so for secular reasons. *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam). It ignored Tingley's evidence that counselors can "increase well-being . . . in individuals who pursue [change] in obedience to their own religious convictions." 3-ER-413. In fact, with zero evidence that Tingley's speech causes harm, the panel reached outside the record to suggest that Tingley would tell clients that they are "the abomination we had heard about in Sunday school." Panel Op. at 48–49. And it simultaneously discounted the "scientifically documented" harms, *id.* at 59—like "crippling emotional and psychological pain"—that can come from speech that facilitates only gender exploration and change, 3-

ER-278. At this stage in the litigation, the panel should have let the record speak for itself, *see United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020), and drew any inferences in Tingley's favor, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]he pleadings [gave] rise to a sufficient suspicion of religious animosity" and "warrant[ed] [a] pause for discovery." *New Hope*, 966 F.3d at 163 (cleaned up). This Court should correct this mistake.

## CONCLUSION

At one time, this Court held that "professional speech may be entitled to the strongest protection our Constitution has to offer." *Conant*, 309 F.3d at 637 (cleaned up). Yet *Pickup* created a world where professionals instead get the weakest protection. In doing so, *Pickup* puts this Court at odds with itself, the Supreme Court, and virtually every other court across the country. This Court should overrule *Pickup* to maintain uniformity and protect a professional's speech no matter where he or she resides.

The majority decision furthers *Pickup*'s mistake by creating a category of speech that the government can freely subject to content-based restrictions. Not only did the majority misuse history to reach this result, it ignored the Supreme Court's warning not to carve out exceptions to the general prohibition on content-based speech restrictions. This, too, warrants rehearing.

Finally, the panel turned a blind eye to how Washington's censorship law operates in the real world. That caused the panel to ignore the law's more-than-subtle departures from religious neutrality. To afford religious views like Tingley's the respect they deserve, this Court should also reconsider the panel's Free Exercise decision.

Respectfully submitted,

Dated: October 4, 2022

By:*/s/ Roger G. Brooks*

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

DAVID A. CORTMAN
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

GREGORY D. ESAU
ELLIS LI MCKINSTRY
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101
(206) 682-0565
gesau@elmlaw.com

ROGER G. BROOKS
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org

CODY S. BARNETT
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2022, I electronically filed the foregoing Petition for Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Roger G. Brooks*
Roger G. Brooks
Attorney for Plaintiff-Appellant

October 4, 2022

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** | 21-35815

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App.
P. 32(a)(4)-(6) and **contains the following number of words**: | 4,189 |.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Roger G. Brooks | **Date** | October 4, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/2021*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRIAN TINGLEY,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>ROBERT W. FERGUSON, in his official capacity as Attorney General for the State of Washington; UMAIR A. SHAH, in his official capacity as Secretary of Health for the State of Washington; KRISTIN PETERSON, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance division of the Washington State Department of Health,<br>*Defendants-Appellees*,<br><br>EQUAL RIGHTS WASHINGTON,<br>*Intervenor-Defendant-Appellee.* | No. 21-35815<br><br>D.C. No.<br>3:21-cv-05359-RJB |

2                    TINGLEY V. FERGUSON

| | |
|---|---|
| BRIAN TINGLEY,<br>             *Plaintiff-Appellee*,<br><br>      v.<br><br>ROBERT W. FERGUSON, in his<br>official capacity as Attorney General<br>for the State of Washington; UMAIR<br>A. SHAH, in his official capacity as<br>Secretary of Health for the State of<br>Washington; KRISTIN PETERSON, in<br>her official capacity as Assistant<br>Secretary of the Health Systems<br>Quality Assurance division of the<br>Washington State Department of<br>Health,<br>         *Defendants-Appellants,*<br><br>      and<br><br>EQUAL RIGHTS WASHINGTON,<br>        *Intervenor-Defendant.* | No. 21-35856<br><br>D.C. No.<br>3:21-cv-05359-<br>RJB<br><br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted May 17, 2022
Seattle, Washington

Filed September 6, 2022

Before:  Kim McLane Wardlaw, Ronald M. Gould, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Bennett

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's dismissal of an action challenging a Washington state licensing scheme that disciplines health care providers for practicing conversion therapy on minors.

Conversion therapy encompasses therapeutic practices and psychological interventions that seek to change a person's sexual orientation or gender identity.  Plaintiff Brian Tingley, a licensed marriage and family therapist, alleged that Washington's ban on practicing conversion therapy on minors violated his free speech and free exercise rights under the First Amendment, as well as those of his clients, and that the law was unconstitutionally vague under the Fourteenth Amendment.

The panel held that Tingley had standing to bring his claims in an individual capacity and the claims were prudentially ripe.  Tingley's complaint showed a plan or desire to violate Washington's law; Washington confirmed

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

that it will enforce the ban on conversion therapy "as it enforces other restrictions on unprofessional conduct;" and Tingley alleged that the law had chilled his speech and that he has self-censored himself out of fear of enforcement. Tingley did not, however, have standing to bring claims on behalf of his minor clients. Without more detail about his current clients an opinion adjudicating the alleged rights of these third parties would be plainly advisory.

Addressing the merits, the panel stated that in 2014, this court upheld a substantially similar law enacted by California that subjected its state-licensed mental health providers to discipline for practicing conversion therapy on minor clients. *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014). In *Pickup*, the court concluded that California's regulation of conversion therapy treatment was a regulation of conduct and that any effect it may have on free speech interests was merely incidental. The panel held that the Supreme Court's intervening decision in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), did not require the court to abandon the analysis in *Pickup* insofar as it related to conduct. Because *NIFLA* abrogated only the part of *Pickup* relating to the professional speech doctrine, and not its central holding that California's conversion therapy law was a regulation on conduct that incidentally burdened speech, *Pickup* remained binding law and controlled the outcome of this case.

The panel held that Washington's licensing scheme for health care providers did not violate the First or Fourteenth Amendments. States do not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through scalpel. The Washington legislature acted rationally when it decided

to protect the "physical and psychological well-being" of its minors by preventing state-licensed health care providers from practicing conversion therapy on them.

In addition to being supported by circuit precedent, the decision to uphold Washington's law was confirmed further by its place within the well-established tradition of constitutional regulations on the practice of medical treatments. There is a long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders. Washington's law not only fell within the tradition of state regulation of the health professions, but it also affected the health of children—a vulnerable group in the eyes of the law.

Affirming the dismissal of Tingley's challenge under the Free Exercise Clause of the First Amendment, the panel held that the law was a neutral law targeted at preventing the harms associated with conversion therapy, and not at the religious exercise of those who wish to practice this type of therapy on minors.

Finally, Washington's law was not unconstitutionally vague. By its terms, the law gave fair notice of what conduct was proscribed to a reasonable person, and certainly to a license-holding provider with the specialized, technical knowledge of the psychology profession; and contained standards limiting the discretion of those who will enforce it.

Concurring in part, Judge Bennett joined the majority opinion except as to Part III pertaining to the tradition of constitutional regulations on the practice of medical treatments. Judge Bennett stated that the court should not hypothesize with dicta when the conclusion is commanded

by binding precedent.  As the panel held in Part II of the discussion section, it was bound by *Pickup* as to Tingley's free speech claim.  Part III was therefore unnecessary, including its discussion of the "long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders"—an attempt to meet *NIFLA*'s exception for a category of speech warranting lesser scrutiny.

## COUNSEL

Roger G. Brooks (argued), Alliance Defending Freedom, Scottsdale, Arizona; Kristen K. Waggoner and John J. Bursch, Alliance Defending Freedom, Washington, D.C.; David A. Cortman, Alliance Defending Freedom, Lawrenceville, Georgia; Cody S. Barnett, Alliance Defending Freedom, Lansdowne, Virginia; Gregory D. Esau and Ellis Li McKinstry, Seattle, Washington; for Plaintiff-Appellant/Cross-Appellee.

Cristina Sepe (argued), Jeffrey C. Grant, and Sierra McWilliams, Assistant Attorneys General; Kristin Beneski, First Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Seattle, Washington; for Defendants-Appellees/Cross-Appellants.

Raegen Rasnic, Skellenger Bender P.S., Seattle, Washington; Shannon Minter and Christopher Stoll, National Center for Lesbian Rights, San Francisco, California; for Intervenor-Defendant-Appellee.

Deborah J. Dewart, Hubert, North Carolina, for Amicus Curiae Institute for Faith and Family.

Charles LiMandri, Paul M. Jonna, and Jeffrey M. Trissell, LiMandri & Jonna LLP, Rancho Santa Fe, California; Thomas Brejcha and Peter Breen, Thomas More Society, Chicago, Illinois; for Amicus Curiae Ethics and Public Policy Center.

Paul M. Sherman, Institute for Justice, Arlington, Virginia, for Amicus Curiae Institute for Justice.

Shireen A. Barday, Gibson Dunn & Crutcher LLP, New York, New York; Isaac Ruiz, Ruiz & Smart PLLC, Seattle, Washington; J. Denise Diskin, QLaw Foundation of Washington, Seattle, Washington; for Amici Curiae The Trevor Project Inc., American Foundation for Suicide Prevention, and American Association of Suicidology.

Tassity Johson, Jessica Ring Amunson, and Jessica Sawadogo, Jenner & Block LLP, Washington, D.C.; Nathalie F.P. Gilfoyle and Deanne M. Ottaviano, American Psychologial Association, Washington, D.C.; for Amicus Curiae American Psychological Association.

Daniel J. Shih, Susman Godfrey LLP, Seattle, Washington; Yvonne Chin, Julia Mizutani, Antoinette Davis, Nancy Talner, and Justin Abbasi, ACLU of Washington Foundation, Seattle, Washington; for Amici Curiae American Civil Liberties Union of Washington and Other Organizations.

Paul F. Rugani, Orrick Herrington & Sutcliffe LLP, Seattle, Washington, for Amici Curiae Fred T. Korematsu Center for Law and Equality; Aoki Center for Critical Race and Nation Studies; Center on Race, Inequality, and the Law at New York University School of Law; and Loyola Law School Anti-Racism Center.

Sean M. SeLegue, Arnold & Porter Kaye Scholer LLP, San Francisco, California, for Amicus Curiae First Amendment Scholars.

---

## OPINION

GOULD, Circuit Judge:

This appeal requires us to decide, again, whether a state may prohibit health care providers operating under a state license from practicing conversion therapy on children. Twenty states and the District of Columbia have laws prohibiting or restricting the practice of conversion therapy, which seeks to change an individual's sexual orientation or gender identity. This appeal concerns Washington's law that subjects licensed health care providers to discipline if they practice conversion therapy on patients under 18 years of age.

In 2014, we upheld a substantially similar law enacted by California that subjects its state-licensed mental health providers to discipline for practicing conversion therapy on minor clients. *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014). Finding itself bound by *Pickup*, the district court in this case dismissed Plaintiff Brian Tingley's challenge to Washington's nearly identical law.

We affirm. Washington's licensing scheme for health care providers, which disciplines them for practicing conversion therapy on minors, does not violate the First or Fourteenth Amendments. States do not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through scalpel.

## BACKGROUND

### I

Conversion therapy encompasses therapeutic practices and psychological interventions that seek to change a person's sexual orientation or gender identity. The goal is to change an individual's sexual orientation from gay to heterosexual or to change an individual's gender identity from transgender to cisgender. Within the field of psychology, conversion therapy is also known as "reparative therapy" or "sexual orientation and gender identity change efforts" ("SOGICE").[1] Conversion therapy developed in the mid-nineteenth century to "cure" patients of homosexual desires and gender-nonconforming behaviors, which were viewed at that time as mental illnesses. Such views, once held by professional organizations in the psychology and psychiatric fields, have evolved with time and research.

