**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRIAN TINGLEY, | No. 21-35815 |
| *Plaintiff-Appellant,* | D.C. No. 3:21-cv-05359-RJB |
| v. | |
| ROBERT W. FERGUSON, in his official capacity as Attorney General for the State of Washington; UMAIR A. SHAH, in his official capacity as Secretary of Health for the State of Washington; KRISTIN PETERSON, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance division of the Washington State Department of Health, | ORDER |
| *Defendants-Appellees,* | |
| EQUAL RIGHTS WASHINGTON, | |
| *Intervenor-Defendant-Appellee.* | |

BRIAN TINGLEY,

> *Plaintiff-Appellee,*

v.

ROBERT W. FERGUSON, in his official capacity as Attorney General for the State of Washington; UMAIR A. SHAH, in his official capacity as Secretary of Health for the State of Washington; KRISTIN PETERSON, in her official capacity as Assistant Secretary of the Health Systems Quality Assurance division of the Washington State Department of Health,

> *Defendants-Appellants,*

and

EQUAL RIGHTS WASHINGTON,

> *Intervenor-Defendant.*

No. 21-35856

D.C. No. 3:21-cv-05359-RJB

Filed January 23, 2023

Before:  Kim McLane Wardlaw, Ronald M. Gould, and Mark J. Bennett, Circuit Judges.

Order;
Statement by Judge O'Scannlain;
Dissent by Judge Bumatay

## SUMMARY[*]

### Civil Rights

The panel denied on behalf of the court a petition for rehearing en banc in a case in which the panel affirmed the district court's dismissal of an action challenging a Washington state licensing scheme that disciplines health care providers for practicing conversion therapy on minors.

Respecting the denial of rehearing en banc, Judge O'Scannlain, joined by Judges Ikuta, R. Nelson and VanDyke, stated that although the result in this case was reached by faithfully applying this court's precedent in *Pickup v. Brown*, 740 F.3d 1208, 1221 (9th Cir. 2014), which held that a California ban on "sexual orientation change efforts" was a regulation of professional conduct only incidentally burdening speech, the Supreme Court has rejected *Pickup* by name. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018). And other circuits have rejected *Pickup*'s holding, concluding instead that therapeutic speech is speech, entitled to some First Amendment protection. The court should have granted

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

rehearing en banc to reconsider *Pickup* and to resolve this circuit split.

Additionally, the court should have granted rehearing en banc to clarify that regulation of the medical profession is not a First-Amendment-free zone; the First Amendment's protections continue to apply even when a state legislature exercises its traditional police power.

Dissenting from the denial of rehearing en banc, Judge Bumatay wrote that because the speech underpinning conversion therapy is overwhelmingly—if not exclusively—religious, the court should have granted plaintiff Tingley's petition for en banc review to evaluate his Free Speech claim under a more exacting standard. It may well be the case that, even under heightened review, Washington's interest in protecting minors would overcome Tingley's Free Speech challenge. But the court plainly erred by subjecting the Washington law to mere rational-basis scrutiny.

## ORDER

The full court was advised of the petition for rehearing *en banc*. A judge requested a vote on whether to rehear the matter *en banc*. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of *en banc* consideration. *See* Fed. R. App. P. 35. Judges Collins and Lee did not participate in the deliberations or vote in this case.

The petition for rehearing *en banc* is **DENIED**.

---

O'SCANNLAIN, Circuit Judge,[1] joined by IKUTA, R. NELSON, and VANDYKE, Circuit Judges, respecting the denial of rehearing en banc:

Is therapeutic speech speech? Does a tradition of licensing a given profession override all First Amendment limits on licensing requirements? The three-judge panel answered 'no' to the first question, and a majority of the panel answered 'yes' to the second. In my view, both holdings are erroneous and significant constitutional misinterpretations, and I respectfully dissent from our court's regrettable failure to rehear this case en banc.[2]

---

[1] As a judge of this court in senior status, I no longer have the power to vote on calls for rehearing cases en banc or formally to join a dissent from failure to rehear en banc. See 28 U.S.C. § 46(c); Fed. R. App. P. 35(a). Following our court's general orders, however, I may participate in discussions of en banc proceedings. See Ninth Circuit General Order 5.5(a).

[2] Although the panel's treatment of religious liberty is also concerning, this statement focuses on the free speech issue.