The American Psychological Association ("APA") removed homosexuality from the Diagnostic and Statistical Manual of Mental Disorders in 1973, and it now views gender nonconforming behaviors as "gender dysphoria," rather than as a "gender identity disorder." The APA has twice conducted a systematic review of the research on conversion therapy and adopted a resolution that conversion therapy "puts individuals at a significant risk of harm" and is not effective in changing a person's gender identity or sexual orientation. The APA opposes conversion therapy "in any stage of the education of psychologists" and instead "encourages psychologists to use an affirming, multicultural, and evidence-based approach" that includes

---

[1] Because the text of the Washington law uses "conversion therapy," that is the term we use in this opinion.

"acceptance, support, . . . and identity exploration and development, within a culturally competent framework." As of 2015, every major medical, psychiatric, psychological, and professional mental health organization opposes the use of conversion therapy.

## II

Washington requires health care providers to be licensed before they may practice in Washington. *See* Wash. Rev. Code § 18.122.030(2). Title 18 of the Revised Code of Washington regulates business and professions, and Chapter 130 of Title 18, Washington's "Uniform Disciplinary Act,"[2] lists actions that are considered "unprofessional conduct" for licensed health care providers and subjects them to disciplinary action. *Id.* §§ 18.130.180, 18.130.160. Therapists, counselors, and social workers who "work under the auspices of a religious denomination, church, or religious organization" are exempted from the Chapter's requirements. *Id.* § 18.225.030(4).

Washington enacted Senate Bill 5722 ("SB 5722") in 2018, which added "[p]erforming conversion therapy on a patient under age eighteen" to the list of unprofessional conduct in the Uniform Disciplinary Act for licensed health care providers. S.B. 5722, 65th Leg., Reg. Sess. (Wash. 2018), codified at Wash. Rev. Code §§ 18.130.020(4) and 18.130.180(27). SB 5722 defined conversion therapy:

> (a) "Conversion therapy" means a regime that seeks to change an individual's

---

[2] The Uniform Disciplinary Act "governs unlicensed practice, the issuance and denial of licensure, and the discipline of persons licensed under this chapter." Wash. Rev. Code § 18.225.080.

sexual orientation or gender identity. The term includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex. The term includes, but is not limited to, practices commonly referred to as "reparative therapy."

(b) "Conversion therapy" does not include counseling or psychotherapies that provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development that do not seek to change sexual orientation or gender identity.

Wash. Rev. Code § 18.130.020(4)(a)–(b). The legislature expressly specified that SB 5722 may not be applied to (1) speech by licensed health care providers that "does not constitute performing conversion therapy," (2) "[r]eligious practices or counseling under the auspices of a religious denomination, church, or organization that do not constitute performing conversion therapy by licensed health care providers," and (3) "[n]onlicensed counselors acting under the auspices of a religious denomination, church, or organization." 2018 Wash. Sess. Laws, ch. 300, § 2.

The legislature's asserted intent in enacting SB 5722 was to regulate "the professional conduct of licensed health care providers." *Id.* § 1(1). It found that it had "a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by conversion therapy."

*Id.* § 1(2). Health Impact Review of SB 5722, a report from the Washington State Board of Health, accompanied SB 5722 and was presented to the Legislature. Reviewing the available research on conversion therapy, the report found that "conversion therapy is associated with negative health outcomes such as depression, self-stigma, cognitive and emotional dissonance, emotional distress, and negative self-image."

Washington's law does not prevent health care providers from communicating with the public about conversion therapy; expressing their personal views to patients (including minors) about conversion therapy, sexual orientation, or gender identity; practicing conversion therapy on patients over 18 years old; or referring minors seeking conversion therapy to counselors practicing "under the auspices of a religious organization" or health providers in other states.

## III

Tingley has worked as a licensed marriage and family therapist for more than twenty years. Although he does not work "under the auspices of a religious denomination," Wash. Rev. Code § 18.225.030(4), his Christian views inform his work. Tingley believes that the sex each person is assigned at birth is "a gift of God" that should not be changed and trumps an individual's "feelings, determinations, or wishes." He also believes that "sexual relationships are beautiful and healthy" but only if they occur "between one man and one woman committed to each other through marriage." Tingley claims that many of his clients share his religious viewpoints and come to him specifically because he holds himself out as a "Christian provider[]."

Tingley sued state officials ("Washington") in May 2021, seeking to enjoin SB 5722. He alleged that Washington's ban on practicing conversion therapy on minors violates his free speech and free exercise rights under the First Amendment, as well as those of his clients, and that the law is unconstitutionally vague under the Fourteenth Amendment. Equal Rights Washington ("ERW"), the lead organization supporting SB 5722's passage, intervened as a defendant. Tingley sought a preliminary injunction, which Washington and ERW both opposed, and the defendants filed motions to dismiss his complaint.

The district court granted Washington's motion to dismiss. The district court first held that Tingley had standing to bring claims in his individual capacity but that he lacked standing to bring claims on behalf of his minor clients. As to the merits, the district court recognized that Washington's motion to dismiss hinged squarely upon whether our decision in *Pickup v. Brown* remained good law. Concluding that *Pickup* remained controlling, the district court applied *Pickup* to reject Tingley's constitutional claims.

Tingley appealed, and Washington and ERW cross-appealed, contending that the district court erred in holding that Tingley had standing. We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court's dismissal of Tingley's complaint.

## STANDARD OF REVIEW

We review *de novo* questions of standing and ripeness. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir. 2003). We also review *de novo* the district court's dismissal for failure to state a claim, crediting all factual allegations in the complaint as true and construing the

pleadings in the light most favorable to Tingley, the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). Dismissal is proper "if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (citation omitted).

We review for abuse of discretion a district court's decision to deny a preliminary injunction. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012).

## DISCUSSION

### I

Tingley has standing to bring his claims in an individual capacity but does not have standing to bring claims on behalf of his minor clients. Because Article III limits our jurisdiction to cases and controversies, the "irreducible constitutional minimum of standing" requires a plaintiff to have suffered an injury in fact, caused by the defendant's conduct, that can be redressed by a favorable result. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). At the motion to dismiss stage, "general factual allegations of injury" suffice to meet the plaintiff's burden. *Id.* at 561. Where, as here, the plaintiff alleges a future injury, the threatened injury must be "certainly impending" or there must be a "substantial risk" of the harm occurring. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

### A

Washington contends that the district court improperly relaxed the standing inquiry because Tingley brought First

Amendment claims. But the district court did not err on standing. The "unique standing considerations" in the First Amendment context "tilt dramatically toward a finding of standing" when a plaintiff brings a pre-enforcement challenge. *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (cleaned up). "[T]he Supreme Court has dispensed with rigid standing requirements" for First Amendment protected speech claims and has instead endorsed a "hold your tongue and challenge now" approach. *Cal. Pro-Life Council*, 328 F.3d at 1094 (citation omitted). We have held that "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). Washington argues that the district court erred in applying a relaxed standing analysis "to First Amendment claims given its correct conclusion that the First Amendment *does not apply* to Tingley's claims" and that under our precedent, "there is no viable argument that such conduct is protected by the First Amendment." Tingley's standing to bring First Amendment claims, however, "in no way depends on the merits" of those claims. *See Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). The district court followed the law as declared by the Supreme Court and did not improperly relax the standing inquiry.

Washington also contends that Tingley does not have standing to bring a facial challenge to the constitutionality of a law not yet enforced against him. A "recurring issue" for federal courts is determining when the threat of enforcement creates a sufficient injury for a party to have standing to bring a pre-enforcement challenge to a law. *Driehaus*, 573 U.S. at 158. *Driehaus* set the general standard for pre-enforcement standing: a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

We rely on a three-factor inquiry to help determine whether a threat of enforcement is genuine enough to confer an Article III injury. We consider (1) whether the plaintiff has a "concrete plan" to violate the law, (2) whether the enforcement authorities have "communicated a specific warning or threat to initiate proceedings," and (3) whether there is a "history of past prosecution or enforcement." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). "Neither the mere existence of a proscriptive statute nor a generalized threat of prosecution" satisfies this test. *Id.*

**1**

The first factor is satisfied by Tingley's complaint. It specifically alleged Tingley's past work with clients and expectations for future work with clients that show a plan or desire to violate Washington's law. Tingley claims that he has worked with several minors in recent years who have "sought his help in reducing same-sex attractions," and others "who have expressed discomfort with their biological sex." He details a few examples. In one instance, "parents brought to [Tingley's] clinic their teenage minor daughter who had . . . begun expressing unhappiness with her female gender identity, and . . . asserting a male gender identity." The parents sought a counselor who would "hopefully enable her to return to comfort with her female body." The client, after a few sessions with Tingley, "expressed a desire to become more comfortable with her biological sex," and Tingley "worked with her toward that goal."

In another example, Tingley described working with a teen who sought his help with "unwanted same-sex attractions" and "attraction to pornography." Tingley "supports this client as he works toward the change he desires to see in his own life." Given Tingley's "visible identity as a licensed counselor who is a Christian," Tingley expects that "parents and minors will continue to come to him for counseling with a goal of" helping children "return to comfort with a gender identity aligned with [their] biological sex" or lessen same-sex attractions. Tingley "currently works with and will continue to work with clients to these ends."

Relying upon our language in *Thomas*, Washington asserts that Tingley has failed to specify "when, to whom, where, or under what circumstances" he plans to violate the law. 220 F.3d at 1139. But we do not require plaintiffs to specify "when, to whom, where, or under what circumstances" they plan to violate the law when they have already violated the law in the past. *See, e.g.*, *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 836 (9th Cir. 2012) (explaining that "plaintiffs had more than a concrete plan to violate the laws at issue because they actually did violate them on a number of occasions") (internal quotation marks and citations omitted). In *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009), we determined that pharmacists challenging state rules requiring them to sell Plan B emergency contraceptives could not "control when a patient requesting Plan B will visit their pharmacy" but nevertheless satisfied Article III's requirements because they "can point to specific past instances when they have refused to sell Plan B" as "direct violations of the challenged rules." *Id.* at 1123. Similarly, Tingley cannot control when clients will come to him for help changing their sexual orientation or gender identity, but

his complaint describes "specific past instances" of working with minors in a way that would violate the law.

### 2

The second prong of the *Thomas* inquiry into the credibility of the threat of enforcement is whether the authorities in charge of enforcing the challenged law "have communicated a specific warning or threat to initiate proceedings." 220 F.3d at 1139. Washington has not issued a warning or threat of enforcement to Tingley. We have, however, interpreted the government's failure to *disavow* enforcement of the law as weighing in favor of standing. *See, e.g.*, *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (explaining that "the state's refusal to disavow enforcement of [the challenged law] against motor carriers during this litigation is strong evidence that the state intends to enforce the law and that [plaintiffs] face a credible threat" of enforcement). Washington has not disavowed enforcement and instead has confirmed that it will enforce the ban on conversion therapy "as it enforces other restrictions on unprofessional conduct."

And in the context of pre-enforcement challenges to laws on First Amendment grounds, a plaintiff "need only demonstrate that a threat of potential enforcement will cause him to self-censor." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014). Tingley has alleged that the law has chilled his speech and that he has self-censored himself out of fear of enforcement. He claims to be unable "to freely and without fear speak what he believes to be true" and contends that his conversations with new clients are "more guarded and cautious" and that he is afraid to "publiciz[e] . . . that he offers to counsel minors on these issues." Washington's general warning of enforcement coupled with Tingley's self-censorship in the

face of the law satisfy the second prong of the *Thomas* inquiry for standing.