First, the panel said that therapeutic speech is non-speech conduct and so protected only by rational basis review. *Tingley v. Ferguson*, 47 F.4th 1055, 1077 (9th Cir. 2022). True, it reached this result by faithfully applying our decision in *Pickup v. Brown*, which held that a California ban on "sexual orientation change efforts" was a regulation of professional conduct only incidentally burdening speech. 740 F.3d 1208, 1221 (9th Cir. 2014). But the Supreme Court has rejected *Pickup* by name. *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372 (2018). And other circuits have rejected *Pickup*'s holding, concluding instead that therapeutic speech is—speech, entitled to some First Amendment protection. *See King v. Governor of New Jersey*, 767 F.3d 216, 224-29 (3d Cir. 2014); *Otto v. City of Boca Raton*, 981 F.3d 854, 865-66 (11th Cir. 2020). The panel's defense of *Pickup*'s continuing viability is unconvincing. We should have granted rehearing en banc to reconsider *Pickup* and so to resolve this circuit split.

Second, a majority of the panel purported to discover a "long (if heretofore unrecognized) tradition of regulation" which warrants applying only rational basis review to laws burdening therapeutic speech. *Tingley*, 47 F.4th at 1080 (2022) (quoting *NIFLA*, 138 S. Ct. at 2372). In reality, the majority drew out a gossamer thread of historical evidence into a sweeping new category of First Amendment exceptions. If new traditions are so easily discovered, speech-burdening laws can evade *any level of scrutiny* simply by identifying some legitimate purpose which they might serve. We should have granted rehearing en banc also to clarify that regulation of the medical profession is not a First-Amendment-free zone.

## I

Brian Tingley, a licensed Washington therapist, challenged a 2018 Washington law prohibiting "conversion therapy." The case turns entirely on the language of the statute and the First Amendment to the United States Constitution.

## A

In 2018, the Washington legislature enacted S.B. 5722, which made "[p]erforming conversion therapy on a patient under age eighteen" a form of unprofessional conduct subject to discipline. S.B. 5722, 65th Leg., Reg. Sess. (Wash. 2018), *codified at* Wash. Rev. Code §§ 18.130.020(4), 18.130.180(27). "[C]onversion therapy" is defined as any "regime that seeks to change an individual's sexual orientation or gender identity." Wash. Rev. Code § 18.130.020(4)(a). The statute clearly applies to conversion therapy performed entirely through speech.

Tingley's therapeutic work consists of conversations with his patients. These conversations are informed by his belief that a person's biological sex should not be changed, and that sexual relationships ought to occur "between one man and woman committed to each other through marriage." *Tingley*, 47 F.4th at 1065. He "has worked with several minors … who have 'sought his help in reducing same-sex attractions,' and others 'who have expressed discomfort with their biological sex.'" *Id.* at 1067. He plans to continue working with minor patients along these lines despite S.B. 5722. *Id*. at 1068. He sought injunctive relief against state officials ("Washington"), alleging, inter alia, that the threat that Washington will enforce S.B. 5722 against him unconstitutionally chills his right to free speech.

### B

The district court dismissed Tingley's claims, and Tingley appealed. The panel affirmed, and in particular held that Tingley's free speech claim was foreclosed by our holding in *Pickup*. A majority of the panel affirmed on the additional grounds that S.B. 5722 belonged to a longstanding tradition of regulating medical practice.

### 1

In *Pickup*, our court held that a California conversion therapy ban similar to the Washington law at issue here was a regulation of "the conduct of state-licensed professionals," and that "any effect it may have on free speech interests is merely incidental." 740 F.3d 1208, 1230-31. The panel here applied Ninth Circuit precedent to conclude that Tingley's talk therapy was conduct, not speech, thereby effectively putting him at risk of professional discipline. *Id.* at 1073.

Although the Supreme Court in *NIFLA* criticized *Pickup* by name, the three-judge panel concluded that *Pickup*'s relevant holding remained good law because it and *NIFLA* were not "clearly irreconcilable." *Tingley*, 47 F.4th at 1074-75 (quoting *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc)). *Pickup* described a continuum of constitutional protection for speech by licensed professionals, from most-protected "public dialogue," to least-protected "professional *conduct*," with "professional speech 'within the confines of a professional relationship'" somewhere in between. The "conversion therapy" ban, according to *Pickup*, was in the least-protected category: a mere "regulation of conduct," protected only by "rational basis review." *Id.* at 1072-73 (quoting *Pickup*, 740 F.3d at 1228). Since "*NIFLA* only abrogated the theoretical 'midpoint' of *Pickup*'s continuum," the panel here reasoned

that "*Pickup*'s approach survives for regulations of professional conduct." *Id.* at 1075.