### 3

The third factor, concerning the history of enforcement, carries "'little weight' when the challenged law is 'relatively new' and the record contains little information as to enforcement." *Cal. Trucking*, 996 F.3d at 653 (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010)). SB 5722 was enacted in 2018, and Washington apprised us before argument that it had just received its first complaint alleging that a licensed mental health provider performed conversion therapy on minors. The sparse enforcement history weighs against standing but "is not dispositive." *Libertarian Party*, 709 F.3d at 872; *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174 (9th Cir. 2018); *Wolfson*, 616 F.3d at 1060. Because the first two factors are satisfied by the "general factual allegations of injury" contained in Tingley's complaint, which we must take to be true at this early juncture, we hold that Tingley has standing to bring the First and Fourth Amendment challenges to SB 5722 on behalf of himself.

### B

Tingley does not, however, have standing to bring claims on behalf of his minor clients. The ordinary rule of standing is that a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. Courts may allow plaintiffs to assert the rights of third parties in cases where the rights of those parties would be indirectly violated if the challenged law is enforced against the plaintiff. *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103,

2118–19 (2020), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

Plaintiffs must satisfy two additional elements to establish third-party standing. First, a plaintiff must have a "'close' relationship" to the third parties whose rights he claims will be indirectly violated by the law. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Second, a plaintiff must show that the third parties are hindered from protecting their own interests by bringing a lawsuit of their own. *Id.*

Tingley has alleged a sufficiently close relationship with his current clients to meet this standard. But Tingley makes generalized statements about the rights of his clients that are purportedly violated by this law, claiming that the law denies clients "access to ideas that they wish to hear, and to counseling that is consistent with their own personal faith, life goals and motivations." Tingley does not explain how a law that allows minors to seek conversion therapy from counselors practicing under the "auspices of a religious denomination," Wash. Rev. Code § 18.225.030(4), denies his clients "access to ideas that they wish to hear, and to counseling that is consistent with their own personal faith." Without more detail about his current clients, their desired information, or how the law has specifically deprived them of access to this information, an opinion adjudicating the alleged rights of these third parties would be plainly advisory. *See United Pub. Workers v. Mitchell*, 330 U.S. 75, 89, (1947).

Further, Tingley's allegations of the asserted hindrances his clients face in bringing their own claims are speculative. Minors seeking conversion therapy have brought their own lawsuits challenging conversion therapy bans in other states. *See, e.g., Pickup*, 740 F.3d at 1224; *Doe v. Christie*, 33 F.

Supp. 3d 518 (D.N.J. 2014), *aff'd*, 783 F.3d 150 (3d Cir. 2015) (citation omitted). Pseudonymous filing would be appropriate in this context to "preserve privacy in a matter of sensitive and highly personal nature." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). Tingley does not engage with why pseudonymous filing would not ease the alleged stigma and emotional hardship he claims is preventing his clients from being able to assert their own rights, or why his minor clients are different from those in other states who brought their own lawsuits.

Tingley emphasizes that the bar to third-party standing is lowered in the First Amendment context. While this is true, it is because "'society's interest in having the statute challenged' may outweigh the prudential considerations that normally counsel against third-party standing." *Mothershed v. Justices of the Supreme Court*, 410 F.3d 602, 610 (9th Cir. 2005) (quoting *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984)). Because we conclude that Tingley has standing to bring claims in his individual capacity, this societal interest is already met. We will not strain the limitations imposed on us by Article III to reach undeveloped claims brought on behalf of third-party minors.

## C

Washington claims that Tingley's lawsuit is also nonjusticiable because his claims are prudentially unripe. The two guiding considerations for prudential ripeness are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas*, 220 F.3d at 1141 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Both are satisfied here.

The fitness prong is met when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stormans*, 586 F.3d at 1126 (citation omitted). We consider whether the action "has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Id.* (citation omitted). Here, the law Tingley challenges is final, with the "status of law." *Id.* The law represents Washington's final decision with respect to prohibiting licensed health care providers from performing conversion therapy on minors, and it is binding on providers like Tingley who must immediately comply with its terms. The issues Tingley raises with respect to the law are purely legal, on First and Fourteenth Amendment grounds. *See Driehaus*, 573 U.S. 167.

Of course, bringing a First Amendment challenge to a law does not necessarily mean that the issues presented are "purely legal." *Thomas*, 220 F.3d at 1142. Although the plaintiffs in *Thomas* challenged a law on First Amendment grounds, we held that the challenge did not present "purely legal" issues because the claim "rest[ed] upon hypothetical situations with hypothetical tenants" and was "devoid of any specific factual context." 220 F.3d at 1141–42. Tingley's claims concerning *future* clients rest upon hypothetical situations with hypothetical clients, but he also described the current clients who he "continues to work with to these ends." Tingley has provided enough of a specific factual context for the legal issues he raises, and his claims do not leave "incomplete hypotheticals or open factual questions akin to those in *Thomas*." *Stormans*, 586 F.3d at 1126.

Evaluating whether withholding judicial review presents a hardship requires looking at whether the challenged law

"requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Id.* (citation omitted). Tingley claims that SB 5722 required an "immediate and significant change" in his conduct, forcing him to choose between refraining from desired speech or engaging in that speech and risking costly sanctions. And the law imposes "serious penalties," upon therapists who do not comply: fines up to $5,000 for each violation, censure, probation, suspension from practice, or even revocation of their license to practice. *See* Wash. Rev. Code § 18.130.160. Washington's contention that Tingley is not actually forced to choose between refraining from protected speech or risking enforcement because the law regulates his conduct, not his speech, again invites us to peek impermissibly at the merits in determining questions of justiciability. *Twitter, Inc. v. Paxton*, 26 F.4th 1119, 1124 (9th Cir. 2022) ("Prudential ripeness is a non-merits threshold issue."). Satisfying both prongs of our ripeness inquiry, the claims Tingley brings on behalf of himself are prudentially ripe.

## II

After holding that Tingley's claims are justiciable, we now consider the merits of his claims. We begin by analyzing Tingley's primary challenge to Washington's law: that it violates his right to free speech by regulating what he, as a licensed health care provider in Washington, can say and do to minor clients within the confines of the counselor-client relationship.

On this question, we do not write on a clean slate. In our 2014 decision in *Pickup v. Brown*, we upheld a nearly identical law enacted by California that prohibited licensed mental health providers from performing any "sexual orientation change efforts" on minors. 740 F.3d at 1221.

Our full court declined to rehear the case en banc. *Id.* at 1214. Accordingly, resolving Tingley's free speech challenge appears straightforward. But Tingley claims that the Supreme Court's intervening decision in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), abrogated *Pickup* to the point that it is no longer binding on us.

We proceed to analyze Tingley's free speech challenge in several steps. We first compare Washington's law banning conversion therapy to California's law in *Pickup*. The two laws are nearly identical. We then examine our decision in *Pickup* and whether we are bound by it. We are.

## A

Because Tingley, in his briefing, attempts to distinguish the law we examined in *Pickup* from the one he challenges here, we compare the two laws. Both Washington and California amended their code of professional conduct for licensed mental health providers to specify that practicing conversion therapy on minors would be considered unprofessional conduct subject to discipline. California prohibited "[a]ny sexual orientation change efforts attempted on a patient under 18 years of age," Cal. Bus. & Prof. Code § 865.2, while Washington prohibited "[p]erforming conversion therapy on a patient under age eighteen," Wash. Rev. Code § 18.130.180(27). Washington and California use substantially similar language to describe what conduct is encompassed by their respective laws:

> [A]ny practices by mental health providers that seek to change an individual's sexual orientation. This includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic

attractions or feelings toward individuals of the same sex.

Cal. Bus. & Prof. Code § 865(b)(1).

> [A] regime that seeks to change an individual's sexual orientation or gender identity. The term includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex.

Wash. Rev. Code § 18.130.020(4)(a). The two laws also use almost identical language to describe what conduct is not encompassed by their bans on conversion therapy:

> [P]sychotherapies that: (A) provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and (B) do not seek to change sexual orientation.

Cal. Bus. & Prof. Code § 865(b)(2).

> [C]ounseling or psychotherapies that provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development that do not seek to change sexual orientation or gender identity.

Wash. Rev. Code § 18.130.020(4)(b). And the two legislatures use identical language to describe their purpose in enacting the laws: "protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by conversion therapy." 2018 Wash. Sess. Laws, ch. 300, § 1; *see also* 2012 Cal. Legis. Serv. ch. 835, § 1(n) (using same language with "sexual orientation change efforts" in place of "conversion therapy"). Tingley's attempts to distinguish the two laws are without merit, and are contradicted by his concession to the district court that the two laws are "substantively similar" and that *Pickup* "is binding . . . if it is still good law." This is the question that we next address.

**B**

*Pickup* involved an appeal of consolidated cases challenging California's licensing scheme that disciplined mental health providers from performing any "sexual orientation change efforts" on minors. 740 F.3d at 1221. We looked to our earlier precedents to distill principles about whether, and when, a state can regulate the conduct and speech of health care providers without running afoul of the First Amendment. We examined *National Ass'n of the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000) *("NAAP")*, in which we upheld California's licensing scheme for mental health providers. *Id.* at 1056. There, we rejected the idea that therapists are entitled to special First Amendment protection simply because they "employ speech to treat their clients." 228 F.3d at 1054. We held that while communication during therapy "is entitled to constitutional protection," it is "not immune from regulation." *Id.*

We also considered *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), in which we invalidated a federal policy that allowed doctor's licenses to be revoked if they recommended medical marijuana to a patient. *Id.* at 638–39. We distinguished prohibiting doctors from *treating* patients with marijuana—which the government could do—from prohibiting doctors from simply *recommending* marijuana. *Id.* at 634–37. A prohibition on the latter is based on the content and viewpoint of speech, while the former is a regulation based on conduct. *Id.*

Noting that the line between conduct and speech can be difficult to discern, we drew upon principles from *NAAP* and *Conant* to develop a continuum approach in *Pickup* for determining whether a law regulates the speech or conduct of professionals. 740 F.3d at 1227. We held that "public dialogue" by a professional is at one end of the continuum and receives the greatest First Amendment protection. *Id.* To illustrate, we explained that even though a state can regulate the practice of medicine, a doctor who *publicly* advocates for a position that the medical establishment considers outside the mainstream would still receive "robust protection" from the First Amendment. *Id.*

At the midpoint of the continuum is professional speech "within the confines of a professional relationship," which we held, as a category, received "somewhat diminished" protection under the First Amendment. *Id.* at 1228. We provided the example of truthful informed consent disclosures as falling into this category, as well as laws giving rise to liability for negligent medical advice. 740 F.3d at 1228.

At the other end of the continuum is where the regulation of professional *conduct* falls. *Id.* at 1229. At this end, the state's power to regulate is "great" even though this type of

regulation "may have an incidental effect on speech." *Id.* Most medical treatments require speech, we explained, but a state may still ban a particular treatment it finds harmful; otherwise, any prohibition of a medical treatment would implicate the First Amendment and unduly limit the states' "power to regulate licensed professions." *Id.*

We applied this continuum to California's conversion therapy law and held that it was a regulation of conduct. Unlike the law at issue in *Conant* that prohibited doctors from recommending the use of marijuana to patients, California's ban on practicing conversion therapy on minor patients still allowed therapists to discuss conversion therapy with patients, recommend that patients obtain it (from unlicensed counselors, from religious leaders, or from out-of-state providers, or after they turn 18), and express their opinions about conversion therapy or homosexuality more generally. *Id.* at 1229. California's conversion therapy ban "regulate[d] only treatment" and "any effect it may have on free speech interests is merely incidental." *Id.* at 1231. We further held that California's regulation of conversion therapy treatment, because it was a regulation of conduct, did not require content and viewpoint analysis. *Id.* at 1231. Under rational basis review, we upheld California's conversion therapy law, holding that it was "rationally related to the legitimate government interest of protecting the well-being of minors." *Id.* at 1232.