### 2

A majority of the panel identified a second reason to uphold the ban: a "long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders." *Id.* at 1080; *see id.* at 1092 (Bennett, J., concurring in part) (declining to join this "unnecessary" "dicta"). The panel majority's primary purported evidence was a handful of turn-of-the-century cases upholding regulations of medical practice, without reference to medical practitioner speech. *Id.* at 1080-81. The panel majority then held that medical regulations burdening such speech are within the tradition, and so receive no First Amendment scrutiny, but are subject only to rational basis review.

### II

Our decision in *Pickup* is, I suggest, no longer viable. While *Pickup* may have seen no distinction between "treatments … implemented through speech" and those implemented "through scalpel," *Tingley*, 47 F.4th at 1064, the First Amendment recognizes the obvious difference, and protects *therapeutic speech* in a way it does not protect *physical medical procedures*. *NIFLA* further clarifies that *Pickup*'s oxymoronic characterization of therapeutic speech as non-speech conduct was incorrect. Other circuits have noted *Pickup*'s error and declined to follow its reasoning. We should have done the same here.

A

The Supreme Court has already ruled: the First Amendment cannot be evaded by regulating speech "under the guise" of regulating conduct. *NAACP v. Button*, 371 U.S. 415, 439 (1963). "[I]ncidental speech" is permissibly burdened when regulated conduct "'was in part initiated, evidenced, or carried out by means of language,'" *Pickup*, 740 F.3d at 1229 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949))—but the key phrase is "in part." There must be some "separately identifiable" conduct to which the speech was incidental. *Cohen v. California*, 403 U.S. 15, 18 (1971). Even when a law "generally functions as a regulation of conduct," it merits First Amendment scrutiny insofar as it burdens conduct which "consists of communicating a message" and nothing more. *Holder v. Humanitarian L. Project* ("*HLP*"), 561 U.S. 1, 28 (2010). In sum, under binding Supreme Court precedents, conversion therapy consisting entirely of speech cannot be prohibited without some degree of First Amendment scrutiny.

In reaching the contrary conclusion, *Pickup* erred. Along the way, it grievously misinterpreted most of the precedents on which it most heavily relied:

- The Supreme Court in *HLP* held that the First Amendment protected expert instruction and advice by licensed professionals. 561 U.S. at 27. *Pickup* wrongly claimed that *HLP* involved only "political speech" by "ordinary citizens." 740 F.3d at 1230.

- Our court has held that medical practitioners cannot be prohibited from recommending marijuana use because doing so would "alter[] the traditional role of medical professionals by prohibiting speech necessary to the proper functioning" of the medical

profession. *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) (cleaned up). *Pickup* mistakenly distinguished *Conant* as turning on whether the law burdened speech "wholly apart from the actual provision of treatment." *Pickup*, 740 F.3d at 1229. While *Conant* considered the ban's effect on speech outside the treatment context, it did so only *after* concluding that the ban must be subject to strict scrutiny.

- Our court has said that, while psychoanalytic practice per se is not entitled to First Amendment protection, "[t]he communication that occurs during psychoanalysis is." *Nat'l Ass'n for the Advancement of Psychoanalysis v. California Bd. of Psychology* ("*NAAP*"), 228 F.3d 1043, 1054 (9th Cir. 2000). *NAAP* then applied mere rational basis review to the law at issue only because it did "not dictate what can be said between psychologists and patients during treatment." *Id*. at 1054. *Pickup* contradicted *NAAP* by applying neither intermediate nor strict scrutiny, despite the obvious fact that a conversion therapy ban *does* dictate the content of therapeutic speech.

- *Pickup* misleadingly cited Supreme Court precedent for the proposition that some speech "is not 'an act of communication'." *Pickup*, 740 F.3d at 1230 (citing *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011)). *Carrigan* was not about speech, but expressive conduct: it held that a vote does not communicate because it has a direct legal effect and no generally understood meaning beyond that effect. Speech uttered during therapy, in contrast, has no effect *other than* through what it

> communicates. *Carrigan* gives no support for the
> proposition that such speech is not speech at all.

Given the flaws in *Pickup*'s reasoning and its misreading of
relevant precedents, it is unsurprising that the Supreme
Court in *NIFLA* rejected—not only *Pickup*'s professional-
speech doctrine—but also its analysis of the line between
speech and conduct.