## 1

The Supreme Court's intervening decision in *NIFLA* does not require us to abandon our analysis in *Pickup* insofar as it related to conduct. *NIFLA* abrogated only the "professional speech" doctrine—the part of *Pickup* in which we determined that speech within the confines of a

professional relationship (the "midpoint" of the continuum) categorically receives lesser scrutiny. 138 S. Ct. at 2372.

*NIFLA* involved a challenge to a California law that required licensed pregnancy clinics to inform clients that California provides free or low-cost family planning services, including abortion. 138 S. Ct. at 2368. The district court denied the plaintiffs' motion for injunctive relief, and we affirmed. *See Nat'l Inst. of Family & Life Advoc. v. Harris*, 839 F.3d 823, 830 (9th Cir. 2016). We applied the continuum framework from *Pickup*, concluded that the law fell at the midpoint and regulated professional speech, and upheld the law as satisfying intermediate scrutiny. *Id.* at 838–42.

The Supreme Court granted certiorari and reversed our decision. It expressly rejected the professional speech doctrine. *NIFLA*, 138 S. Ct. at 2371–72. On this point, the Court criticized *Pickup* by name, along with decisions by other circuit courts embracing the doctrine. Explaining that it had never "recognized 'professional speech' as a separate category of speech," the Supreme Court concluded that speech is "not unprotected merely because it is uttered by 'professionals.'" *Id.* at 2371–72. The Court, however, did not "foreclose the possibility" that there might be some reason in the future to treat professional speech as a unique category. *Id.* at 2375.

Despite abrogating the professional speech doctrine, the Court nevertheless affirmed that there are some situations in which speech by professionals *is* afforded less protection under the First Amendment. *Id.* at 2372. The first exception is for commercial speech or compelled disclosures, in which professionals are required to "disclose factual, noncontroversial information," such as the terms under which professional services are offered. *Id.* (citing *Zauderer*

*v. Office of Disciplinary Couns. of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)).  The second exception, which corresponds to the holding in *Pickup*, is that "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.*  As support, the Court described regulations on professional conduct it had previously upheld, such as state rules limiting lawyers' communication with potential clients, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978); state regulation of malpractice by professionals, *NAACP v. Button*, 371 U.S. 415, 438 (1963); and the right of states to compel doctors performing abortions to provide information "in a manner mandated by the State" about the risks of this medical treatment, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

But the Court concluded that the notice requirement for licensed clinics at issue in *NIFLA* did not meet any exception for lessened scrutiny.  It was not limited to factual, noncontroversial information about the terms of services. *Id.* at 2372 (citing *Zauderer*, 471 U.S. at 651).  Nor was it an "informed-consent requirement or any other regulation of professional conduct." *Id.* at 2373.  The notice requirement was "not tied to a procedure" and applied to all interactions a client has with a clinic, "regardless of whether a medical procedure is ever sought, offered, or performed." *Id.*

**2**

*NIFLA* did not abrogate *Pickup* to the extent that Tingley contends it did.  All parties agree that *NIFLA* abrogated the part of *Pickup* in which we stated that professional speech, *as a category*, receives less protection under the First Amendment.  There is no question that *NIFLA* abrogated the professional speech doctrine, and its treatment of all

professional speech *per se* as being subject to intermediate scrutiny.   But Tingley instead contends that *NIFLA* abrogated *Pickup* in full, and that *Pickup* and *NIFLA* are irreconcilable to the point where *Pickup* is no longer binding law.  We do not agree.

The presumption in this Court is that three-judge panels are bound by prior precedent. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc).  The only exception to that general rule is that when a prior case is "clearly irreconcilable" with an intervening decision by a higher authority, a panel is "bound by the later and controlling authority" instead of the prior circuit authority, which should consider "effectively overruled." *Id.* at 893.

The "clearly irreconcilable" requirement from *Miller* is a "high standard" to meet. *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) (citation omitted).   It is not enough for there to be "some tension" between the cases or for the intervening authority to "cast doubt" on this Court's prior authority. *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (citations omitted).  As long as we can apply prior circuit precedent "consistently with" or "without 'running afoul'" of the intervening authority, we must do so. *Id.* (quoting *United States v. Orm Hieng*, 679 F.3d 1131 1140 (9th Cir. 2012)); *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) ("[I]f we can apply our precedent consistently with that of the higher authority, we must do so.").

*Miller*'s high standard is not met here. *Pickup* "can be reasonably harmonized" with *NIFLA*, and we can apply *Pickup* to the facts of this case "without 'running afoul'" of *NIFLA*. *Lair*, 697 F.3d at 1206–07.  In *Pickup*, we held that California's law banning conversion therapy regulated professional conduct, and we described a continuum

approach to regulating the speech of professionals. 740 F.3d at 1227–29 (citation omitted). In *NIFLA*, we applied *Pickup*'s continuum and held that the notice requirement at issue in that case fell at the midpoint and regulated "professional speech." 839 F.3d at 839. We held that professional speech, as a category, is subject to intermediate scrutiny (a question left unanswered by *Pickup*), and that the notice requirement for licensed clinics in *NIFLA* satisfied this level of scrutiny. *Id.* at 840–41. The Supreme Court reversed, holding that our application of the First Amendment to professional speech, as its own category, was improper, and that professional speech is not categorically subject to lesser scrutiny. *NIFLA*, 138 S. Ct. at 2371–72. But the Court affirmed that two exceptions exist in which professional speech *is* afforded less protection. *Id.* at 2371–75. One of those exceptions the Court recognized is the regulation of professional conduct, even if it "incidentally burden[s] speech." *Id.* at 2373. Because *Pickup*'s holding rests upon that exception, it survives *NIFLA*.

*NIFLA* only abrogated the theoretical "midpoint" of *Pickup*'s continuum—which we did not apply to the conversion therapy law in *Pickup*—and the idea that professional speech *per se* receives less protection. The two cases can be applied consistently: *Pickup*'s approach survives for regulations of professional conduct.

### 3

Tingley is wrong to claim that we have twice recognized that *NIFLA* fully abrogated *Pickup*. We have not. Neither case provides the support he ascribes to it.

*American Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749 (9th Cir. 2019) (en banc), involved a challenge to an ordinance that required health warnings on

advertisements for certain sugary drinks. We clarified, in light of *NIFLA*, how we approach a First Amendment claim concerning compelled truthful disclosures. *Id.* at 755–56. Specifically, we reexamined our decision in *CTIA–The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105 (9th Cir. 2017) ("*CTIA I*"), a case about compelled commercial speech that predated *NIFLA*. In *American Beverage*, we "reaffirm[ed] our reasoning and conclusion" in *CTIA I*. 916 F.3d at 756. We concluded that "nothing in *NIFLA* suggests that *CTIA [II]* was wrongly decided" and, "[t]o the contrary, *NIFLA* preserved the exception to heightened scrutiny" for compelled disclosures, including "health and safety warnings." *Id.* Because the required health warnings for sugary drinks was a compelled truthful disclosure and one of the exceptions *NIFLA* recognized, we applied the *Zauderer* test the Court described in *NIFLA* and held that the plaintiffs met the requirements for a preliminary injunction. *Id.* at 756–58.

Even though *NIFLA* abrogated the professional speech doctrine, we have twice upheld a pre-*NIFLA* case expressly because *NIFLA* affirmed that exceptions exist for speech by professionals that is subject to less scrutiny. *Am. Bev. Ass'n*, 916 F.3d at 756; *see also CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 837, 844 (9th Cir. 2019) ("*CTIA II*") ("In light of our en banc decision in *American Beverage*, and having considered the parties' supplemental briefing on *NIFLA*, we again affirm the district court's decision."). Under our reasoning in these cases, *Pickup*, which concerns the other exception preserved in *NIFLA*, must also be reaffirmed along those lines.

Our decision in *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020), also indicates that the conduct-versus-speech distinction from *Pickup*

remains intact. There, we heard a challenge to a California licensing restriction requiring a private school to reject students' applications if they did not have a high school diploma or GED or had not passed a certain federal exam. *Id.* at 1067. We analyzed whether the licensing restriction was a regulation of conduct, as the district court had found, demonstrating that the exception for regulations on professional conduct survives *NIFLA*. *Id.* at 1069–73. We ultimately reversed the district court's holding that California's law regulated conduct and instead concluded that it was a content-based regulation on speech. *Id.* at 1073. We remanded to the district court to decide if the exception recognized in *NIFLA* for commercial speech applied and what level of scrutiny to apply. *Id.* at 1074. Both *American Beverage* and *Pacific Coast Horseshoeing School* confirm that *Pickup*'s treatment of regulations of professional conduct incidentally affecting speech survives *NIFLA*.

Tingley also contends that "other circuits have likewise recognized that *NIFLA* is irreconcilable with *Pickup*." But the decisions Tingley cites do not suggest that *NIFLA* fully abrogated *Pickup*.

In *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019), the Fourth Circuit recognized that the Supreme Court "disapproved of" the "so-called 'professional speech doctrine'" in *Pickup*. *Id.* at 207. The Fourth Circuit, however, held that the law before it, which prohibited the practice of law by corporations, "fits within *NIFLA*'s exception for professional regulations" of conduct "that incidentally affect speech." *Id.* The Fourth Circuit explained that *NIFLA* "recognize[d] two situations in which states have broader authority to regulate the speech of professionals than that of nonprofessionals." *Id.* Although "[m]any laws that regulate the conduct of a profession or

business place incidental burdens on speech . . . the Supreme Court has treated them differently than restrictions on speech." *Id.* at 207–08. Instead of supporting Tingley's argument, the Fourth Circuit's decision in *Capital Associated Industries* shows the opposite: *Pickup* was abrogated only in part by *NIFLA*.

So does the Fifth Circuit decision in *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 934 (5th Cir. 2020), which involved a First Amendment challenge to state surveyor-licensing requirements. *Id.* at 928–29. The Fifth Circuit clarified that "to the extent *Hines* [*v. Alldredge*, 783 F.3d 197 (5th Cir. 2015), the Fifth Circuit equivalent of *Pickup*] relied on the professional speech doctrine, its reasoning has been abrogated by *NIFLA*," but the Fifth Circuit "reiterate[d] *NIFLA*'s insistence on the conduct-speech analysis." *Id.* at 934. Because the district court did not conduct the requisite conduct-speech analysis and erred by "categorically exempting occupational-licensing requirements from First Amendment scrutiny," the Fifth Circuit remanded for the district court to determine whether the plaintiff's practice "constitutes speech or conduct." *Id.*

The Sixth Circuit decision similarly recognizes only a partial abrogation of *Pickup*. *EMW Women's Surgical Center, P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019), concerned a state statute that compelled doctors to, among other things, "describe the ultrasound images to the patient" before performing the abortion the patient requested. *Id.* at 423. The Sixth Circuit noted that heightened scrutiny under the First Amendment "generally applies to content-based regulation of any speaker, including a physician or other professional," but that "the Supreme Court noted in *NIFLA* [that] there is 'less protection for professional speech in two circumstances,'" including the "regulation of 'professional

conduct.'" *Id.* at 426 (quoting *NIFLA*, 138 S. Ct. at 2372). Examining the compelled informed-consent statute for doctors performing abortions, the Sixth Circuit held that even though the law controlled the doctors' speech, it did not violate the First Amendment "because the required disclosures are incidental to the Commonwealth's regulation of doctors' professional conduct." *Id.* at 432.