### B

*NIFLA* distinguished speech from conduct, but it
rejected *Pickup*'s analysis of the speech-conduct distinction.
*Pickup* asked if the speech burdened fell under the vague
heading "'*treatment* of emotional suffering and
depression,'" in which case it was "'*not* speech.'" 740 F.3d
at 1231 (quoting *NAAP*, 228 F.3d at 1054, but see discussion
of *NAAP* supra). *NIFLA* rejected recategorizing speech as
professional conduct merely because it took place in a
professional context. 138 S. Ct. at 2373. Instead, *NIFLA*
asked if the speech was incidental to some discrete instance
of non-speech conduct, such as a "medical procedure"
whose commission "'without the patient's consent'" would
constitute "'assault.'" 138 S. Ct. at 2373 (quoting
*Schloendorff v. Soc'y of N.Y. Hosp.*, 211 N.Y. 125, 129-30
(1914) (Cardozo, J.)). Under *NIFLA*, a law regulating
medical professional speech "regardless of whether a
medical procedure is ever sought, offered, or performed,"
and not incidental to some other discrete instance of
professional conduct, receives at least intermediate scrutiny,
and likely strict scrutiny. *Id.* at 2373, 2375.

Especially after *NIFLA*, it is clear that simply labeling
therapeutic speech as "treatment" cannot turn it into non-
speech conduct. *Pickup*'s efforts to effect this transformation
were unpersuasive, and the panel here fared no better. The

panel alludes to two further reasons why talk therapy might be non-speech conduct, but neither is convincing.

First, the panel notes that the Washington legislature reasonably believed conversion therapy to have negative effects on "physical and psychological wellbeing," *id.* at 1078, suggesting that therapeutic speech is not speech because it is reasonably thought to risk physical harm. But it would make no sense for the First Amendment to protect speech through heightened scrutiny while subjecting legislative determinations of the line between speech and conduct only to rational basis review. The panel cites no evidence for the implausible proposition that conversion therapy conducted entirely by means of speech risks direct physical harm. *Id*. Speech which risks psychological harm does not thereby become non-speech conduct entirely without First Amendment protections. *Snyder v. Phelps*, 562 U.S. 443, 450 (2011) (protecting speech which a jury had found "outrageous," and which experts testified "had resulted in severe depression and had exacerbated pre-existing health conditions").

Second, the panel finds that conversion therapy bans are in line with "the medical recommendations of expert organizations," *Tingley*, 47 F.4th at 1078, suggesting that therapeutic speech is not speech because it is not public discourse, but belongs to the realm of expertise. Two panel members go further, pointing out that therapists use professional reference books, follow "established practice standards," and apply "theories and techniques." *Id.* at 1082 (quoting Wash. Rev. Code §§ 18.19.010, 18.19.020). But if these features transformed speech into conduct, the First Amendment would not protect legal advice (attorneys make use of authoritative references), education (teachers follow established practice standards), or advertising (marketing

professionals apply theories and techniques). Actually, the First Amendment offers at least some protection to all of these forms of expert speech. *See HLP*, 561 U.S. 1, 27 (legal advice); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (teaching); *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 366 (2002) (advertising).

C

Other circuits analyzing the issue have uniformly rejected our *Pickup* case. Considering a closely analogous challenge to a conversion therapy ban, the Eleventh Circuit held that the 'conduct' involved in talk therapy "consists—entirely—of words," and that calling it non-speech conduct was mere "relabeling." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020). Further noting that "*NIFLA* directly criticized *Pickup*," the Eleventh Circuit concluded that there was "not … much question that, even if some type of professional speech might conceivably fall outside the First Amendment," therapeutic speech did not. *Id.* at 867.

Even before *NIFLA*, other circuits had found *Pickup*'s analysis of the speech-content distinction both incoherent and foreclosed by Supreme Court precedent. "[I]t would be strange indeed," the Third Circuit reasoned, if "the same words, spoken with the same intent, somehow become 'conduct' when the speaker is a licensed counselor" rather than a student—and in any case "the argument that verbal communications become 'conduct' when they are used to deliver professional services was rejected by *Humanitarian Law Project*." *King v. Governor of New Jersey*, 767 F.3d 216, 228 (3d Cir. 2014). While the Third Circuit did ultimately uphold a conversion therapy ban, it did so only *after* applying intermediate scrutiny, and it had "serious

doubts that anything less than intermediate scrutiny would adequately protect the First Amendment interests inherent" in professional speech. *Id*. at 236. In any event, *King*'s holding that intermediate scrutiny applies did not survive *NIFLA*, and *King* now stands *only* for the proposition that therapeutic speech is entitled to some First Amendment protection.

In addition to these emphatic rejections, many circuits *including our own* have noticed that *NIFLA* rejected *Pickup*, including its version of the speech-content distinction. *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 436 (6th Cir. 2019) (noting that *NIFLA* "did *not* adopt any of the 'different rules' applied in *Pickup*"); *Pac. Coast Horseshoeing*, 961 F.3d at 1068 (9th Cir.) (rejecting *Pickup*'s version of the speech-conduct distinction, and noting *Pickup*'s abrogation by *NIFLA*); *see also Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) (noting in passing *Pickup*'s abrogation); *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020) (same). By reaching the opposite conclusion, the panel here perpetuated a circuit split that many had thought resolved. This error should have been corrected through en banc rehearing.