Nor does the Eleventh Circuit's decision in *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), show that *Pickup* has been abrogated in full by *NIFLA*. There, the Eleventh Circuit examined conversion therapy bans instituted by a city and county in Florida. *Id.* at 859. Although it rejected the argument that the conversion therapy bans regulated professional conduct, creating a split with our circuit, it recognized that "certain types of speech receive either less protection or no protection under the First Amendment." *Id.* at 865. The Eleventh Circuit explained that *NIFLA* "refused to recognize professional speech as a new speech category," but that the Court recognized two exceptions: "commercial speech, as well as incidental speech swept up in the regulation of professional conduct." *Id.* at 865, 867. Even though the Eleventh Circuit did not agree that the conversion therapy ordinances regulated conduct, it confirmed that "there is no doubt that 'States may regulate professional conduct,'" *id.* at 865 (quoting *NIFLA*, 138 S. Ct. at 2372), because "words can in some circumstances violate laws directed not against speech but against conduct," *id.* (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992)).

Every decision by our sister circuits that Tingley relies upon shows that *NIFLA* did not fully abrogate *Pickup*. The exception to heightened scrutiny for regulations of professional conduct survives *NIFLA*. Tingley, and some of

our sister circuits, may disagree with whether laws prohibiting licensed therapists from practicing conversion therapy on minors regulate conduct, but disagreement with our ultimate conclusion on the merits does not mean that *Pickup*, or the exception for regulations of professional conduct, is abrogated by *NIFLA*. Because *NIFLA* abrogated only the part of *Pickup* relating to the professional speech doctrine, and not its central holding that California's conversion therapy law is a regulation on conduct that incidentally burdens speech, *Pickup* remains binding law and controls the outcome of this case.

## C

We now apply *Pickup* to Washington's law. Washington's law is, for all intents and purposes, identical to California's law that we held satisfied rational basis review. States carry a "light burden" under this review. *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018), *amended*, 881 F.3d 792 (9th Cir. 2018). A law is "presumed to be valid and will be sustained" under rational basis review if it is "rationally related to a legitimate state interest. *Id.* (quoting *Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 440 (1985)); *see also Dobbs*, 142 S. Ct. at 2284 (stating that health and welfare laws are entitled to a "strong presumption of validity") (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)).

Washington's law satisfies rational basis review for the same reason that California's law satisfied this level of review in *Pickup*. The Washington Legislature's stated purpose in enacting SB 5722 is identical (besides using "conversion therapy" instead of "SOCE") to the California Legislature's stated purpose in enacting SB 1172: "protecting the physical and psychological well-being of

minors, including lesbian, gay, bisexual, and transgender youth, and . . . protecting its minors against exposure to serious harms caused by conversion therapy." 2018 Wash. Sess. Laws, ch. 300, § 1. This is, "[w]ithout a doubt," a legitimate state interest. *Pickup*, 740 F.3d at 1231. Washington also has a "compelling interest in the practice of professions within [its] boundaries," *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975), "regulating mental health," *NAAP*, 228 F.3d at 1054, and affirming the equal "dignity and worth" of LGBT people, *Fulton v. City of Philadelphia, Pa.*, 141 S. Ct. 1868, 1882 (2021) (citation omitted).

The Washington legislature acted rationally when it decided to protect the "physical and psychological well-being" of its minors by preventing state-licensed health care providers from practicing conversion therapy on them. It considered evidence that demonstrated a "scientifically credible proof of harm" to minors from conversion therapy. *Pickup*, 740 F.3d at 1232. The APA, whose task force systematically reviewed the scientific research on conversion therapy and adopted a resolution against it in 2009, confirmed in its amicus brief that the research presented to Washington showed harm from both aversive practices and non-aversive practices, such as talk therapy. The report accompanying Washington's law concluded that there is a "fair amount of evidence that conversion therapy is associated with negative health outcomes such as depression, self-stigma, cognitive and emotional dissonance, emotional distress, and negative self-image" and that "the literature indicates that large proportions of surveyed individuals who have been a part of conversion therapy report adverse health effects associated with these efforts." The report acknowledged that "[r]esearch ethics make it difficult to rigorously study a practice associated with harm." In other words, ethical review boards are unlikely to

approve double-blind research studies subjecting children to a practice for which there is already a fair amount of evidence indicating it is harmful.

Further, Washington legislators relied on the fact that "[e]very major medical and mental health organization" has uniformly rejected aversive and non-aversive conversion therapy as unsafe and inefficacious. State legislators also considered qualitative evidence of harm from Washington residents who were exposed to non-aversive conversion "talk" therapy and urged them to enact legislation prohibiting the practice. *See, e.g.*, *Senate Floor Debate*, TVW (Jan. 19, 2018 10:00 AM), https://tvw.org/video/senate-floor-debate-2018011151/?eve ntID=2018011151 at 1:18:00–1:20:20.

In relying on the body of evidence before it as well as the medical recommendations of expert organizations, the Washington Legislature rationally acted by amending its regulatory scheme for licensed health care providers to add "[p]erforming conversion therapy on a patient under age eighteen" to the list of unprofessional conduct for the health professions. Wash. Rev. Code § 18.130.180(27). As in *Pickup*, we hold that Washington's law satisfies rational basis review.

### III

In addition to following our precedent in *Pickup*, we have an additional reason for reaching the conclusion that we reach today. The Supreme Court has recognized that laws regulating categories of speech belonging to a "long . . . tradition" of restriction are subject to lesser scrutiny. *NIFLA*, 138 S. Ct. at 2372 (citation omitted). Washington's law regulates a category of speech belonging to such a

tradition, and it satisfies the lesser scrutiny imposed on such laws.

## A

In *NIFLA*, the Court rejected that professional speech, as a category, is subject to lesser scrutiny under the First Amendment. This is because a category that would exempt all speech uttered by individuals in professional capacities as varied as accounting, consulting, law, dentistry, architecture, investment banking, and contracting could entirely swallow the protection for free speech that the Founders enshrined in our Constitution.

Even so, the Court has repeatedly recognized that there may be categories of speech warranting lesser scrutiny under the First Amendment that, while appearing novel, belong to a "long (if heretofore unrecognized) tradition" of restriction. *Id.* (citation omitted). To impose content-based restrictions on such categories, States must have "persuasive evidence" of a "tradition to that effect." *Id.* (internal quotation marks and citation omitted).

The Court first left open the door to new categories of speech in *United States v. Stevens*, 559 U.S. 460 (2010). There, it declined to carve out a "novel exception" from the First Amendment for speech depicting extreme animal cruelty. *Id.* at 472. The Court reasoned that there was no evidence that this type of speech has historically been unprotected, yet it declined to "foreclose the future recognition of such additional categories." *Id.* Instead, it invalidated the law as unconstitutionally overbroad. *Id.* at 482.

In *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 792 (2011), the Court rejected the government's

attempt to "create new categories of unprotected speech" for restrictions on the labeling and sale of violent video games. The Court affirmed that States could not create new categories of speech "without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription." *Id.* Instead of a long tradition of proscription, the Court characterized the State's attempt to restrict the sale of violent video games as an "attempt to shoehorn speech about violence into obscenity." *Id.* at 793.

In *United States v. Alvarez*, 567 U.S. 709, 730 (2012), the Court affirmed our determination that the Stolen Valor Act, which made it a crime to lie about receiving a military award, violated the First Amendment. The Court stated that there may exist "some categories of speech that have been historically unprotected . . . but have not yet been specifically identified or discussed . . . in our case law." *Id.* at 722 (citation omitted). It declined, however, to recognize a new, broad category encompassing all false statements "made to any person, at any time, in any context." *Id.* at 720.

Drawing upon this line of cases in *NIFLA*, the Court held that there was not "'persuasive evidence . . . of a long (if heretofore unrecognized) tradition'" of exempting speech by professionals from First Amendment protection. *NIFLA*, 138 S. Ct. at 2372 (quoting *Alvarez*, 567 U.S. at 722). A category encompassing all words spoken by individuals in their professional capacity, in the Court's eyes, was too broad and lacked "such a tradition." *Id.* But, as described *supra*, the Court recognized that some subcategories of speech by professionals *are*, in fact, excepted from heightened scrutiny and instead subject to less scrutiny. *Id.*

What follows from this line of cases is that in some circumstances, a seemingly novel restriction on speech, even

if content-based, may be tolerated, but only if there is a "long (if heretofore unrecognized) tradition" of that type of regulation, *id.*, and the category is not too broad. Whether we view Washington's law as falling into the exception from heightened scrutiny for regulations on professional conduct that incidentally involve speech, *see* Part II, *supra*, or, alternatively, as discussed below, as falling into the tradition of regulations on the practice of medical treatments, the law satisfies the requisite scrutiny.

**B**

There is a long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders. *See Dent v. West Virginia*, 9 S. Ct. 231, 232 (1889) (upholding medical licensing requirements, including a prohibition on "swear[ing] falsely to any question which may be propounded to him on his examination") (citation omitted); *see also Hawker v. People of New York*, 170 U.S. 189, 191 (1898) (allowing state, as part of its police power, to deem who possesses a "sufficient good character" to practice medicine).

And such regulation of the health professions has applied to all health care providers, not just those prescribing drugs. In *Collins v. Texas*, 223 U.S. 288 (1912), for instance, the Court affirmed the conviction of a man practicing osteopathy without a license, reasoning that "[i]t is true that he does not administer drugs, but he practises what at least purports to be the healing art." *Id.* at 296. Texas, and all other states, "constitutionally may prescribe conditions to such practice, considered by it to be necessary or useful to secure competence in those who follow it." *Id.* The Court provided a long list of cases from state courts similarly establishing "the right of the state to adopt a policy even upon medical

matters concerning which there is difference of opinion and dispute." *Id.* at 297–98.

Conversion therapy, as the briefing here has highlighted, involves a difference of opinion and dispute. Tingley contends that "change in gender identity and sexual orientation" is "possible with God's help" and wants to practice conversion therapy on minor clients who seek it. Equal Rights Washington, in turn, cites studies in the record documenting that "youth who underwent conversion therapy were 'more than twice as likely to report having attempted suicide'" and that the medical community has rejected the practice as "unnecessary, ineffective, and unsafe." Tingley responds that states, and courts in reviewing their laws, cannot rely upon the positions of expert medical organizations because "it is not uncommon for professional organizations to do an about-face in response to new evidence or new attitudes."

But the Court has upheld substantive regulations on medical treatments based upon differences of opinion and, in doing so, has relied upon the positions of the professional organizations Tingley criticizes, even when those positions have changed over time. In *Lambert v. Yellowley*, 272 U.S. 581 (1926), the Court upheld the constitutionality of the National Prohibition Act's limit on the prescription of spirit liquor for medical treatment. Under that Act, only a licensed physician could prescribe liquor, and no more than a pint of liquor could be prescribed for medical treatment. *Id.* at 587. The evidence presented to Congress showed that "practicing physicians differ about the value of malt, vinous, and spiritous liquors for medicinal purposes, but that the preponderating opinion is against their use for such purposes." *Id*. at 590. The Court relied upon a resolution adopted by the American Medical Association declaring that

"the use of alcoholic liquor as a thereapeutic [sic] agent was without 'scientific basis' and 'should be discouraged.'" *Id.* at 591.