### III

Unrelated to its reliance on *Pickup*, the panel majority also erred in holding that a previously unknown tradition of regulation authorizes Washington's conversion therapy ban. The majority purported to identify a new entry in the "long familiar" catalog of carve-outs such as "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citations omitted). But the majority's purported

evidence simply does not demonstrate a long tradition of regulating therapeutic speech, but only what everyone already knew, that the police power extends to regulating medical practice. That a law exercises the police power does not exempt it from First Amendment scrutiny.

## A

The majority's analysis radically underestimated both the burden of proof facing any purported discovery of a new tradition of regulation, and the narrowness with which any such tradition must be defined.

To start, the majority failed to grapple with the Supreme Court's "especial[] reluctan[ce]" to recognize new traditional exceptions. *NIFLA*, 138 S. Ct. at 2372. In the dozen years since *Stevens*, the Supreme Court has never once found the requisite "persuasive evidence" of a new tradition. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 (2011) (no traditional exception for depictions of violence); *see NIFLA*, 138 S. Ct. at 2371 (nor for professional speech); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446 (2015) (nor for campaign finance).[3] Circuit courts have been similarly reluctant, rejecting almost all purported new traditions—most often sub silentio, sometimes explicitly. *E.g.*, *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1124 (9th Cir. 2020) (no traditional exception for biographical information); *Otto v. City of Boca Raton*, 41 F.4th 1271, 1274 (11th Cir. 2022) (Grant, J., concurring in denial of rehearing en banc) (nor for medical practitioner speech); *see*

---

[3] Even when a new tradition would only reduce the level of scrutiny from strict to intermediate, the Court has required an "unbroken tradition" of regulation dating to the "late 1860s." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1469 (2022).

*also State v. Casillas*, 952 N.W.2d 629, 637 (Minn. 2020) (nor for non-consensual transmittals of sexual images). And for good reason: a new tradition requires extensive historical evidence. *E.g.*, *NetChoice LLC v. Paxton*, 49 F.4th 439, 469-480 (5th Cir. 2022) (opinion of Oldham, J.) (surveying evidence for a tradition of common carrier regulations of the communications industry).

Further, the panel majority severely underestimates the narrowness with which any new regulatory tradition must be defined. It must be—not just "not too broad," *Tingley*, 47 F.4th at 1080—but as narrow as the existing exceptions, whose narrowness the Supreme Court has repeatedly emphasized. *E.g.*, *United States v. Alvarez*, 567 U.S. 709, 718-19 (2012) (tradition does not recognize a broad exception for all false speech, but narrow exceptions for defamation, fraud, invasion of privacy, and the like); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (a law cannot merely bear the "epithet" of a traditional regulatory category, it must fall into the category as "measured by standards that satisfy the First Amendment"). Following the Supreme Court's lead, circuits have not allowed laws to evade means-end scrutiny through loose analogies to traditional categories. *E.g.*, *United States v. Anderson*, 759 F.3d 891, 894 (8th Cir. 2014) (child-pornography category limited to images of actual abuse); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 31 (D.C. Cir. 2014) (Kavanaugh, J., concurring) (required-disclosure category limited to disclosures preventing deception or ensuring health or safety).

In sum, a content-discriminatory law has two ways to survive a First Amendment challenge: it must either pass "rigorous" means-end scrutiny, or fit within a carefully "delimit[ed]" long-standing tradition. *Bennett v. Metro.*

*Gov't of Nashville & Davidson Cnty*. 977 F.3d 530, 553 (6th Cir. 2020) (Murphy, J., concurring in the judgment). Both routes require not one, but two showings: either the regulation must be *narrowly* tailored to serve a *compelling* interest, or it must belong to a *narrowly* delimited and *longstanding* tradition. The panel majority erred in concluding that S.B. 5722 could traverse the second route without clear showings of narrowness and longevity.