Nearly 100 years later, we are faced with a similar situation. As in *Lambert*, the evidence presented shows some difference in opinion about the efficacy and harm of conversion therapy, but the "preponderating opinion" in the medical community is against its use. *Id.* at 590. Washington relied upon a resolution adopted by the American Psychological Association that the use of conversion therapy "should be discouraged." *Id.* at 591. Just as Tingley claims his minor clients want conversion therapy, in 1926, some patients likely wanted their doctor to treat their condition with more than a pint of liquor. That purported desire, and a patient's right to choose, nevertheless did not overcome the right of the government to regulate what medical treatments its licensed health care providers could practice on their patients according to the applicable standard of care and governing consensus at the time (even if not unanimous).

That expert medical organizations have changed their view over time, with additional research, is a good thing. Science, and the medical practices used to treat human conditions, evolve over time. But we still trust doctors, and the professional organizations representing them, to treat our ailments and update their recommendations on the governing standard of care. That doctors prescribed whiskey in 1922, and thought of homosexuality as a disease in 1962, does not mean that we stop trusting the consensus of the medical community in 2022 or allow the individual desires of patients to overcome the government's power to regulate medical treatments.

## C

Washington, understandably, rests its case upon our precedent in *Pickup*. But the long tradition of this type of regulation provides further support for our decision today.

Otherwise, this would endanger other regulations on the practice of medicine where speech is part of the treatment. Aside from prohibiting practicing conversion therapy on minors, Washington's Uniform Disciplinary Act contains other limitations on speech uttered by licensed health care professionals. Wash. Rev. Code § 18.130.180(16), for instance, prohibits the "[p]romotion for personal gain of any unnecessary or inefficacious drug, device, treatment, procedure, or service." Similarly, § 18.130.180(4) precludes "[i]ncompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed." Section 18.130.180(19) subjects to discipline the offering "to cure or treat diseases by a secret method." And § 18.130.180(3) prohibits all advertising by health care professionals that is "false, fraudulent, or misleading."

Because the Uniform Disciplinary Act applies to licensed marriage and family therapists like Tingley, and because Tingley claims his treatments "consist entirely of speech," all these limitations impose restrictions on his speech based on the content of his words. If Washington's prohibition on licensed health care providers practicing conversion therapy on minors (§ 18.130.180(27)) is an unconstitutional content-based restriction on the speech of licensed health care professionals, then this would preclude other reasonable "health and welfare laws," *Dobbs*, 142 S. Ct. at 2284, that apply to health care professionals and impact their speech. It would also, as *amici* warn, endanger centuries-old medical malpractice laws that restrict

treatment and the speech of health care providers. *See also* Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech,* 2007 U. Ill. L. Rev. 939, 950 (2007) (contending that "doctors are routinely held liable for malpractice for speaking or for failing to speak" without First Amendment concern, such as by "failing to inform patients in a timely way of an accurate diagnosis" or by "failing to give patients proper instructions").

The practice of psychotherapy is not different from the practice of other forms of medicine simply because it uses words to treat ailments.  Tingley is not immune from regulation on the practice of medicine because he claims that all he does "is sit and talk" with his clients.  Washington law defines psychotherapy as more than just talking.  It is the "practice of counseling using diagnosis of mental disorders according to the fourth edition of the diagnostic and statistical manual of mental disorders, published in 1994, and the development of treatment plans for counseling based on diagnosis of mental disorders in accordance with established practice standards."  Wash. Rev. Code § 18.19.020.

Marriage and family therapy, more specifically, is the "diagnosis and treatment of mental and emotional disorders, whether cognitive, affective, or behavioral, within the context of relationships, including marriage and family systems."  *Id* § 18.225.010(8).  This type of therapy "involves the professional application of psychotherapeutic and family systems theories and techniques in the delivery of services to individuals, couples, and families for the purpose of treating such diagnosed nervous and mental disorders."  *Id.*  And Washington defines mental health counseling as "the application of principles . . . for the

purpose of treatment of mental disorders" which "includes, but is not limited to, the assessment, diagnosis, and treatment of mental and emotional disorders." *Id.* § 18.225.010(9).

If Washington's law is upheld and conversion therapy is considered conduct, Tingley contends, then "protesting," "debating," and "book clubs" could be next. This misses the mark. What licensed mental health providers do during their appointments with patients for compensation under the authority of a state license is treatment. The work that Tingley does is different than a conversation about the weather, even if he claims that all he does is "sit and talk." When a health care provider acts or speaks about treatment with the authority of a state license, that license is an "imprimatur of a certain level of competence." *Otto v. City of Boca Raton*, No. 19-10604, 2022 WL 2824907, at *19 (11th Cir. July 20, 2022) (Rosenbaum, J., joined by Pryor, J. J., dissenting in the denial of rehearing en banc). Comparing the work that licensed mental health providers do to book club discussions or conversations among friends minimizes the rigorous training, certification, and post-secondary education that licensed mental health providers endure to be able to treat other humans for compensation.

The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients. This is why there is a historical tradition of states restricting the medical practices health care providers can use, while not, for instance, forbidding architects from "propos[ing] buildings in the style of I.M. Pei" or preventing accountants from "discuss[ing] legal tax avoidance techniques." *Otto*, 981 F.3d at 867. The expressive conduct of other professions, even when involving the speech of professionals within the confines of a client relationship,

48      TINGLEY V. FERGUSON

does not run the same risk of harm. From "time immemorial," we have recognized "[t]he power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." *Dent*, 129 U.S. at 122. And "[f]ew professions require more careful" scrutiny than "that of medicine." *Id.*; *see also Shea v. Bd. of Med. Examiners*, 146 Cal. Rptr. 653, 661 (Ct. App. 1978) ("The Legislature . . . has the right to require that those licensed to practice medicine be of good moral character, reliable, trustworthy, and not given to deception of the public or to the practice of imposing upon credulous or ignorant persons.").

Tingley's minor patients come to him for his help in treating a mental health condition, such as anxiety or depression. Washington law defines Tingley's practice as "the diagnosis and treatment of mental and emotional disorders," Wash. Rev. Code § 18.225.010(8), even if he only uses speech in that treatment. Whether children with a mental health condition go to a primary care physician and seek anti-depressant pills, or a therapist and seek psychotherapy, or a psychiatrist and seek both, the State may regulate the licensed provider's treatment of those health conditions. That some of the health providers falling under the sweep of Wash. Rev. Code § 18.130 use speech to treat those conditions is "incidental[]." *NIFLA*, 138 S. Ct. at 2372. The treatment can be regulated all the same.

## D

Washington, like other states, has concluded that health care providers should not be able to treat a child by such means as telling him that he is "the abomination we had

heard about in Sunday school."[3]  Washington's law not only falls within the tradition of state regulation of the health professions, but it also affects the health of children—a vulnerable group in the eyes of the law.

Tingley claims that he has minor patients who want to receive conversion therapy.  Perhaps he does.  But a review of his complaint reveals examples of children who claim to want conversion therapy only after their parents bring them to Tingley for it.  He describes working with a teenage girl whose parents brought her to Tingley with a belief that "God had created their daughter female" and "sought [his] professional expertise as a counselor to work with their daughter towards" a goal of "return[ing] to comfort with her female body and reproductive potential, and with a gender identity as a female."  Only "[a]fter several counseling sessions" with Tingley did this child "express[] a desire to become more comfortable with her biological sex, notwithstanding her previous claims of a male gender identity."  As for counseling minors on sexual orientation, Tingley provided the example of counseling a teen whose "parents first brought him to my office."  And then, only "over time" like the other client he described, did this client seek Tingley's "counsel on a number of topics including attraction to pornography and unwanted same-sex attractions."  These examples highlight the difficulty in assessing whether there has been knowing, informed, and voluntary consent, *c.f. Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973), when it comes to children receiving

---

[3] *See* John J. Lapin, Note, *The Legal Status of Conversion Therapy*, 22 Geo. J. Gender & L. 251, 251 (2021) (quoting Sam Brinton, *I Was Tortured in Gay Conversion Therapy. And It's Still Legal in 41 States*, N.Y. Times (Jan. 24, 2018), https://www.nytimes.com/2018/01/24/opinion/gay-conversion-therapy-torture.html.

medical treatment. This is particularly so when that treatment is encouraged by the sincerely held religious beliefs of their parents, from whom children rely on for shelter, food, and financial support.

The difficulties in having therapists, legislators, and judges assess whether a minor is consenting, without coercion, to a therapeutic practice that every major medical organization has opposed, demonstrates why Washington's law is appropriately tailored to its interest in "protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth." 2018 Wash. Sess. Laws, ch. 300, § 1. Washington cannot easily draw lines between children who want conversion therapy because of their own free will and religious beliefs, children who want conversion therapy because of internalized homophobia and transphobia, and children who want conversion therapy because their parents want them to have conversion therapy. Instead, Washington reasonably relied on scientific evidence and the consensus of every major medical organization to prohibit the practice on all children, regardless of the religious beliefs of the child, and regardless of the religious beliefs of the health care provider.

Children may identify as gay, straight, cisgender, or transgender. These identities "must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Faretta v. California*, 422 U.S. 806, 834 (1975). We uphold Washington's law and reject Tingley's free speech challenge because the Washington law permissibly honors individual identity.

## IV

Tingley also appeals the district court's dismissal of his free exercise challenge to Washington's law. The Free

Exercise Clause of the First Amendment prevents Congress from making a law "prohibiting the free exercise" of religion and applies to the States through the Fourteenth Amendment. *Church of the Lukumi Babalu Aye, Inc., v. City of Hialeah*, 508 U.S. 520, 531 (1993). But this right "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation marks and citation omitted). We apply strict scrutiny only when a law fails to be neutral and generally applicable, even if the law incidentally burdens religious practice. *Church of the Lukumi*, 508 U.S. at 531. Otherwise, we apply rational basis review. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) (*"Stormans II"*).

## A

Washington's law satisfies neutrality. Tingley has failed to "discharge[] his burdens" at the first step of our Free Exercise Clause inquiry. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022).

## 1

To start, we evaluate the object of the law. If the purpose of the law is to restrict practices *because of* the religious motivations of those performing the practices, the law is not neutral. *Parents for Priv. v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894. The object of Washington's law is not to target religion. In *Welch v. Brown*, 834 F.3d 1041 (9th Cir. 2016), we considered and rejected a free exercise challenge to California's nearly

identical conversion therapy law.[4] Here, as in *Welch*, the object of the State's ban on conversion therapy is "the prevention of harm to minors, regardless of the motivations for seeking" or providing conversion therapy. *Welch*, 834 F.3d at 1047; *see also* 2018 Wash. Sess. Laws, ch. 300, § 1. Washington's exemption for counselors practicing in a religious capacity, Wash. Rev. Code § 18.225.030(4), shows that it intended to regulate health care providers only to the extent they act in a licensed and non-religious capacity, "*only* within the confines of the counselor-client relationship." *Welch*, 834 F.3d at 1045. Washington restricted licensed providers from performing conversion therapy on minors because of the demonstrated harm that results from these practices, and not to target the religious exercise of health care providers. This is unlike the situation in *Kennedy*, in which the school district admitted that it "sought to restrict [the coach's] actions at least in part because of their religious character." 142 S. Ct. at 2422.

### 2

The next step in evaluating a law for neutrality is to examine the text of the law to determine if it is neutral on its face. *Church of the Lukumi*, 508 U.S. at 533. A law fails to be neutral if "it refers to a religious practice without a secular meaning discernible from the language or context." *Id.* Washington's law prohibits therapists from practicing conversion therapy on minors. It makes no reference to religion, except to clarify that the law does not apply to practice by religious counselors. *See* 2018 Wash. Sess.