B

The panel majority ran afoul of the Supreme Court's requirement that regulatory traditions be defined narrowly. It defined its new tradition broadly, as including all "regulation governing the practice of those who provide health care within state borders," *Tingley*, 47 F.4th at 1080— a definition so broad as not even to be a tradition of regulating *speech*. To be sure, *certain subcategories* of speech related to medical practice may well be unprotected. The Supreme Court has acknowledged, for example, that professional malpractice torts "fall within the traditional purview of state regulation of professional conduct." *NIFLA*, 138 S. Ct. at 2373 (quoting *NAACP*, 371 U.S. at 438, and preempting the panel majority's argument that malpractice laws will be "endanger[ed]" absent a new tradition, *Tingley*, 47 F.4th at 1082). But a narrow exception for malpractice does not imply a broad exception for all speech related to medical practice, any more than the narrow exception for fraud implies a broad exception for all false speech, or for all speech inviting detrimental reliance. *See Alvarez*, 567 U.S. at 718; *cf. NIFLA*, 138 S. Ct. at 2373 (quoting *NAACP*, 371 U.S. at 439). Traditional exceptions to First Amendment scrutiny aren't defined at such a high level of generality— or, at least, shouldn't be.

Even setting aside the narrowness requirement, the panel majority's proposed tradition makes little sense on its own terms. That regulations of medical practice get rational basis review cannot on its own save a regulation of therapeutic speech from First Amendment scrutiny. After all, building regulations, too, get rational basis review. *Village of Euclid v. Ambler Realty Co*., 272 U.S. 365 (1926). *Contra Tingley*, 47 F.4th at 1083 (suggesting that medicine and architecture differ in this regard). But a state cannot evade First Amendment scrutiny for signage regulations simply by pointing out that building regulation is within the police power, *cf. Reagan Nat'l Advert.*, 142 S. Ct. at 1473 (applying intermediate scrutiny to signage regulation), let alone evade scrutiny of restrictions on the speech of licensed architects by redescribing it as "building castles in air."

The panel majority's argument produces the absurd implication that any speech-burdening regulation which can be characterized as an exercise of the police power is exempt from First Amendment scrutiny.

C

Even construing the panel majority to intend a more narrowly defined tradition of regulating medical practitioner speech within the treatment context, there simply is no evidence of any such tradition. Though the panel majority cited various Supreme Court precedents, *none* involves such a regulation:

- *Dent v. West Virginia* upheld a medical licensing requirement against a substantive due process challenge. 129 U.S. 114 (1889). But the regulation did not burden speech. Although it did "prohibit[] 'swearing falsely to any question which may be propounded'" to a license applicant, *Tingley*, 47

F.4th at 1080 (citing *Dent*, 129 U.S. at 126) (cleaned up), the panel majority gained nothing from emphasizing this fact—fraud has always been recognized as a traditional regulatory category. *See Alvarez*, 567 U.S. at 718.

- *Hawker v. New York* upheld a law barring convicted felons from medical practice based on their lack of good character. 170 U.S. 189 (1898). More recent Supreme Court decisions establish that good character requirements in professional licensing are generally permissible—*unless* they burden speech, in which case they receive constitutional scrutiny. *See Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 263 (1957).

- *Collins v. Texas* upheld application of a medical licensing law to an osteopath. 223 U.S. 288, 296 (1912). The Supreme Court found the application "intelligible" because the osteopath engaged in purportedly "scientific manipulation affecting the nerve centers," *Collins*, 223 U.S. at 296—in other words, it did not regulate his speech, but his physical contact with patients.

- *Collins* also contains what the panel majority called a "long list of cases from state courts," *Tingley*, 47 F.4th at 1080—really four Supreme Court cases appealed from state courts. Two upheld medical licensing laws, *Hawker*, 170 U.S. 189; *Meffert v. Packer*, 195 U.S. 625 (1904), while another upheld a vaccine mandate, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). The fourth case regulated speech, but not medical speech in particular; it targeted advertising not just of medical practices, but also of

"hotels, lodging houses, eating houses, [and] bath houses." *Williams v. Arkansas*, 217 U.S. 79, 89 (1910). It is well-established that medical advertising enjoys some degree of First Amendment protection. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 366 (2002).

- *Lambert v. Yellowley* upheld a Prohibition-era limitation on medical prescriptions of alcohol. 272 U.S. 581 (1926). Although prescriptions do involve words, they are also legally efficacious acts, and so can be regulated as conduct. *See Conant*, 309 F.3d at 634. And although this case does show that the practice of medicine has long been regulated despite good-faith disagreement about which regulations are desirable, *Tingley*, 47 F.4th at 1080-81, this fact is irrelevant. It shows only that medical regulations generally get rational basis review—not that medical regulations *burdening speech* receive no more scrutiny than other medical regulations.

- *Dobbs v. Jackson Women's Health Organization* included an appendix cataloging nineteenth-century abortion laws, 142 S. Ct. 2228, 2285-2300 (2022), which the panel majority describes as "apply[ing] to health care professionals and impact[ing] their speech," *Tingley*, 47 F.4th at 1082. But really, the laws in question only burdened speech "suggest[ing]," "advis[ing]," "direct[ing]," or otherwise incidental to the procuring of an abortion, itself a criminal act at the time. It has long been understood that speech which aids and abets criminal conduct is not protected speech. *See United States v. Freeman*, 761 F.2d 549, 551 (9th Cir. 1985).