---

[4] After our decision in *Pickup*, one of the two consolidated cases came back to us after the district court denied the plaintiffs' request for a preliminary injunction based on free exercise grounds. We affirmed. *Welch*, 834 F.3d at 1044.

Laws, ch. 300, § 2. The law's express protection for the practice of conversion therapy in a religious capacity is at odds with Tingley's assertion that the law inhibits religion. Tingley all but concedes the law is facially neutral, instead arguing that facial neutrality is "not determinative" and advocating what he sees as "subtle departures from neutrality," *Church of the Lukumi*, 508 U.S. at 534 (citation omitted), which we discuss below.

**3**

The circumstances surrounding the enactment of SB 5722 do not undermine its facial neutrality. Beyond examining a law's neutrality on its face, we also look at the circumstances of the law's enactment, including the historical background, precipitating events, and legislative history. *Church of the Lukumi*, 508 U.S. at 540; *see also Kennedy*, 142 S. Ct. at 2422 n.1.

Tingley's primary mode of distinguishing this case from *Welch* is by pointing to comments made by Washington legislators that, to him, show the law is "tainted with anti-religious animus." He analogizes to *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), in which the Court found that comments by members of the Colorado Civil Rights Commission evinced a lack of neutrality under the Free Exercise Clause. *Id.* at 1723–24. For several reasons, Tingley's comparison fails.

First, the comments to which Tingley refers do not show a hostility toward religion. Washington State Senator Liias's comment, in which he "speak[s] for [him]self," that the bill is directed against "barbaric practices," goes toward the mode of treatment that constituents described to him—such as using electroshock therapy or inducing vomiting—and not toward the religious belief Tingley and others hold

against homosexuality. *Senate Floor Debate*, TVW (Jan. 19, 2018 10:00 AM), https://tvw.org/video/senate-floor-debate-2018011151/?eventID=2018011151 at 1:16:48–1:20:23.

Tingley also claims that another sponsor of the bill, Republican State Senator Maureen Walsh, denounced those who try to "pray the gay away," which implicitly suggests that the law has an object of inhibiting religion. Tingley takes Senator Walsh's comments out of context. Walsh, whose daughter is gay, was speaking to her personal experience as a parent. She shared the story of a friend's experience of conversion therapy and used her friend's words that he thought he could "pray the gay away" but instead found the conversion therapy to be ineffective. *Senate Floor Debate*, TVW (Jan. 19, 2018 10:00 AM), https://tvw.org/video/senate-floor-debate-2018011151/?eventID=2018011151 at 1:20:30–1:23:50. Soon after that comment, Senator Walsh invoked her own Christian beliefs, that "God put us all on the Earth to be here and function as we do." She acknowledged that this issue is complicated and said that she understood why some of her colleagues would not vote for the bill. Viewed in context, these comments do not establish the anti-religious bias that Tingley claims.

We reject Tingley's contention that these stray, out-of-context comments by Washington legislators are "more overtly hostile" than the statements in *Masterpiece*. *Masterpiece* involved a free exercise challenge brought by a cake shop owner who refused to bake wedding cakes for same-sex couples. 138 S. Ct. at 1723. Public, on-the-record comments by Colorado Civil Rights Commission members compared the plaintiff's invocation of his religious beliefs to "defenses of slavery and the Holocaust," and individual commissioners disparaged his religious invocation as "despicable." *Id.* at 1729. The stray comments from

Washington legislators speaking for themselves about the experiences of friends and constituents who underwent conversion therapy come nowhere close to the hostility contained in the comments at issue in *Masterpiece*.

*Masterpiece* also examined public comments by government officials in a different context. The commissioners' statements about the plaintiff and his religious beliefs were made during the *adjudication of the plaintiff's specific case* before the commission. *Id.* at 1729–30. Here, in comparison, the stray comments were made as part of a voluminous legislative history that does not show a hostility toward religion, nor an object of targeting religious practice. The Court in *Masterpiece* acknowledged the distinction between hostile comments made by an adjudicatory body when deciding a case in front of it, and comments made by a legislative body when debating a bill. *Id.* at 1730. In *Masterpiece*, the Court could not "avoid the conclusion that these statements cast doubt on the fairness and impartiality of the Commission's adjudication of [the plaintiff's] case." *Id.* at 1730.

Stray remarks of individual legislators are among the weakest evidence of legislative intent. The Court has "long disfavored arguments based on alleged legislative motives" because such inquiries are a "hazardous matter." *Dobbs*, 142 S. Ct. at 2255–56 (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). The Court has "been reluctant to attribute those motives to the legislative body as a whole" because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 2256 (quoting *O'Brien*, 391 U.S. at 384).

The allegedly hostile comments cited by Tingley do not establish a free exercise violation. Viewed in context, the

stray comments are not hostile toward religious practice, they did not take place in an adjudicative context like *Masterpiece*, and, as the Court recently made clear, they are weak evidence of the intent of the entire legislature in enacting the challenged law.

### 4

In addition to the object, text, and legislative history, we also consider the real-world operation of a law to determine if it is neutral. *Church of the Lukumi*, 508 U.S. at 535. In *Church of the Lukumi*, a city's ordinances against animal sacrifices contained so many exemptions that in practice, the city effectively accomplished a "religious gerrymander" targeting the petitioners' religious exercise. *Id.* (citation omitted). Tingley contends that Washington's law is not operationally neutral because the Washington Legislature knew the law would prohibit counseling "almost exclusively" "sought 'for religious reasons' and provided by those who believe in 'Christian faith-based methods.'" But the legislative history and evidence before the Washington legislature show that the legislators understood that people seek conversion therapy for religious *and* secular reasons, such as "social stigma, family rejection, and societal intolerance for sexual minorities," *Welch*, 834 F.3d at 1046, and that the harm from conversion therapy is present regardless of why people seek it.

SB 5722 evenhandedly prohibits health care providers from performing conversion therapy on minors, whether those minors seek it for religious or non-religious reasons: "[t]he same conduct is outlawed for all." *Stormans II*, 794 F.3d at 1077 (quoting *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995)). The law prohibits, or more accurately deems "unprofessional," the practice of conversion therapy by all licensed providers (regardless of

their religious or secular motivations) on clients who are under the age of 18 (regardless of their religious or secular motivations). If SB 5722 was aimed only at therapists wanting to practice conversion therapy on minors for religious reasons, this would be cause for concern. But that "a particular group, motivated by religion, may be more likely to engage in the proscribed conduct" does not amount to a free exercise violation. *Welch*, 834 F.3d at 1047 (quoting *Stormans II*, 794 F.3d at 1077).

SB 5722 is a neutral law targeted at preventing the harms associated with conversion therapy, and not at the religious exercise of those who wish to practice this type of therapy on minors.

## B

Tingley also does not carry his burden of showing that Washington's law is not a law of general applicability. Broadly speaking, there are two ways a law is not generally applicable. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). The first is if there is a "formal mechanism for granting exceptions" that "invite[s] the government to consider the particular reasons for a person's conduct." *Id.* at 1879 (internal quotation marks and citation omitted). The second is if the law "prohibits religious conduct while permitting secular conduct" that also works against the government's interest in enacting the law. *Id.* at 1878. Neither applies here.

## 1

SB 5722 does not provide a formal and discretionary mechanism for individual exceptions. Tingley contends that the vague terms in Washington's law will lead to a discretionary system of individual exemptions. Specifically,

he suggests that the hostile comments made by individual legislators indicate that "these officials" (even though they are not the ones who will enforce the law) "will likely exempt secular, 'value-neutral' counseling" as not violative of the law "while punishing counseling . . . informed or motivated by faith-based convictions." This speculative and conclusory "possibility" is not sufficient to meet Tingley's burden.

The Supreme Court in *Fulton* described a "formal mechanism" for granting individual exceptions that vests discretion with the enforcing officers. 141 S. Ct. at 1879. There, Philadelphia stopped referring children to a Catholic adoption agency that refused to recognize same-sex parents. *Id.* at 1875. The city relied upon a contractual provision that prohibited adoption agencies from discriminating against prospective adoptive parents based upon their sexual orientation "unless an exception is granted by the Commissioner . . . in his/her sole discretion." *Id.* at 1878. The Court found that this provision (1) was a formal mechanism, (2) creating a system of individual exceptions, (3) that would be exercised at the discretion of a government official. *Id.* at 1878–79. There is no provision in the Washington law for individual exceptions that would allow secular exemptions but not religious ones. In fact, there is no exemption system whatsoever, not even one that affords "some minimal governmental discretion." *Stormans II*, 794 F.3d at 1082.

**2**

Nor does the Washington law "treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *see also Stormans II*, 794 F.3d at 1079 ("A law is not generally applicable if its prohibitions substantially underinclude non-

religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect."). In *Tandon*, the Supreme Court granted an application for emergency injunctive relief requested by plaintiffs who wished to gather for religious exercise in violation of California's pandemic restrictions.   141 S. Ct. at 1297. Because California permitted hair salons, retail stores, movie theaters, and indoor restaurants to bring more than three households together, but it did not permit the same for people who wanted to gather for at-home religious exercise, the Court concluded the State's policy was not generally applicable. *Id.*

Tingley is unable to identify comparable secular activity that undermines Washington's interest in enacting SB 5722 but is permitted under the law.   Whether secular and religious activity are "comparable" is evaluated "against the asserted government interest that justifies the regulation at issue" and requires looking at the risks posed, not the reasons for the conduct. *Id.* at 1298.

We do not accept Tingley's contention that gender-affirming therapy "can lead to the very types of psychological harms" Washington says it wants to eliminate by prohibiting conversion therapy.  SB 5722 is not targeted toward anecdotal reports of "regret" from "sex reassignment surgery" or the prescription of "puberty blocking drugs" about which Tingley's complaint warns.  Instead, the law is targeted toward the scientifically documented increased risk of suicide and depression from having a licensed mental health provider try to change you.  These harms are not the same. *See Tandon*, 141 S. Ct. at 1298 (Kagan, J., dissenting) ("[T]he law does not require that the State equally treat apples and watermelons.").  Tingley is unable to show that Washington's law permits secular conduct that undermines

the same interest Washington asserted in enacting SB 5722. Washington's law is neutral and generally applicable, and survives rational basis review, for the reasons described in Part II.[5]

## V

Aside from his First Amendment claims, Tingley also challenges Washington's law as unconstitutionally vague under the Fourteenth Amendment's Due Process Clause. A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (9th Cir. 2008). Tingley raises a vagueness challenge under both the fair notice and the arbitrary enforcement theories.

## A

The operative question under the fair notice theory is whether a reasonable person would know what is prohibited by the law. The terms of a law cannot require "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010) (quoting

---

[5] We decline Tingley's demand to apply strict scrutiny under the "hybrid rights exception," which stems from dicta in *Smith*, 494 U.S. at 881–82. We have cast doubt on whether this exception exists, and we have not applied strict scrutiny to a challenged law on this basis. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1236–37 (9th Cir. 2020) (doubting whether exception exists and whether strict scrutiny would be required if it does); *see also Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 440 n.45 (9th Cir. 2008) (describing widespread criticism and declining to adopt the exception).

*United States v. Williams*, 553 U.S. 285, 306 (2008)).  For facial vagueness challenges, we tolerate uncertainty at the margins; the law just needs to be clear "in the vast majority of its intended applications."  *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000).  Here, Washington's law gives fair notice to a reasonable person of what conduct is prohibited in the "vast majority of its intended applications."