A later section of the majority opinion includes additional citations, but these are even less relevant to the tradition-of-regulation analysis, being dated a century too late to support a *longstanding* constitutional tradition. *Tingley*, 47 F.4th at 1081-82 (citing a Washington statute enacted in 1984 and a 2007 law review article discussing recent caselaw). And in any event, the regulations they contain are easily cognizable under well-understood First Amendment categories such as fraud, informed consent, and aiding and abetting liability. In sum, the panel majority's scattershot citations are not merely insufficient evidence—they are not even relevant evidence. They do not so much as give reason to suspect a long-standing tradition of regulating therapeutic speech.[4]

### D

While there is no longstanding tradition of regulating therapeutic speech, there *is* a constitutional tradition relevant here—namely, that of protecting religious speech. Unfortunately, the panel did not consider it.

The Supreme Court has repeatedly emphasized that protections for religious speech are at the core of the First Amendment. *E.g.*, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[A] free-speech clause

---

[4] Judge Rosenbaum's dissental in *Otto,* which similarly argued for new tradition of regulation, cited only three pre-1970 cases not cited by the panel majority here—and they are equally unavailing. 41 F.4th at 1291-95. Two concern equal protection challenges to licensing law exemptions, *Crane v. Johnson*, 242 U.S. 339 (1917) (upholding prayer healer exemption); *Watson v. Maryland*, 218 U.S. 173 (1910) (upholding grandfather exemption), while the third involved medical advertising, *Semler v. Oregon State Bd. of Dental Examiners*, 294 U.S. 608 (1935). As already shown, neither type of law supports a broader tradition of regulating medical practitioner speech.

without religion would be Hamlet without the prince."). As the very term "conversion therapy" suggests, the speech Washington's law singles out for opprobrium is religious speech. *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (an ordinance's "use of the words 'sacrifice' and 'ritual'" indicates that it targeted religion). S.B. 5722's carve-out for "[n]on-licensed counselors acting under the auspices of a religious [group]" implicitly acknowledges the constitutional issue, 2018 Wash. Sess. Laws, ch. 300, § 2, but it cannot save the law from constitutional challenge. Many licensed therapists take seriously the origins of "psychotherapy" in the religious "cure of souls." Institute for Faith & Family Amicus Br. at 13-14 (quoting Thomas Szasz, *The Myth of Psychotherapy* 28 (1978)). Tingley is among them. "[H]is Christian views inform his work," including his practice of conversion therapy, in which he speaks to his patients about "what he believes to be true," such as that a person's biological sex is "'a gift of God' that should not be changed." *Tingley*, 47 F.4th at 1065, 1068. Tingley's religious speech does not lose its constitutional protection simply because he is subject to a licensing requirement. *Cf. Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1884 (2021) (Alito, J., concurring) (arguing that traditional religious practices merit constitutional protection even when the state has imposed licensing requirements).

Yet the panel majority here entirely ignored the First Amendment's special solicitude for religious speech. Instead, it commended Washington for concluding "that health care providers should not be able to treat a child by such means as telling him that he is 'the abomination we had heard about in Sunday school'." *Tingley*, 47 F.4th at 1083 (quoting a law review note quoting an op-ed). Far from

showing that conversion therapy bans are constitutionally innocuous, this passage in the panel majority opinion unwittingly reveals why First Amendment scrutiny is necessary.**[5]**

## IV

The Supreme Court has already spoken: a legislature cannot evade First Amendment scrutiny simply by labeling therapeutic speech as conduct, and the First Amendment's protections continue to apply even when a state legislature exercises its traditional police power. Because the panel failed to apply binding Supreme Court precedent, I respectfully dissent from the court's decision not to rehear this case en banc.

---

[5] This section of the panel majority, *Tingley*, 47 F.4th at 1083-84, contains more rhetoric than law. It cites only two binding authorities, one about coerced consent to police search of a vehicle, *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973), the other about the right to conduct one's own criminal defense, *Faretta v. California*, 422 U.S. 806, 834 (1975). It concludes: "We uphold Washington's law and reject Tingley's free speech challenge because the Washington law permissibly honors individual identity." *Tingley*, 47 F.4th at 1084. That a law burdens speech in order to "honor[] individual identity" does not, as far as I am aware, exempt it from First Amendment scrutiny.