Tingley claims that "sexual orientation" and "gender identity" are vague terms without consistent definitions.  Neither term is unconstitutionally vague.  We previously rejected a challenge on vagueness grounds to "sexual orientation" in California's nearly identical law, foreclosing Tingley's challenge to this term.  *Pickup*, 740 F.3d at 1234.  Sexual orientation has only become more commonly understood in society since we decided *Pickup* in 2014, *see Obergefell v. Hodges*, 576 U.S. 644, 661 (2015), as has gender identity.  "Gender identity" and "gender expression" are common legal terms that appear in multiple provisions of Washington law, federal statutes, and caselaw.  *See, e.g.*, Wash. Rev. Code § 48.43.072 (defining terms); 18 U.S.C. § 249(c)(4) (including "gender identity" as a protected characteristic under the federal hate crimes act); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020) (holding that an employer violates Title VII by discriminating against someone because of their sexual orientation or "gender identity").

"Sexual orientation" and "gender identity" have common meanings that are clear to a reasonable person—let alone a licensed mental health provider.  Usually, we look to a term's common meaning, but if the law regulates the "conduct of a select group of persons having specialized

knowledge," then the "standard is lowered" for terms with a "technical" or "special meaning." *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993) (citation omitted). Here, Washington's law proscribes the conduct of licensed mental health providers—a "select group of persons having specialized knowledge"—so we must also consider the specialized knowledge of this group and its familiarity with these terms. *Id.* Washington's expert, who chaired the APA Task Force surveying the scientific literature about conversion therapy, stated in a declaration that "sexual orientation" and "gender identity" are well-established concepts in the psychology field. Tingley himself holds himself out as having counseled minors on "gender identity" issues, making it difficult to believe that he, a licensed mental health provider in Washington, does not understand what this term means.

We also reject Tingley's argument that a reasonable person could not understand what conduct is proscribed by Washington's law because the line between permissible counseling involving "identity exploration and development" and impermissible counseling seeking to "change" a minor's identity may be hard to discern. But the terms of the statute provide a clear, dividing line: whether change is the object. *See* Wash. Rev. Code § 18.130.020(4)(b) ("'Conversion therapy' does not include counseling or psychotherapies that provide . . . identity exploration and development *that do not seek to change sexual orientation or gender identity.*") (emphasis added); Wash. Rev. Code § 18.130.020(4)(a) ("'Conversion therapy' means a regime *that seeks to change* an individual's sexual orientation or gender identity." The term includes "efforts to *change* behaviors or gender expressions . . . .") (emphasis added). As Washington explains, what matters is not whether change occurs, but whether the therapeutic

interventions have a "fixed outcome" or an "a priori goal of an externally-chosen identity." Tingley ignores that "identity exploration" and "identity development" are technical psychological terms that are "well enough known" by those in the industry "to correctly apply them." *Weitzenhoff*, 35 F.3d at 1289 (citation omitted). Tingley's "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack." *Hill*, 530 U.S. at 733.

## B

Tingley's arbitrary enforcement theory for unconstitutional vagueness also fails. A law is void for vagueness if it "lack[s] any ascertainable standard for inclusion and exclusion." *Kashem v. Barr*, 941 F.3d 358, 374 (9th Cir. 2019) (internal quotation marks and citation omitted). Here, the law provides ascertainable standards to determine what is conversion therapy and what is not conversion therapy. Psychotherapy practices that seek to "change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex" constitute conversion therapy. Wash. Rev. Code § 18.130.020(4)(a). Psychotherapy practices, however, that "provide acceptance, support, and understanding of clients" do not constitute prohibited conversion therapy, nor do practices that facilitate "clients' coping, social support, and identity exploration and development that do not seek to change sexual orientation or gender identity." *Id.* § 18.130.020(4)(b). The statute effectively provides a checklist of practices for "inclusion and exclusion." *Kashem*, 941 F.3d at 374 (citation omitted).

That the law's injunctive relief provision, Wash. Rev. Code § 18.30.185, allows "any . . . person" to initiate an action to enjoin the licensed therapist from practicing

conversion therapy does not render the licensing scheme unconstitutionally vague. The "any . . . person" provision applies only to injunctive relief. The disciplinary sanctions are instead governed by § 18.130.080 and § 18.130.165, which vest the Washington Department of Health, not "any" person, with responsibilities for enforcement. *See also id.* § 18.130.040 (designating the Department of Health Secretary as the disciplining authority). Section 18.130.080 provides standards for the Washington Department of Health to use in determining whether a complaint "merits investigation." Section 18.130.160 vests the Department of Health with the authority to issue an order sanctioning a license holder, but only after making "a finding, after [a] hearing." This provision also tells the Department of Health what information it may properly consider and what sanctions are permissible. Wash. Rev. Code § 18.130.160. Tingley's contention that § 18.30.185 gives "unconstrained discretion" to "activists . . . who ideologically oppose [his] faith and viewpoint" in a way that "multiplies the threat" of arbitrary enforcement is speculative and contradicted by the standards provided by the licensing scheme. And even though section 18.30.185 permits "any" person to initiate an action for injunctive relief, such a person would still need to prove the traditional factors for injunctive relief to enjoin a license holder's purported conduct; mere disagreement with someone's "faith and viewpoint" will not carry this burden.

Washington's law prohibiting licensed mental health providers from practicing conversion therapy on minors is not unconstitutionally vague. By its terms, the law gives fair notice of what conduct is proscribed to a reasonable person, and certainly to a license-holding provider with the specialized, technical knowledge of the psychology profession. The law contains standards limiting the discretion of those who will enforce it, and it does not matter

TINGLEY V. FERGUSON                65

that the law allows individuals to initiate actions for injunctive relief.  Because the law "provides both sufficient notice as to what is prohibited and sufficient guidance to prevent against arbitrary enforcement," *United States v. Kuzma*, 967 F.3d 959, 970 (9th Cir. 2020), the district court did not err in dismissing Tingley's vagueness challenge.

## CONCLUSION

Our decision today is controlled by our precedent and ample reasoning.  Tingley has standing to bring his free speech and free exercise challenges to Washington's law, but they cannot proceed under *Pickup* and *Welch*.  In addition to being supported by circuit precedent, our decision to uphold Washington's law is confirmed further by its place within the well-established tradition of constitutional regulations on the practice of medical treatments.  Finally, Washington's law is not void for vagueness.  We thus affirm the district court's dismissal of Tingley's claims.

## AFFIRMED.

BENNETT, Circuit Judge, concurring in part:

I join the majority opinion except as to Part III of the Discussion section and those portions of the Conclusion that refer to Part III's reasoning.  Respectfully, I believe that we should not hypothesize with dicta when our conclusion is commanded by binding precedent.  "As a three-judge panel of this circuit, we are bound by prior panel decisions . . . and can only reexamine them when their 'reasoning or theory' of that authority is 'clearly irreconcilable' with the reasoning or theory of intervening higher authority." *Rodriguez v. AT &*

*T Mobility Servs., LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quoting *Miller v. Gammie,* 335 F.3d 889, 893 (9th Cir. 2003) (en banc), *overruled on other grounds by Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021)).  As we hold in Part II of the Discussion section, we are bound by *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), as to Tingley's free speech claim.  Part III is therefore unnecessary, including its discussion of the "long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders"—an attempt to meet *NIFLA*'s exception for a category of speech warranting lesser scrutiny.  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018).  "The 'cardinal principle of judicial restraint' is that 'if it is not necessary to decide more, it is necessary not to decide more.'"  *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 617 n.13 (9th Cir. 2017) (quoting *PDK Lab'ys Inc. v. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and in the judgment)).

The New York Times

https://www.nytimes.com/2018/01/24/opinion/gay-conversion-therapy-torture.html

OP-ED CONTRIBUTOR

# I Was Tortured in Gay Conversion Therapy. And It's Still Legal in 41 States.

**By Sam Brinton**

Jan. 24, 2018

In the early 2000s, when I was a middle schooler in Florida, I was subjected to a trauma that was meant to erase my existence as a newly out bisexual. My parents were Southern Baptist missionaries who believed that the dangerous and discredited practice of conversion therapy could "cure" my sexuality.

For over two years, I sat on a couch and endured emotionally painful sessions with a counselor. I was told that my faith community rejected my sexuality; that I was the abomination we had heard about in Sunday school; that I was the only gay person in the world; that it was inevitable I would get H.I.V. and AIDS.

But it didn't stop with these hurtful talk-therapy sessions. The therapist ordered me bound to a table to have ice, heat and electricity applied to my body. I was forced to watch clips on a television of gay men holding hands, hugging and having sex. I was supposed to associate those images with the pain I was feeling to once and for all turn into a straight boy. In the end it didn't work. I would say that it did, just to make the pain go away.

I have begun to repair the damage that conversion therapy caused me and my family. But the failed promise of change has very likely caused a permanent tear in our relationship.

Many think that conversion therapy — the snake oil idea that you can forcibly change someone's sexual orientation or gender identity — is an artifact of the past, a medieval torture practice. But in fact it is still legal in 41 states, including so-called progressive ones like New York and Massachusetts. New York City fully banned the practice only last month.

Today I am proudly bisexual and gender fluid, and I serve as the head of advocacy and government affairs for the Trevor Project, the world's largest suicide prevention and crisis intervention organization for L.G.B.T.Q. youth. We constantly hear from survivors

Tingley v. Ferguson
No. 21-35815, archived August 31, 2022

of conversion therapy who have been so hurt that they are contemplating suicide. So we know the severity of the problem.

A new report tells us just how huge it is. Nearly 700,000 adults in the country have received conversion therapy at some point, including about 350,000 who received the treatment as adolescents, according to a study by the Williams Institute, a think tank on sexual orientation and gender identity law and public policy at U.C.L.A.

It is heartbreaking that the study estimates that 20,000 L.G.B.T.Q. teens will receive conversion therapy from a health care professional before they turn 18. An even larger number of youth, an estimated 57,000 teenagers, will receive the treatment from a religious or spiritual adviser before adulthood.

Every prominent professional health association, including the American Medical Association, the American Psychological Association and the American Academy of Pediatrics, opposes the use of conversion therapy on youth, calling it harmful and ineffective.

The practice can be performed by a licensed therapist in an office, in a correctional-style campground, by a parent continuously punishing a child for acting too feminine or by a pastor who wants to pray the gay away. The trauma of conversion therapy can cause depression, suicidal ideation, family rejection and a whole host of horrors that children must then face without the knowledge that mental health professionals are supposed to help rather than harm.

That's why we are leading a campaign to pass legislation to ban conversion therapy in every state. Working with partners across the country — in particular the National Center for Lesbian Rights and the Human Rights Campaign — we've made significant progress. Nine states, the District of Columbia and 32 localities have laws protecting kids under the age of 18 from receiving conversion therapy from licensed health care professionals. The Williams Institute study shows that 6,000 teenagers would have undergone treatment before they reached 18 if their state had not banned the practice.

In the past couple of weeks, Virginia, Washington, Arizona and Missouri have introduced bills to ban conversion therapy. But there are still challenges in stopping this barbaric practice. In fact, New Hampshire recently rejected an effort to protect L.G.B.T.Q. youth from conversion therapy with a close vote in the Legislature, being swayed in favor of allowing the practice to continue; many legislators falsely believe that no such practice could exist. The new data from the Williams Institute shows just how wrong they are.

I vividly remember calling the Trevor Project a decade ago as a young college student

who was just realizing that the trauma of conversion therapy had devastated my ability to cope with the myriad challenges L.G.B.T.Q. youth must survive on a daily basis. I now hear similar stories of calls just like mine.

We must pass legislation to stop licensed therapists who seek to harm L.G.B.T.Q. youth with conversion therapy. Everyone should know that you can't change what you never chose.

Tingley v. Ferguson
No. 21-35815 archived August 31, 2022