BUMATAY, Circuit Judge, dissenting from the denial of rehearing en banc:

The issues at the heart of this case are profoundly personal. Many Americans and the State of Washington find conversion therapy—the practice of seeking to change a person's sexual orientation or gender identity—deeply troubling, offensive, and harmful. They point to studies that show such therapy ineffective. Even worse, they claim that conversion therapy correlates with high rates of severe emotional and psychological trauma, including suicidal ideation. Under the appropriate level of judicial review, these concerns should not be ignored.

But we also cannot ignore that conversion therapy is often grounded in religious faith. According to plaintiff Brian Tingley, a therapist licensed by the State of Washington, his practice of conversion therapy is an outgrowth of his religious beliefs and his understanding of Christian teachings. Tingley treats his clients from the perspective of a shared faith, which he says is conducive to establishing trust. And as part of his therapeutic treatment, Tingley counsels his clients to live their lives in alignment with their religious beliefs and teachings.

To be sure, the relationship between the LGBT community and religion may be a complicated one. But as with any community, members of the LGBT community have different experiences with faith. According to one 2013 survey, 42% of LGBT adults identify as "Christian." Forty-three percent consider religion to be important in their lives—including 20% who say it is "very important" to them. *A Survey of LGBT Americans*, Pew Research Center,

91–92, 96 (June 13, 2013).[1]  A more recent study found that 46.7% of LGBT adults, or 5.3 million LGBT Americans, are religious.  Kerith J. Conron et al., *Religiosity Among LGBT Adults in the US*, UCLA Williams Institute, 2, 5 (Oct. 2020).[2]  Thus, for many who voluntarily seek conversion therapy, faith-based counseling may offer a unique path to healing and inner peace.  Indeed, Tingley only works with clients who freely accept his faith-based approach.

Ordinarily, under traditional police powers, States have broad authority to regulate licensed professionals like Tingley.  Under that authority, the State of Washington has banned the practice of conversion therapy on minors.  *See* Wash. Rev. Code §§ 18.130.020(4), 18.130.080(27).  The prohibition applies to all forms of the treatment, including voluntary, non-aversive, and non-physical therapy.  *Id*.[3]  In other words, Washington outlaws pure talk therapy based on sincerely held religious principles. As a result, Tingley cannot discuss traditional Christian teachings on sexuality or gender identity with his minor clients, even if they seek that counseling.    While  States'  regulatory  authorities  are

---

[1] Available at: https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2013/06/SDT_LGBT-Americans_06-2013.pdf.

[2] Available at: https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Religiosity-Oct-2020.pdf.

[3] Washington notes that conversion therapy may encompass more pernicious practices, such as electric shock treatment or the use of nausea-inducing drugs.  I have little doubt that a law prohibiting coercive, physical, or aversive treatments on minors would survive a constitutional challenge under any standard of review.    But Washington's law proscribes a broad range of counseling, some of which would clearly be classified as voluntary, religious, and speech.  Under Tingley's constitutional challenge, we must focus on the law's impact on these aspects of conversion therapy.

generally broad, they must give way to our Constitution.

And here, the First Amendment protects against government abridgment of the "freedom of speech." U.S. Const. amend. I. No matter our feelings on the matter, the sweep of Washington's law limits speech motivated by the teachings of several of the world's major religions. Such laws necessarily trigger heightened levels of judicial review. After all, "religious and philosophical objections" to matters of sexuality and gender identity "are protected views and in some instances protected forms of expression." *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1727 (2018). As Judge O'Scannlain writes, religious speech gains "special solicitude" under the First Amendment. *See also Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). And those protections don't dissipate merely because Tingley is a licensed therapist. In the free exercise context, the Court has recently remarked that the First Amendment protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). That principle applies equally when faith takes the form of speech.

Because the speech underpinning conversion therapy is overwhelmingly—if not exclusively—religious, we should have granted Tingley's petition for en banc review to evaluate his Free Speech claim under a more exacting standard. It may well be the case that, even under heightened review, Washington's interest in protecting minors would overcome Tingley's Free Speech challenge. But our court plainly errs by subjecting the Washington law to mere rational-basis scrutiny. *See Tingley v. Ferguson*, 47 F.4th 1055, 1077–78 (9th Cir. 2022).

It is a "bedrock principle" of the First Amendment that the government cannot limit speech "simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). While I recognize that the speech here may be unpopular or even offensive to many Americans, it is in these cases that we must be most vigilant in adhering to constitutional principles. Those principles require a heightened review of Tingley's Free Speech claim. It may be easier to dismiss this case under a deferential review to Washington's law, but the Constitution commands otherwise.

I respectfully dissent from the denial of rehearing en banc.